**UNITED STATES of America, Plaintiff,**

v.

**Richard S. CANNISTRARO and Richard O. Bertoli, Defendants.**

**Crim. A. No. 89–218.**

United States District Court,
D. New Jersey.

July 22, 1992.

John M. Fietkiewicz, David M. Rosenfield, Asst. U.S. Attys., Newark, N.J., for U.S.

Richard O. Bertoli, pro se.

Franklin M. Sachs, Podvey, Sachs, Meanor, Catenacci, Hildner & Cocoziello, Newark, N.J., for defendant Richard O. Bertoli.

Richard S. Cannistraro, pro se.

Patricia D. Codey, Federal Public Defender's Office, Newark, N.J., Michael B. Pollack, New York City, for defendant Richard S. Cannistraro.

LECHNER, District Judge.

This is a criminal action which originated on 16 June 1989 when an indictment (the "Indictment") was returned. Defendants Richard O. Bertoli ("Bertoli"), Leo M. Eisenberg ("Eisenberg") and Richard S. Cannistraro ("Cannistraro") were named in the Indictment.[1] On 29 September 1989 a six count superseding indictment (the "Superseding Indictment")[2] was returned against Bertoli, Cannistraro and Eisenberg.[3] On 21 January 1992 the Govern-

---

1. On 16 June 1989 the Indictment was sealed by order of United States Magistrate Judge Stanley R. Chesler.

2. On 29 September 1989 the Superseding Indictment was sealed by Magistrate Judge Chesler and was unsealed on 5 October 1989.

 The charges against Bertoli and Eisenberg in the Superseding Indictment were identical to the charges against them in the Indictment. Cannistraro, however, was charged in the Indictment only with the conspiracy concerning the securities of Solar Age Manufacturing Corp. *United States v. Eisenberg,* 773 F.Supp. 662, 672 n. 7 (D.N.J.1991).

3. The nature of the counts in the Superseding Indictment and the facts underlying it are set forth in the various opinions preceding this one. *See, e.g., Eisenberg,* 773 F.Supp. at 672–80.

 The Superseding Indictment was filed as part of a second prosecution of Cannistraro. As to the first prosecution, on 28 May 1987, a federal grand jury sitting in Newark, New Jersey returned a nine-count indictment against Cannistraro, indictment number 87–193 (the "1987 Cannistraro Indictment"). The 1987 Cannistraro Indictment charged Cannistraro with conspiracy to violate the securities laws, securities fraud, mail fraud, interstate transportation of stolen property and obstruction of justice. An earlier decision concerning the proceedings relative to the 1987 Cannistraro Indictment described that indictment as follows:

 > Specifically, the [1987 Cannistraro Indictment] alleged that between 1982 and 1983 Cannistraro entered into an arrangement with portfolio managers of mutual and bank funds whereby they agreed to assist him in manipulating the price of the securities of Liquidation Control, Inc. ... and Toxic Waste Containment, Inc..... According to the [1987 Cannistraro Indictment], the portfolio managers agreed to buy large blocks of these stocks for their funds' accounts, in return for which Cannistraro agreed to establish "nominee" brokerage accounts for the fund managers to conceal their fundamental interest in the transactions. The [1987 Cannistraro Indictment] further alleged Cannistraro, who at the time was a securities analyst at Wood Gundy, Inc. ..., drafted a false and misleading Wood Gundy research investment report concerning [Toxic Waste Containment, Inc.] and distributed this report through the United States mails. Finally, the [1987 Cannistraro Indictment] alleged Cannistraro had provided mon-

ment returned an eight count second superseding indictment (the "Second Superseding Indictment") against Bertoli and Cannistraro (collectively, the "Defendants"). Count One of the Second Superseding Indictment charges the Defendants with racketeering activities involving Monarch Funding Corporation ("Monarch") in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* Count Two charges the Defendants with conspiracy to commit racketeering in violation of RICO. Count Three charges the Defendants with conspiracy to obstruct justice in violation of 18 U.S.C. § 371. Counts Four through Seven charge Bertoli with obstruction of justice in violation of 18 U.S.C. § 1503. Count Eight charges the Defendants with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371.[4] Eisenberg is not a defendant in the Second Superseding Indictment although he is listed as a co-conspirator.[5]

Currently before the court are the pretrial motions of the Defendants [6] (1) to dismiss the Second Superseding Indictment for prosecutorial misconduct, or in the alternative, for discovery of grand jury materials (the "Misconduct Motion"), (2) to dis-

---

ey to a grand jury witness in an effort to have this witness lie under oath to the grand jury about the witness' stock nominee relationship with Cannistraro.
*United States v. Cannistraro,* 694 F.Supp. 62, 65 (D.N.J.1988), *aff'd in part and vacated in part,* 871 F.2d 1210 (3d Cir.1989); *see also United States v. Cannistraro,* 734 F.Supp. 1110 (D.N.J.), *aff'd without opinion,* 919 F.2d 137 (3d Cir. 1990), *cert. denied,* — U.S. —, 111 S.Ct. 2011, 114 L.Ed.2d 98 (1991).
On 21 September 1987, shortly before trial, Cannistraro pleaded guilty to all nine counts of the 1987 Cannistraro Indictment. He did so without the benefit of a plea agreement with the Government. *Cannistraro,* 694 F.Supp. at 65. On 2 November 1987 Cannistraro was sentenced to a term of imprisonment totalling eight years, followed by five years of probation, fines totalling $330,000, restitution in the amount of $394,847 and a special assessment of $50. *Id.* at 67. Cannistraro challenged his sentence on Eighth Amendment grounds and moved to reduce or correct the sentence under Rule 35 of the Federal Rules of Criminal Procedure (the "Rule 35 Motion"). Cannistraro's challenge to his sentence was denied. *Id.* at 62. Cannistraro appealed the denial of his challenge to the sentence. On 9 April 1989 the Third Circuit affirmed the denial of the challenge on Eighth Amendment grounds, but remanded the action for clarification of the statistics used in the sentencing relative to the Rule 35 Motion, if such statistics were relied upon in determining the sentence. *United States v. Cannistraro,* 871 F.2d 1210 (3d Cir.1989). On remand, it was determined at a 5 May 1989 hearing that the statistics in question were not relied upon in sentencing Cannistraro. *Cannistraro,* 734 F.Supp. at 1117.
Cannistraro was not re-sentenced at that time, however, because he had moved pursuant to Rule 32(d) of the Federal Rules of Criminal Procedure to withdraw his guilty plea. This motion was denied in an opinion and order, filed 12 April 1990, and he was re-sentenced on 23 April 1990 to the same punishment. *See id.* at 1110. The denial of Cannistraro's motion to withdraw his guilty plea was affirmed by the Third Circuit. *See United States v. Cannistraro,* 919 F.2d 137 (3d Cir.1990). The Supreme Court denied certification of Cannistraro's appeal from the Third Circuit's affirmance. *See Cannistraro v. United States,* — U.S. —, 111 S.Ct. 2011, 114 L.Ed.2d 98 (1991).
After the Superseding Indictment was filed, Cannistraro moved for dismissal of the Superseding Indictment against him for violation of the Double Jeopardy Clause of the United States Constitution. This motion was denied in an unpublished opinion and order, filed 15 August 1990. *See United States v. Eisenberg,* Cr. No. 89–218 (D.N.J. 15 August 1990). The Third Circuit affirmed this decision by judgment order, filed 9 November 1990. The Supreme Court denied certification on 29 April 1991. *See Cannistraro v. United States,* — U.S. —, 111 S.Ct. 1682, 114 L.Ed.2d 77 (1991).

4. Previously, Bertoli moved to dismiss Counts One, Two and Three of the Superseding Indictment which are substantially the same as Counts One, Two and Three of the Second Superseding Indictment. Bertoli also made several pretrial omnibus discovery motions, all of which were discussed in *Eisenberg,* 773 F.Supp. at 662.

5. Eisenberg entered a plea to count one of the Superseding Indictment on 23 January 1992.

6. These motions include the latest of twenty-two motions and three letter requests filed by Bertoli and ten motions and four letter requests filed by Cannistraro in this matter. The Government has filed seven motions and five applications in this matter. To ensure recently re-appointed standby counsel for Cannistraro is apprised of the prior proceedings in this matter, a summary of such proceedings is set forth in an appendix to this opinion. To date, including this opinion, seven hundred and seventy-nine pages of opinions and orders have resulted from these motions, applications and letter requests. See Appendix to this opinion.

miss the Second Superseding Indictment for pre-indictment delay, for selective prosecution and for vindictive prosecution (the "Pre–Indictment Delay Motion"), (3) to preclude the introduction of the Cayman Islands Depositions (the "Cayman Islands Motion") at trial, (4) to dismiss Counts One and Two of the Second Superseding Indictment on the ground that the RICO Counts are barred by the statute of limitations (the "Statute of Limitations Motion"), (5) to dismiss Counts One, Two and Eight of the Second Superseding Indictment for failure to state an action for securities fraud (the "Securities Fraud Motion"), (6) to dismiss Count Seven (the "Obstruction of Justice Motion"), (7) to compel discovery pursuant to Fed.R.Crim.P. 16 (the "Motion to Compel Discovery") and (8) for the court to consider the pretrial motions filed in connection with the Superseding Indictment as filed following the Second Superseding Indictment (the "Motion re First Pretrial Motions") (collectively, the "Second Pretrial Motions").[7]

For the reasons set forth below: the Misconduct Motion is denied; the Pre–Indictment Delay Motion is denied; the Statute of Limitations Motion is denied; the Securities Fraud Motion is denied and the Obstruction of Justice Motion is denied. The Motion to Compel Discovery is denied; however, Bertoli is given leave to continue to inspect documents in possession of the Government. The Cayman Islands Motion is also denied; however, Bertoli is given leave to cross-examine witnesses with respect to the Second Superseding Indictment and to recross individuals not previously recrossed and Cannistraro is given leave to cross-examine individuals deposed in the Cayman Islands.

*Facts*

As to Count One, the Second Superseding Indictment states Monarch, the enterprise, was a securities brokerage firm in New York City, New York which was engaged in the business of underwriting, purchasing and selling securities primarily traded in the over-the-counter markets. Second Superseding Indictment, Count One ("Count One"), ¶ 2. Count One states Bertoli was the former president of a brokerage firm, not named in the Second Superseding Indictment, and controlled and had a beneficial interest in several nominee brokerage accounts[8] maintained at Mon-

---

**7.** In support of the Second Pretrial Motions, the Defendants have submitted the following: Brief in Support of Defendant Bertoli's Motion to Dismiss Indictment for Prosecutorial Misconduct, or in the Alternative, for Discovery of Grand Jury Materials (the "Misconduct Motion Moving Brief"); Memorandum of Law in Support of Richard O. Bertoli's Motion to Dismiss (the "Pre–Indictment Delay Moving Brief"); Affidavit of Richard O. Bertoli in Support of Motion to Dismiss for Pre–Indictment Delay and for Vindictive and Selective Prosecution (the "Bertoli Aff."); Memorandum of Law in Support of Defendants' Motion to Preclude Cayman Islands Depositions (the "Cayman Islands Moving Brief"), including as Exhibit A, the Government's letter to court, dated 23 January 1992 (the "23 January 1992 Letter"); Brief in Support of Motion to Dismiss Indictment on the Grounds that the RICO Offenses and Conspiracy are Barred by the Statute of Limitations (the "Statute of Limitations Moving Brief"); Memorandum in Support of Motion to Dismiss Counts One, Two and Eight (the "Securities Fraud Moving Brief"); Brief in Support of Motion to Dismiss Obstruction of Justice Counts of the Indictment (the "Obstruction of Justice Moving Brief"); Notice of Motion for Discovery (the "Discovery Notice of Motion"); Affidavit of Bertoli in Support of Discovery Motion (the "Dis-

covery Affidavit"); Notice of Motion for the Court to Consider Motions Filed in Connection with the First Superseding Indictment to be Filed in Connection With the Second Superseding Indictment (the "Motion re First Pretrial Motions"); Reply Memorandum of Law in Support of Defendants' Second Set of Pre–Trial Motions (the "Defendants' Reply Brief") and Exhibits to Reply Brief of the Defendants in Support of the Defendants' Second Set of Pretrial Motions (the "Defendants' Reply Exhibits"). Cannistraro has also submitted a letter, dated 27 May 1992, in reply to the Second Pretrial Motions.

The Government has submitted the following in opposition to the Second Pretrial Motions: Brief of the United States in Opposition to the Defendants' Second Set of Pretrial Motions (the "Opposition Brief"); Exhibits to Brief of the United States in Opposition to the Defendants' Second Set of Pretrial Motions (the "Unsealed Government Exhibits") and the Sealed Exhibit in opposition to the Defendants' Second Set of Pretrial Motions (the "Sealed Exhibit").

Oral argument was held on 19 June 1992 (the "19 June 1992 Oral Arg. Tr.").

**8.** A nominee brokerage account names a person or entity as the owner of the securities broker-

arch. *Id.*, ¶ 3. These nominee brokerage accounts included accounts in the names of family members and various Cayman Islands individuals and entities. *Id.*

Count One states Cannistraro was a securities research analyst with Wood Gundy, Inc. ("Wood Gundy"), a brokerage firm located in New York City, New York. *Id.*, ¶ 4. It states Cannistraro controlled and had a beneficial interest in nominee brokerage accounts maintained at Monarch. *Id.* These nominee brokerage accounts included accounts in the names of relatives and Cayman Islands individuals and entities. *Id.* Count One states that Eisenberg was the owner and president of Monarch. *Id.*, ¶ 5. It states Eisenberg controlled and had a beneficial interest in nominee brokerage accounts maintained at Monarch, which included accounts in the names of various Cayman Islands individuals and entities. *Id.* Count One describes the pattern of racketeering engaged in by the Defendants and others, including Eisenberg, as consisting of predicate acts of mail fraud, wire fraud, interstate transportation of money taken by fraud, securities fraud and obstruction of justice. *Id.*, ¶ 9.

Count One charges that from about January 1982 to the present, in the District of New Jersey and elsewhere, the Defendants and Eisenberg participated in the affairs of Monarch through a pattern of racketeering activity, the object of which was to "use Monarch as a vehicle to engage in fraudulent securities trading practices and thereby obtain money and other things of value for the [D]efendants...." *Id.*, ¶¶ 7–8. It identifies the victims of the racketeering activity as the purchasers and sellers of securities recommended and traded by the Defendants and Eisenberg. *Id.*, ¶ 8. It alleges the means and methods of conducting the conspiracy included "attempts to conceal and cover-up their fraudulent activities." *Id.*, ¶ 9.

Count One charges the Defendants with engaging in racketeering activity through the execution of seven separate fraudulent trading or concealment schemes involving the following securities: Astrosystems, Inc. ("Astrosystems"); Nature's Bounty, Inc. ("Nature's Bounty"); Liquidation Control, Inc. ("LCI"); Toxic Waste Containment, Inc. ("Toxic Waste") and High Technology Capital Corp. ("High Tech"). *Id.*, ¶ 9.

As to the scheme involving Astrosystems [9] (the "Astrosystems Scheme"), Count One states that between approximately October 1982 and August 1983, in the District of New Jersey and elsewhere, the Defendants and Eisenberg established nominee brokerage accounts at Monarch and elsewhere to purchase Astrosystems securities from the investing public with the knowledge that favorable research reports were to be prepared by Cannistraro and disseminated by Wood Gundy to the investing public. *Id.*, ¶ 12. Count One charges the Defendants and Eisenberg made such purchases with the expectation that the research reports would cause an increase in the price of Astrosystems securities. *Id.*

Count One identifies four such reports transmitted between November 1982 and December 1982 recommending the purchase of Astrosystems securities. *Id.*, ¶ 13. It charges that the reports were false and misleading because they did not disclose that the Defendants and Eisenberg "had purchased Astrosystems securities based upon advance knowledge of the reports, and intended to profit on the sale of these securities once the dissemination of the reports had caused the price of Astrosystems securities to rise." *Id.*, ¶ 14.

Count One also states that as part of the Astrosystems Scheme, an article recommending the purchase of Astrosystems securities was prepared by Cannistraro and disseminated to the investing public in an industry newsletter, "Portfolio Letter," dated 14 March 1983 (the "14 March 1983 Portfolio Letter"). *Id.*, ¶ 15. It states this article did not disclose the fraudulent trading scheme. *Id.* Count One further states

---

age account when in fact another person or entity has full or partial beneficial ownership or control of the account. Count One, ¶ 1(c).

**9.** Astrosystems is a corporation that designed and manufactured electric products. Count One, ¶ 6(a).

the Defendants and Eisenberg subsequently sold their Astrosystems securities without disclosing the fraudulent trading scheme and obtained profits totalling at least $147,000 from such sale. *Id.*, ¶ 16.

Count One identifies, by date and content, eight instances of mail fraud in violation of 18 U.S.C. §§ 1341–2, two instances of wire fraud in violation of 18 U.S.C. § 1343 and one instance of securities fraud in violation of section 10(b) ("Section 10(b)") of the Securities Exchange Act of 1934 and rule 10b–5 ("Rule 10b–5") 17 C.F.R. § 240.10b–5 15 U.S.C. § 78j, all perpetrated by the Defendants and Eisenberg in executing the Astrosystems Scheme. *Id.*, ¶¶ 17–19.

With respect to the second scheme (the "Nature's Bounty Scheme"), Count One states that from approximately December 1982 to March 1983 the Defendants and others, including Eisenberg, engaged in a scheme involving the securities of Nature's Bounty.[10] *Id.*, ¶¶ 20–21. It states that in or about January 1983, the Defendants and Eisenberg used nominee and other brokerage accounts at Monarch and elsewhere, including a brokerage firm trading account[11] at Monarch (the "Monarch Trading Account"), Euro Bank Corp.'s ("Euro Bank") account[12] at Monarch and a trust account in the name of Berco (the "Berco Trust")[13] at Swiss Bank & Trust Corporation Limited, Grand Cayman Island ("Swiss Bank"), "to purchase Nature's Bounty securities from the investing public, with the knowledge that favorable research reports were to be prepared by [Cannistraro] and disseminated by Wood Gundy to the investing public, and with the expectation that the reports would cause the price of Nature's Bounty securities to rise." *Id.*, ¶ 21.

Count One identifies two reports transmitted in January 1983. *Id.*, ¶ 22. It states they were false and misleading in that they "failed to disclose, among other things, that the [D]efendants ... and others, including ... Eisenberg, had purchased Nature's Bounty securities based upon advance knowledge of the reports, and intended to profit on the sale of these securities once the dissemination, or anticipated dissemination of the reports, had caused the price of Nature's Bounty securities to rise." *Id.*, ¶ 23.

Count One alleges the Defendants and Eisenberg "sold their Nature's Bounty securities to the investing public without disclosing the fraudulent trading scheme, and thereby fraudulently obtained profits totalling at least $400,000." *Id.*, ¶ 24. It identifies, by date and content, six instances of mail fraud, four instances of wire fraud and one instance of securities fraud in violation of Section 10(b) and Rule 10b–5, all perpetrated by the Defendants and others, including Eisenberg, in executing the Nature's Bounty Scheme. *Id.*, ¶¶ 25–27.

As to the third scheme (the "LCI Scheme"), Count One states that between approximately October 1982 and November 1983, the Defendants and others, including Eisenberg, devised a scheme to defraud and obtain money "by means of false and fraudulent pretenses, representations, and promises" with respect to LCI[14] Securities. *Id.*, ¶ 28. Count One describes the LCI Scheme as one in which the Defendants and Eisenberg rigged and manipulated the market in order to raise and control the price of LCI securities and create a greater demand for the same. *Id.*, ¶¶ 29–30.

Count One states Bertoli caused Monarch to underwrite the initial public offering (the

---

10. Nature's Bounty is a corporation that produced and distributed natural vitamins and health food supplements. Count One, ¶ 6(b).

11. A brokerage firm trading account is a brokerage account in which securities are traded on behalf of the brokerage firm. Count One, ¶ 6(d).

12. Euro Bank is a bank on Grand Cayman Island. Count One, ¶ 6(1).

13. The Second Superseding Indictment alleges Berco Trust was established in or about 1981 by Bertoli for the benefit of himself, his wife and his children. Count One, ¶ 6(m).

14. LCI was a corporation that "purportedly engaged in the business of consulting and advising financially distressed companies." Count One, ¶ 6(c).

"IPO")[15] of LCI securities. *Id.*, ¶ 31. It states Bertoli arranged for the LCI IPO to be sold in units; a unit consisted of one share of common stock and two warrants. *Id.*, ¶ 32. It states that the Defendants and others, including Eisenberg, caused "virtually all of the securities in the LCI IPO to be sold to individuals and entities who were controlled by them, or who were under the control of individuals who had understandings with them concerning the manner in which these securities would be traded." *Id.*, ¶ 33. It states that as a result, the Defendants and Eisenberg controlled the LCI securities traded in the market and enhanced their ability to fraudulently manipulate the price of the LCI securities. *Id.*

Count One states that during the LCI IPO and the first few days of aftermarket trading, the Defendants and Eisenberg purchased substantial amounts of LCI securities at minimal cost through nominee brokerage accounts, such as the Euro Bank account at Monarch. *Id.*, ¶ 34. It states one way the Defendants and Eisenberg controlled pricing was that prior to the close of the LCI IPO, they made arrangements with brokers and traders for the LCI securities to be traded according to the directions of Defendants and Eisenberg. It states these individuals bought and sold LCI securities at times and prices determined by the Defendants and Eisenberg, rather than by the market forces. *Id.*

Count One states Defendants and Eisenberg bribed portfolio managers and research analysts of the M & I Growth Fund[16] (the "M & I Fund") and Aggressive Growth Shares, Inc. (the "Bullock Fund").[17] It states the Defendants and Eisenberg opened nominee brokerage accounts at Monarch for the benefit of the M & I Fund and Bullock Fund managers and research analysts. These accounts were used to generate large sums of money through fraudulent trading of LCI securities. *Id.* The managers in turn bought large blocks of LCI securities for their respective funds. *Id.*, ¶ 36. The research analysts caused Halswell Corp.[18] ("Halswell") to open an account at Monarch. *Id.*

Count One states Cannistraro wrote a research report to be circulated prior to the close of the LCI IPO recommending the purchase of the LCI securities (the "LCI Report"). *Id.*, ¶ 37. It states the Defendants caused a broker from G.K. Scott & Co. ("G.K. Scott") to claim authorship of and publish the LCI Report on G.K. Scott letterhead because Cannistraro was an officer and director and the largest shareholder of LCI. *Id.* It states as part of the LCI Scheme the Defendants and Eisenberg caused the LCI Report to be disseminated without disclosing that Cannistraro had actually authored it, that the Defendants and Eisenberg were engaged in a scheme to manipulate the market and that the LCI Report was part of the scheme. *Id.*, ¶ 38.

Count One states that during the first five days of aftermarket trading the Defendants and Eisenberg caused the LCI securities to rise from the IPO unit price of twenty-five cents to $1.25 and that by the end of February 1983, they caused the price to rise to $1.625 per share. *Id.*, ¶ 39. It states the Defendants and Eisenberg sold their LCI securities "without disclosing this fraudulent trading scheme" and "fraudulently obtained profits totalling at least $462,000." *Id.*, ¶ 40. Count One identifies, by date and content, six instances of mail fraud, five instances of wire fraud and one instance of securities fraud in violation of Section 10(b) and Rule 10b–5, all perpe-

---

**15.** An IPO is a procedure whereby a nonpublic company registers its securities which the Securities and Exchange Commission ("SEC") for sale to the general public as a means to raise capital through the sale of its securities; the company then becomes a public company. Count One, ¶ 1(e). The purchasers of the securities are known as subscribers to the IPO. *Id.*

**16.** The M & I Fund was a trust fund consisting of a portfolio of securities. It was managed by the Marshall & Ilsley Bank. Count One, ¶ 6(i).

**17.** The Bullock Fund was an investment company and mutual fund consisting of a portfolio of securities. It was managed by Calvin Bullock, Ltd., an investment advisor. Count One, ¶ 6(j).

**18.** Halswell was a corporation that purchased and sold various over-the-count securities. Count One, ¶ 6(k).

trated by the Defendants and others, including Eisenberg, in executing the LCI Scheme. *Id.,* ¶¶ 41–43.

As to the fourth scheme (the "Toxic Waste Scheme"), Count One states that between approximately December 1982 and October 1983, the Defendants and others, including Eisenberg, engaged in a scheme concerning Toxic Waste [19] securities. *Id.,* ¶ 44–45. Count One describes the Toxic Waste Scheme as one in which the Defendants and Eisenberg rigged and manipulated the market in order to raise and control the price of Toxic Waste securities and create a greater demand for the same in order to ensure they could sell their Toxic Waste securities at a substantial profit. *Id.,* ¶¶ 45–46.

Count One states Bertoli caused Monarch to underwrite the IPO of Toxic Waste securities. *Id.,* ¶ 47. It states Bertoli caused the securities in the Toxic Waste IPO to be sold in units; a unit consisted of one share of common stock and two warrants. *Id.,* ¶ 48. It states the Defendants and others, including Eisenberg, caused "the securities in the Toxic Waste IPO to be sold to individuals and entities who were controlled by them, or who were under the control of individuals who had understandings with them concerning the manner in which these securities would be traded." *Id.,* ¶ 49. It states as a result the Defendants and Eisenberg controlled the LCI securities being traded in the market and enhanced their ability to fraudulently manipulate the price of the Toxic Waste securities. *Id.*

Count One states that during the Toxic Waste IPO and first days of aftermarket trading, the Defendants and Eisenberg purchased substantial amounts of Toxic Waste securities at minimal costs through nominee brokerage accounts in the names of Parsico Ltd. ("Parsico") [20] and Venture Partners "A" ("Venture Partners") [21] main-

tained at Monarch. *Id.,* ¶ 50. It states one way the Defendants and Eisenberg controlled pricing was that prior to the close of the Toxic Waste IPO, they made arrangements with various brokers and traders to trade the Toxic Waste securities according to the directions of Defendants and Eisenberg. It stated these individuals bought and sold Toxic Waste securities at times and prices determined by the Defendants and Eisenberg, rather than by the market forces. *Id.,* ¶ 51. It states Defendants and Eisenberg opened nominee brokerage accounts at Monarch for the benefit of the M & I Fund and Bullock Fund managers and research analysts. *Id.,* ¶ 52. It states the Defendants and Eisenberg bribed the M & I Fund and Bullock Fund managers to buy large blocks of Toxic Waste securities for their respective funds. The M & I Fund and Bullock Fund research analysts caused the Halswell brokerage account at Monarch to purchase large blocks of Toxic Waste securities. *Id.*

Count One states as part of the fraudulent scheme to inflate the price of Toxic Waste securities, Cannistraro wrote four research reports (the "Toxic Waste Reports") to be circulated prior to the close of the Toxic Waste IPO. These reports recommended the purchase of the Toxic Waste securities. *Id.,* ¶ 53. It states Cannistraro caused Wood Gundy to disseminate the Toxic Waste Reports to the investing public. *Id.* It states the Defendants and Eisenberg caused the Toxic Waste Reports to be disseminated without disclosing that the Defendants and Eisenberg were engaged in a scheme to manipulate the market and that the reports were part of the scheme. *Id.,* ¶ 54. Count One states that as part of the Toxic Waste Scheme, on or about March or April 1983, Bertoli and Eisenberg caused Monarch to disseminate to brokers, research analysts, securities newsletters and Monarch customers eighteen thousand

---

**19.** Toxic Waste was a corporation that "purportedly engaged in the business of marketing hazardous waste containment products." Count One, ¶ 6(d).

**20.** The Second Superseding Indictment states Parsico was located at Euro Bank. Count One, ¶ 6(1).

**21.** The Second Superseding Indictment states Venture Partners was located at Euro Bank. Count One, ¶ 6(1).

copies of one of the Toxic Waste Reports recommending the purchase of Toxic Waste securities. *Id.*, ¶ 55. It states that on or around March or April 1983, Cannistraro caused to be prepared and disseminated to the investing public articles in the 14 March 1983 Portfolio Letter and the securities investment newsletter "Ground Floor," dated 22 April 1983 (the "22 April 1983 Ground Floor"). *Id.*, ¶ 56. It states these articles discussed the Toxic Waste Reports and continued to recommend the purchase of Toxic Waste securities without disclosing the Toxic Waste Scheme. *Id.*

It states that during the first three days of aftermarket trading the Defendants and Eisenberg caused the Toxic Waste securities to rise from the IPO unit price of twenty-five cents to $1.25 per share of common stock and that between 10 March 1983 and mid–June 1983, they caused the price to rise to $4.50 per share. *Id.*, ¶ 57. Count One states the Defendants and Eisenberg sold their Toxic Waste securities "without disclosing this fraudulent trading scheme" and "fraudulently obtained profits totalling at least $4,240,000." *Id.*, ¶ 58. It identifies, by date and content, eleven instances of mail fraud, two instances of wire fraud, one instance of interstate transportation of money taken by fraud in violation of 18 U.S.C. § 2314 and one instance of securities fraud in violation of Section 10(b) and Rule 10b–5, all perpetrated by the Defendants and others, including Eisenberg, in executing the Toxic Waste Scheme. *Id.*, ¶¶ 59–62.

As to the fifth scheme (the "Beneficial Owners Concealment Scheme"), Count One states that from approximately March 1983 to November 1984, in the District of New Jersey and elsewhere, the Defendants executed a scheme to conceal the identities of the promoter and beneficial owners of High Tech.[22] *Id.*, ¶ 63. It states that in about March 1983, Bertoli became the promoter of High Tech, whereby he founded High Tech, appointed its officers, board of directors and advisory board, allocated the distribution of its securities and arranged

for the IPO of its securities, which were underwritten by Monarch. *Id.*, ¶ 64.

Count One further states that in March 1983, prior to the IPO of the High Tech securities, the Defendants and Eisenberg caused 3.1 million shares of High Tech restricted common stock to be placed in the names of nominees while the shares were beneficially owned by the Defendants and Eisenberg. *Id.*, ¶ 65. It states the Defendants and Eisenberg did not disclose in High Tech's registration statements and prospectus the role of Bertoli as High Tech's promoter and the Defendants' and Eisenberg's beneficial ownership of more than ten percent of High Tech's common stock and more than ten percent of High Tech's outstanding stock. *Id.*, ¶ 66.

Count One states that having concealed such information, the Defendants raised $425,000 in capital for High Tech from the investing public and were able to direct the management and policies of High Tech to their benefit. *Id.*, ¶ 67. In addition, it states that from approximately February 1984 to July 1984, the Defendants caused 3.1 million shares of High Tech common stock beneficially owned by them to be sold for a profit of at least $115,000. *Id.*, ¶ 68. It identifies, by date and content, five instances of mail fraud, three instances of wire fraud and two instances of securities fraud in violation of 15 U.S.C. §§ 77g, 77x, 77aa(4), 77aa(6) and 77j(a)(1), all perpetrated by the Defendants and others, including Eisenberg, in executing the Beneficial Owners Concealment Scheme. *Id.*, ¶¶ 69–72.

As to the sixth scheme (the "High Tech Scheme"), Count One states the Defendants and others, including Eisenberg, engaged in a scheme concerning High Tech securities from about March 1983 to about February 1984, in the District of New Jersey and elsewhere. *Id.*, ¶ 73. Count One describes the High Tech Scheme as one in which the Defendants and Eisenberg rigged and manipulated the market in or-

---

**22.** High Tech was a corporation that "purportedly engaged in venture capital business." Count One, ¶ 6(e).

der to raise and control the price of High Tech securities and create a greater demand for the same in order to ensure they could sell their High Tech securities at a substantial profit. *Id.*, ¶¶ 74–75.

Count One states Bertoli caused Monarch to underwrite the IPO of High Tech securities. *Id.*, ¶ 76. It states Bertoli caused the securities in the High Tech IPO to be sold in units, consisting of one share of common stock and two warrants. *Id.*, ¶ 77. It states that the Defendants and others, including Eisenberg, caused "the securities in the High Tech IPO to be sold to individuals and entities who were controlled by them, or who were under the control of individuals who had understandings with them concerning the manner in which these securities would be traded." *Id.*, ¶ 78. It states as a result the Defendants and Eisenberg controlled the LCI securities being traded in the market and enhanced their ability to fraudulently manipulate the price of the High Tech securities. *Id.*

Count One states that during the High Tech IPO and first few days of aftermarket trading, the Defendants and Eisenberg purchased substantial amounts of High Tech securities at minimal costs through nominee brokerage accounts maintained at Monarch in the names of Parsico, Venture Partners, VPI Ltd. ("VPI")[23] and Roger Rowland.[24] *Id.*, ¶ 79. It states one way the Defendants and Eisenberg controlled pricing was that prior to the close of the High Tech IPO, they made arrangements for High Tech securities to be traded by traders and brokers according to the directions of the Defendants and Eisenberg. It states this trading procedure allowed High Tech securities to be bought and sold at times and prices determined by the Defendants and Eisenberg, rather than by the market forces. *Id.*, ¶ 80. It states that as part of the High Tech Scheme the Defendants and Eisenberg bribed a fund manag-

er and a research analyst in an attempt to cause the buying of large blocks of High Tech securities. *Id.*, ¶ 81.

Count One states the Defendants and Eisenberg allocated securities in the High Tech IPO to the research analyst's nominee brokerage account at Monarch. *Id.* In exchange for such allocation, and in exchange for money which the Defendants and Eisenberg provided to the research analyst through the trading of LCI and Toxic Waste securities in his nominee accounts at Monarch, the research analyst caused the Halswell brokerage account at Monarch to purchase a large block of High Tech securities. *Id.* In addition, Count One states the Defendants and Eisenberg allocated securities in the High Tech IPO to the M & I Fund manager's nominee brokerage account at Monarch in exchange for which the M & I Fund manager agreed to cause the M & I Fund to purchase a large block of High Tech securities. *Id.*

Count One states as part of the fraudulent scheme to inflate the price of High Tech securities, Cannistraro recommended the purchase of High Tech securities to various brokers at Wood Gundy without disclosing that the Defendants and Eisenberg were engaged in a scheme to manipulate the market and that the recommendation was part of the scheme. *Id.*, ¶ 82.

In addition, Count One states that in or about June 1983 the Defendants agreed with the president and vice president of Solar Age Manufacturing Corp. ("Solar Age")[25] that in exchange for the transfer of 200,000 shares of Solar Age restricted common stock to High Tech, Cannistraro would prepare favorable research reports recommending the purchase of Solar Age securities (the "Solar Age Reports"). *Id.*, ¶ 83, 84. It states such reports were disseminated by Wood Gundy to the investing public. *Id.* It further states Bertoli and High Tech arranged for additional financ-

---

**23.** The Second Superseding Indictment states VPI Ltd. was located at Euro Bank. Count One, ¶ 6(1).

**24.** The Second Superseding Indictment states Roger Rowland was located at Euro Bank. Count One, ¶ 6(1).

**25.** Solar Age was a corporation in the solar energy business. Count One, ¶ 6(f).

ing for Solar Age by a secondary public offering of the securities. *Id.* It states the Solar Age Reports were false and misleading in that they failed to disclose the reports were prepared in exchange for the transfer of 200,000 shares of Solar Age stock to High Tech and that they were prepared in order to increase the value of High Tech's portfolio of securities. *Id.*, ¶ 85.

Count One states that as a result of the dissemination of such reports, the price of Solar Age securities was artificially inflated and the transfer of Solar Age securities to High Tech thereby artificially increased the value of High Tech's portfolio. *Id.*, ¶ 86. It states the fraudulently inflated value of High Tech securities was then publicized to the investing public in various newsletters and letters from High Tech. *Id.* It states the Defendants and Eisenberg caused the price of High Tech securities to rise in the first six days of aftermarket trading from the IPO price of fifty cents to $2.25 per share of common stock; between 15 June and mid-October 1983 the price increased to $3.25 per common share. *Id.*, ¶ 87.

Count One states that from about June 1983 to about February 1984, the Defendants sold their High Tech securities to the investing public without disclosing the fraudulent trading scheme for a profit of at least $1,720,000. *Id.*, ¶ 88. It identifies, by date and content, eleven instances of mail fraud, three instances of wire fraud and one instance of securities fraud in violation of Section 10(b) and Rule 10b–5, all perpetrated by the Defendants and others, including Eisenberg, in executing the High Tech Scheme. *Id.*, ¶¶ 89–91.

As to the seventh and last scheme (the "Cover–Up Scheme"), Count One asserts the Defendants obstructed justice to conceal their wrongdoing. Count One states a subpoena of a grand jury empaneled in the District of New Jersey[26] was served on one of Cannistraro's nominees on or about 24 January 1986, requiring the nominee to produce documents and to testify before the grand jury. *Id.*, ¶ 93. It states Cannistraro instructed and directed this nominee, in return for cash payments, to conceal Cannistraro's beneficial ownership in the nominee's Monarch account. *Id.*, ¶ 94.

Count One states Bertoli engaged in conduct to obstruct justice and to cover up the fraudulent trading schemes by shredding and destroying documents in the Cayman Islands in June and November 1987, by removing documents and hiding the proceeds from the racketeering activities and by submitting false and fraudulent affidavits to the court. *Id.*, ¶ 95.

Count Two of the Second Superseding Indictment charges the Defendants with conspiracy to violate RICO section 1962(c) by agreeing with others, including Eisenberg, to conduct the affairs of Monarch through a pattern of racketeering in violation of RICO section 1962(d). It charges the conspiracy existed from about January 1982 to at least January 1989 in the District of New Jersey and elsewhere. Second Superseding Indictment, Count Two ("Count Two"), ¶ 2. It states the pattern of racketeering consisted of the racketeering acts charged in Count One of the Second Superseding Indictment. *Id.*

Count Three of the Second Superseding Indictment charges Bertoli with conspiracy to obstruct justice in violation of 18 U.S.C. § 371 in connection with a civil litigation brought by the SEC against the Defendants, Eisenberg and Steven Cloyes, a securities broker at Monarch (the "SEC Action"), the grand jury investigations related to the underlying securities fraud, the prosecution of Cannistraro in 1987 and this action. Second Superseding Indictment, Count Three ("Count Three"), ¶ 14. It charges the conspiracy began as early as March 1983 and has continued to the present. *Id.*

Count Three describes the object of the conspiracy as a means "to cover-up, con-

---

**26.** This grand jury was empaneled on 10 September 1985. Second Superseding Indictment, ¶¶ 92–93. A second grand jury was empaneled on 30 January 1986. *Id.*, ¶ 92. Both of these grand juries were investigating, *inter alia,* alleged criminal acts involving LCI and Toxic Waste securities transactions in the District of New Jersey and elsewhere. *Id.*

ceal, and eventually avoid civil and criminal liability for, the illegal racketeering activities of ... Bertoli, ... Cannistraro and ... Eisenberg, and to prevent evidence of their ... beneficial ownership of money and accounts in the Cayman Islands, from being considered and used" in the civil and criminal actions against them. *Id.*, ¶ 15. It states the conspiracy was achieved by causing brokers or nominees to lie to or conceal evidence from investigators and the grand jury, causing Cayman Islands banks from producing documents requested in an informal agreement between the United States Department of Justice and the Cayman Islands Authorities (the "Gentleman's Agreement"),[27] requesting financial documents from Cayman Island entities, concealing documents at Monarch that were subpoenaed by the grand jury, destroying documents relating to the nominee accounts at Euro Bank, filing a false financial disclosure form with the United States Probation Office, transferring funds in the Cayman Islands and submitting false affidavits during the course of this prosecution. *Id.*, ¶¶ 16–28.

Count Three lists thirty-three overt acts committed by the Defendants and Eisenberg between March 1983 and the return of the Second Superseding Indictment in furtherance of this conspiracy. These overt acts are too numerous to set forth in full. However, they include meetings and telephone calls in March and August 1983 between Bertoli and/or Eisenberg and a broker from G.K. Scott, *see* Count Three, overt act numbers 1, 3–4 and 6, and false and misleading statements provided by a G.K. Scott broker to SEC investigators or to the SEC, *id.* overt act numbers 2 and 5. In addition, they include false and misleading statements made by Eisenberg to the SEC. *Id.*, overt act numbers 7–8. The overt acts also include telephone calls or meetings between Cannistraro and his nominees and subsequent false statements by the nominees to the SEC or the grand jury, *id.*, overt acts numbers 9–11, 16–17, 21, flights by the Defendants to the Cayman Islands, *id.* overt acts numbers 12–15, 18–20, 22–24, the shredding of documents in the Cayman Islands, *id.*, overt acts numbers 25, 27, a meeting between Bertoli and Eisenberg in New York, New York, *id.*, overt act number 30, and providing false documents or affidavits to the court or the United States Probation Office. *Id.*, overt acts numbers, 26, 31–33.

Count Four charges Bertoli with obstruction of justice in violation of 18 U.S.C. §§ 1502–1503. Second Superseding Indictment, Count Four, ¶ 4. It states that in or about June 1987 Bertoli and Eisenberg, after a grand jury returned the 1987 Cannistraro Indictment, shredded and destroyed documents in the Cayman Islands which were relevant to the investigations of a grand jury, empaneled on 30 January 1986. *Id.*, ¶¶ 2–4.

Count Five charges Bertoli with obstruction of justice in violation of 18 U.S.C. §§ 1503 and 2. Second Superseding Indictment, Count Five, ¶ 3. It states that in or about November 1987, in the District of New Jersey and elsewhere, Bertoli shredded and destroyed documents in the Cayman Islands that were relevant to the investigations of a grand jury, empaneled on 17 March 1987. *Id.*, ¶¶ 2–3.

Count Six charges Bertoli with obstruction of justice in violation of 18 U.S.C. §§ 1503 and 2. Second Superseding Indictment, Count Six, ¶ 2. It states that in or about April 1990, in the District of New Jersey and elsewhere, Bertoli and others, including Eisenberg, "caused the racketeering proceeds and documents relating to those racketeering proceeds to be transferred from the custody and control of [a Paget–Brown & Co. ("Paget Brown")] employee and then caused the racketeering proceeds to be moved from the Cayman Islands to the Principality of Andorra in Europe." *Id.*

Count Seven charges Bertoli with obstruction of justice in violation of 18 U.S.C.

---

**27.** The Gentlemen's Agreement was sent to three Cayman Islands entities in 1986. Opposition Brief at 95 n. 48. The Cayman Islands authorities approved the use of the Gentlemen's Agreement, but several Cayman Islands entities refused to produce documents and records absent an order of the Grand Court of the Cayman Islands. *Id.*

§§ 1503 and 2. Second Superseding Indictment, Count Seven, ¶ 5. It states that on or about 6 December 1991 Bertoli "submitted three purported 'Affidavits in Contemplation of Death' of Jack Isaacson [28] (the "Isaacson Affidavits"),[29] which stated, among other things, that Isaacson and another individual were the sole beneficial owners of the Cayman Islands bank and brokerage accounts ... relevant to the present RICO prosecution." *Id.*, ¶¶ 2-3 (footnotes added). It states the Isaacson Affidavits were false and fraudulent and Bertoli was aware of this. *Id.*, ¶ 4. It further states Bertoli was aware the Isaacson Affidavits "had been prepared for the use of ... Bertoli and others, including ... Cannistraro and ... Eisenberg, in attempting to fraudulently exculpate themselves...." *Id.*

Count Eight charges the Defendants with conspiracy in violation of 18 U.S.C. § 371 to violate Section 10(b) and Rule 10b–5 in connection with the purchase and sale of Solar Age securities. Second Superseding Indictment, Count Eight ("Count Eight"), ¶ 2, 16. It states the conspiracy existed between about May 1983 and about October 1985 in the District of New Jersey and elsewhere. *Id.*, ¶ 2. Count Eight states that as part of this conspiracy, in June 1983 the Defendants agreed with the president and vice president of Solar Age that in exchange for the transfer of 200,-000 shares of Solar Age common stock to High Tech, Cannistraro would prepare favorable research reports recommending the purchase of Solar Age securities for dissemination to the investing public by Wood Gundy. *Id.*, ¶¶ 3-4. It states it was additionally part of the agreement that Bertoli and High Tech would obtain additional financing for Solar Age by means of a secondary public offering of securities. *Id.*

Count Eight states Bertoli and Cannistraro used nominee brokerage accounts to purchase Solar Age securities with knowledge that Cannistraro was preparing favorable research reports and with the expectation that such reports would cause the price of Solar Age stock to rise. *Id.*, ¶ 4. Count Eight states the Solar Age Reports were false and misleading in that they failed to disclose that they were prepared by Cannistraro in exchange for the transfer of 200,000 shares of Solar Age common stock to High Tech. It further states the Solar Age Reports were misleading because they did not disclose that the Defendants had purchased Solar Age securities based on advance knowledge of the Solar Age Reports and intended to profit on the sale of the Solar Age securities after the dissemination of the Solar Age Reports caused the price of the securities to rise. *Id.*, ¶ 5.

Count Eight states that between about June 1983 and about December 1983, the Defendants sold their Solar Age securities after the price had risen, in part because of the demand created by the Solar Age Reports, to the investing public, without disclosing their scheme to defraud, for a profit of at least $265,000. *Id.*, ¶ 6. Count Eight further states the secondary public offering of Solar Age securities arranged by Bertoli raised over $990,000 for Solar Age. *Id.*, ¶ 7.

Count Eight lists sixteen overt acts committed by the Defendants between June 1983 and September 1985 in furtherance of this conspiracy. These overt acts are too numerous to set forth in full. However, they include a 6 June 1983 meeting attended by Bertoli, Cannistraro and the executive vice president of Solar Age in New York City, New York, *id.*, Count Eight, overt act numbers 1, 2 and 3, various telephone calls and correspondence made on 6 June 1983 and 20 June 1983 by Solar Age personnel at the prompting of Bertoli and Cannistraro, *id.* Count Eight overt act numbers 4, 5 and 6, a 28 June 1983 wire transmission by Wood Gundy, made at the prompting of Cannistraro, of a research report recommending the purchase of Solar

---

**28.** Jack Isaacson ("Isaacson") died on 15 January 1988. Bertoli was the executor of Isaacson's estate. *See* Appendix to Affidavit of Richard Bertoli in support of the motion to dismiss for pre-indictment delay (the "Appendix"), filed 9 December 1991, Ex. B.

**29.** The Isaacson Affidavits are undated.

Age securities, *id.* overt act number 9, and the August and September 1985 mailing of the Solar Age prospectus in connection with the secondary offering of Solar Age securities, *id.* overt act number 15.

### Cayman Islands Depositions [30]

On 4 September 1991 depositions commenced in the Cayman Islands (the "Cayman Islands Depositions") before presiding Judge Sir Denis Malone, Cayman Central Authority (the "Cayman Authority").[31] Attending the Cayman Islands Depositions were the Government and Bertoli. Neither Cannistraro nor his then counsel were present at the Cayman Islands Depositions.[32]

At the start of the Cayman Islands Depositions, the Cayman Authority explained the procedure for the depositions. He stated Cayman law, rather than United States law, would be the background law, but it would not be rigidly applied. 4 September Proceedings Tr. at 16. He explained the "records in the proceedings will be those requested by the United States authorities." *Id.* at 17. He stated the proceedings must be kept within the parameters of the Treaty and that collateral issues should not be pursued widely. *Id.* at 33. With respect to cross-examination, he stated that "questions which affect the credibility of a witness by attacking his character, but are not otherwise relevant to the actual inquiry, ought not to be asked unless there are reasonable grounds for thinking that the implication conveyed by the question is well-founded or true." *Id.* The Cayman Authority explained issues of admissibility

**30.** The depositions were taken pursuant to a Treaty between the United States and the United Kingdom of Great Britain and Northern Ireland concerning the Cayman Islands Relating to Mutual Legal Assistance in Criminal Matters (the "Treaty"), S. Treaty Doc. No. 100–8, 100th Cong., 1st Sess. (1990).

**31.** Depositions were conducted between 4 September 1991 and 17 September 1991 of the following individuals: Nicholas Duggan, records custodian of Butterfield International Cayman, Ltd. (the "Butterfield International"), (the "Duggan Dep. Tr."); Sheree Ebanks, manager of Butterfield International; M.F.B. Gillooly, former directing manager of N.T. Butterfield Bank; David Meyerhoff, financial controller and internal auditor of Swiss Bank; Cecil Chan–A–Sue, records custodian of Royal Bank of Canada; Timothy Bechard ("Bechard"), resident manager of Grand Cayman branch of Richardson Greenshields of Canada (the "Bechard Dep. Tr."); Delano Solomon, Registrar General for the Cayman Islands; Brian Lundie, general manager of Cable and Wireless; Rodney Bond ("Bond"), resident manager of the Swiss Bank, (the "Bond Dep. Tr."); Susan Rivers ("Rivers"), secretary at Euro Bank (the "Rivers Dep. Tr."); Rodney Coleman ("Coleman"), executive chief officer of Paget Brown (the "Coleman Dep. Tr."); Proceedings by the Cayman Authority will be referred to as "__ Sept. Proceedings Tr. at __". The factual witnesses were videotaped and audiotaped; the records witnesses were not videotaped pursuant to the decision of the Cayman Authority. 4 Sept. Proceedings Tr. at 22.

**32.** By letter, dated 8 August 1991, Cannistraro requested the Government to pay for travel expenses pursuant to Fed.R.Crim.P. 15 for his counsel to attend the Cayman Islands Depositions (the "Rule 15 Letter Request"). Letter to court, dated 8 August 1991. The reason stated for this request was the fact that Cannistraro had been incarcerated for the past four years. *Id.* The Government objected to the Rule 15 Letter Request because Cannistraro had never requested an appointment of an attorney under the Criminal Justice Act. Letter to court, dated 14 August 1991. The Government further opposed the Rule 15 Letter Request on the ground that evidence revealed Cannistraro had sufficient assets in an off-shore bank account. *Id.* On 19 August 1991 the Rule 15 Letter Request was denied. Letter from court to Cannistraro, dated 19 August 1991. By letter, dated 22 August 1992, then counsel to Cannistraro stated Cannistraro requested reconsideration of the decision to deny the Rule 15 Letter Request because Cannistraro is "financially unable to bear the costs attendant to three weeks of depositions in the Cayman Islands." Letter to court, dated 22 August 1991. However, an affidavit of indigency was, not, and has not been submitted. The request for reconsideration was denied. Letter from court, dated 23 August 1991.

By letter, dated 26 August 1991, the Government opposed the Rule 15 Letter Request. The Government stated Cannistraro "has completely failed to establish, in a sworn affidavit or other appropriate court filing detailing his assets and liabilities, that he does not have the financial ability to bear these costs." Letter to court, dated 26 August 1991. The Government reiterated that it had evidence Cannistraro had control of foreign bank accounts. *Id.* It further stated Cannistraro's then counsel traveled to the Cayman Islands to review the documents produced pursuant to the Treaty Request in July 1991. *Id.*

By letter, dated 29 August 1991, then counsel to Cannistraro advised the court that he would

were matters for the trial judge in the United States. *Id.* at 34. He reminded the parties that Article Seven of the Treaty limits the use of information obtained through the Treaty. *Id.* During the course of the depositions, the Cayman Authority explained that Bertoli would not be permitted to voir dire the witnesses with respect to documents being introduced by records custodians.[33] *See, e.g.*, Duggan Dep. Tr. at 21–23.

During the Cayman Islands Depositions Bertoli cross-examined all of the witnesses and recrossed Bechard. After the Government conducted redirect-examination of Coleman, Bertoli sought to recross Coleman. Coleman Dep. Tr. at 300. The Cayman Authority did not permit recross-examination. It stated: "There's no Recross here. There's Examination in Chief, there's Cross Examination and there's a Re-examination." *Id.* Bertoli, therefore, moved to strike the redirect testimony on the grounds that he was denied an opportunity to recross. *Id.* at 302. Bertoli states despite the fact that the Government introduced a piece of evidence on redirect,[34] he was not given an opportunity to recross Bond. Cayman Islands Moving Brief at 18–19.

At the close of the Cayman Islands Depositions, Bertoli objected to the fact that the Government did not call four witnesses it had subpoenaed for depositions. 17 Sept. 1992 Dep. Proceedings at 6–7. The Cayman Authority explained that it could not require the Government to call witnesses. *Id.* at 7. Following the Cayman Islands Depositions, Bertoli moved in this court to depose three witnesses in the Cayman Islands, all of whom had previously been subpoenaed but not called by the Government. Notice of Motion, filed 12 Novem-

ber 1991. On 19 December 1991 Bertoli was given leave to depose George Ebanks, deputy managing director of Euro Bank, Joan Bond, assistant secretary of Euro Bank, and Patrick Holmes, an officer at the Guardian Bank and Trust (Cayman) Limited. Letter-opinion and order, filed 19 December 1991. A Letter Rogatory has been submitted to the Cayman Authority requesting that these depositions be conducted; as of the date of this opinion, the depositions have not been scheduled.

*Discussion*

### I. Motion to Dismiss and for Discovery Based on Allegations of Prosecutorial Misconduct

The Defendants move to dismiss the Second Superseding Indictment on the ground of prosecutorial misconduct, or in the alternative, for discovery of grand jury materials. Misconduct Moving Brief at 2–6. Bertoli made the same motion with respect to the Superseding Indictment; the motion to dismiss the Superseding Indictment based on prosecutorial misconduct was denied. *Eisenberg*, 773 F.Supp. at 701–13.

The Defendants speculate:

It is likely, given the fact that not less than seven grand juries were empaneled to investigate the charged offenses, and many witnesses were called to testify before just one of those grand juries, that transcripts of witness testimony from prior grand juries were submitted to subsequent grand juries. Further, it is substantially likely that summaries of testimony and evidence were submitted to the indicting grand jury.

Misconduct Moving Brief at 2. The Defendants argue, "[w]ith respect to the ... [S]econd [S]uperseding [I]ndictment, it

---

not attend the Cayman Islands Depositions because Cannistraro was unable to pay the costs.

**33.** During the Cayman Islands Depositions, the Government sought to introduce documents through an expedited procedure whereby the witness was shown the file of documents prior to the depositions to review and confirm that the records were produced by his place of appointment. Duggan Dep. Tr. 20–21. Bertoli objected to the use of this procedure because he wanted to voir dire the witnesses with respect to

the documents. *Id.* at 21. The Cayman Authority was unfamiliar with the suggested voir dire procedure and ruled that it would not allow voir dire. *Id.* at 21–22.

**34.** The Government introduced, as exhibit 2500, an unsigned letter from Euro Bank ("Exhibit 2500"). Bond Dep. Tr. at 347–53. Although Bertoli objected to the introduction of this letter because it was unsigned and it was not produced by Euro Bank, the Cayman Authority

would be impossible in the short period of time to have provided anything but summaries to the grand jury." *Id.* at 5. At oral argument, Bertoli stated that an investigation conducted on his behalf revealed witnesses who would have been available for the grand jury were not called. 19 June 1992 Oral Arg. Tr. at 11–12.

The Defendants assert that any use of such summaries was improper if the testimony itself was available, if the jury was misled into believing the summaries were actually the testimony and if he was prejudiced by such use. Misconduct Moving Brief at 2 (citing *United States v. Wander*, 601 F.2d 1251, 1260 (3d Cir.1979)). The Defendants request, therefore, an order "requiring disclosure of the grand jury minutes to determine whether transcripts of prior testimony were read to the indicting grand jury." *Id.* In the alternative, the Defendants request an *in camera* review of the grand jury materials to determine if the grand jury was misled with respect to the evidence or testimony presented. *Id.* at 6.

The Government argues the Defendants have failed to establish a showing of misconduct on the part of the Government and that such "misconduct '*substantially* influenced the grand jury's decision to indict....'" Opposition Brief at 21 (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 228 (1988)). The Government argues discovery of grand jury materials is inappropriate because the Defendants have not shown a "'substantial likelihood of gross or prejudicial irregularities in the conduct of the grand jury.'" *Id.* at 23 (quoting *United States v. Fischbach and Moore, Inc.*, 576 F.Supp. 1384, 1394 (W.D.Pa.1983)). Lastly, the Government argues the Defendants have not shown that the Government misled the jury by using summaries of prior grand jury testimony such that an *in camera* review of the grand jury material is warranted. *Id.* at 24–25.

■ The use of hearsay evidence by a grand jury is not prohibited. *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct.

406, 408, 100 L.Ed. 397, *reh'g denied*, 351 U.S. 904, 76 S.Ct. 692, 100 L.Ed. 1440 (1956); *United States v. Ismaili*, 828 F.2d 153, 164 (3d Cir.1987), *cert. denied*, 485 U.S. 935, 108 S.Ct. 1110, 99 L.Ed.2d 271 (1988), *United States v. Steele*, 685 F.2d 793, 806 (3d Cir.), *cert. denied sub nom. Mothon v. United States*, 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982); *Wander*, 601 F.2d at 1260. A grand jury is prohibited from using hearsay evidence if "non-hearsay is readily available; ... the grand jury was also mislead into believing it was hearing direct testimony rather than hearsay; and ... there is also a high probability that had the jury heard the eye-witness it would not have indicted the defendant." *Ismaili*, 828 F.2d at 164 (citing *Wander*, 601 F.2d at 1260).

The Defendants argue because of the secrecy provided to grand jury materials, they are unable to determine whether there was an improper use of hearsay testimony; however, they speculate as to the use of summaries and transcripts of witnesses from prior grand juries. The Defendants, therefore, request discovery of the grand jury materials or an *in camera* review of the grand jury materials.

In considering the Defendants' request for discovery of the grand jury materials, two principles must be borne in mind. First, it is a "'long established policy that maintains the secrecy of grand jury proceedings in the federal courts.'" *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 424, 103 S.Ct. 3133, 3138, 77 L.Ed.2d 743 (1983) (quoting *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958)); *see also United States v. McDowell*, 888 F.2d 285, 289 (3d Cir.1989); *accord Eisenberg*, 773 F.Supp. at 707.

This general rule of grand jury secrecy is codified in Rule 6(e) of the Federal Rules of Criminal Procedure. *United States v. Johns*, 858 F.2d 154, 158 (3d Cir.1988). "Rule 6(e) applies not only to information drawn from transcripts of grand jury proceedings, but also to anything which may reveal what occurred before the grand jury." *In re Grand Jury Matter*, 682 F.2d

stated those objections were issues for the United States court. *Id.* at 353.

61, 63 (3d Cir.1982); *see also Fund for Constitutional Gov't v. National Archives & Records Serv.*, 656 F.2d 856, 869 (D.C.Cir.1981) (The scope of grand jury secrecy encompasses anything "which would reveal 'the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of the jurors, and the like.'") (quoting *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1382 (D.C.Cir.), *cert. denied*, 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980)); *accord, Eisenberg*, 773 F.Supp. at 707.

The secrecy of grand jury proceedings is not absolute. Rule 6(e)(3)(C)(i) authorizes disclosure by court order. The party moving for court-ordered disclosure bears a heavy burden of proving to the court that "the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 222, 99 S.Ct. 1667, 1674, 60 L.Ed.2d 156 (1979) (footnote omitted). Before disclosure of the grand jury transcripts, which would corroborate the Defendants' arguments can be ordered, the Defendants must offer evidence of a "substantial likelihood of gross or prejudicial irregularities in the conduct of the grand jury." *United States v. Budzanoski*, 462 F.2d 443, 454 (3d Cir.) (citing *United States v. Politi*, 334 F.Supp. 1318, 1322 (S.D.N.Y. 1971); *United States v. Dioguardi*, 332 F.Supp. 7, 20 (S.D.N.Y.1971)), *cert. denied*, 409 U.S. 949, 93 S.Ct. 271, 34 L.Ed.2d 220 (1972). Only after the Defendants have met this burden does a court balance the need for disclosure against the need for secrecy. *Id.; see also McDowell*, 888 F.2d at 289.

Second, to the extent the Defendants seeks dismissal of the Second Superseding Indictment as a sanction for such alleged misconduct, the Supreme Court has held in a recent decision that a district court may not exercise its supervisory powers to dismiss an indictment for prosecutorial misconduct in such a way that by-passes the harmless error rule of Fed.R.Crim.P. 52(a).[35] *Bank of Nova Scotia*, 487 U.S. 250, 108 S.Ct. 2369. Thus, dismissal is appropriate only "'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Id.* at 256, 108 S.Ct. at 2374 (quoting *United States v. Mechanik*, 475 U.S. 66, 78, 106 S.Ct. 938, 945–46, 89 L.Ed.2d 50 (1986)); *see also United States v. Soberon*, 929 F.2d 935, 939–40 (3d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 73, 116 L.Ed.2d 47 (1991). A district court has "no authority to dismiss [an] indictment on the basis of prosecutorial misconduct absent a finding that petitioners were prejudiced by such misconduct." *Bank of Nova Scotia*, 487 U.S. at 263, 108 S.Ct. at 2378.

■ It is clear from review of the Affidavit of Assistant United States Attorney John Fietkiewicz (the "Fietkiewicz Affidavit"), submitted under seal, *see* Sealed Government's Exhibit at 1, that the Defendants' contentions that the Government used improper hearsay testimony amount to misplaced speculation.[36] A review of the Fietkiewicz Affidavit reveals that the grand jury was informed of the hearsay nature of the evidence submitted. *Id.* There is no factual basis to conclude the Government misrepresented the reliability of the hearsay testimony and that the grand jury was misled as to the contents of the evidence. Indeed, Bertoli states he conducted his own independent investigation. 19 June 1992 Oral Arg. at 11–12.

**35.** Rule 52(a) provides:
 **Harmless Error.** Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.
 Fed.R.Crim.P. 52(a).

**36.** Bertoli's objection to the *ex parte, in camera* presentation of the Fietkiewicz Affidavit is un-

warranted. *Ex parte, in camera* proceedings are permissible if necessary to preserve the interests of secrecy in grand jury material. *See, e.g., In re Grand Jury Investigation*, 918 F.2d 374, 388 n. 23 (3d Cir.1990) (citing *In re Grand Jury Matter of Catania*, 682 F.2d 61 (3d Cir.1982)).

Despite such investigative efforts, he has not presented any evidence of Government misconduct. The Misconduct Motion to dismiss the Second Superseding Indictment, to the extent it is based on speculation that summaries and prior testimony were read to the grand jury, is denied.

■ In addition, because the Defendants have not offered evidence of a substantial likelihood of prejudicial irregularities in the grand jury proceedings, the request for discovery of grand jury materials or for an *in camera* review of the minutes from the grand jury is denied. *See, e.g., United States v. Torres*, 901 F.2d 205, 232–33 (2d Cir.) (denying motion of defendant for discovery of grand jury minutes or for *in camera* review of such minutes, where defendant failed to sufficiently allege prejudice from allegedly perjured grand jury testimony), *cert. denied sub nom. Cruz v. United States*, ⸺ U.S. ⸺, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990).

## II. Motion to Dismiss for Pre–Indictment Delay, Selective Prosecution and Vindictive Prosecution

The Defendants move to dismiss the Second Superseding Indictment against them on the grounds of pre-indictment delay and selective and vindictive prosecution.

### A. *Pre–Indictment Delay*

■ The Defendants state the investigation for the charges underlying the indictments in this case began in 1982 and continued through the return of the Second Superseding Indictment. They argue the delay in bringing the Indictment and subsequent Superseding Indictment and Second Superseding Indictment violates the Due Process Clause. Pre–Indictment Delay Moving Brief at 5. The Defendants contend the period of delay was prejudicial because numerous defense witnesses have died. *Id.* The Defendants also argue affirmative indications of malice exist, as well as questions as to whether venue is proper. *Id.* The Government argues it did

not purposely delay, and there is no evidence that it purposely delayed bringing the indictments in this case to gain a tactical advantage over the Defendants. Opposition Brief at 29–33. The Government further argues the Defendants have failed to establish prejudice as a result of any delay in bringing the indictments. *Id.* at 33–40.

The Due Process Clause of the Fifth Amendment requires dismissal of an indictment "if it were shown ... that the preindictment delay ... caused substantial prejudice to [the defendant's] right[ ] to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971) (footnote omitted).[37] The *Marion* Court, however, declined to delineate the circumstances in which preindictment delays would require the dismissal of the indictment. *Id.* The Court stated:

> [W]e need not, and could not now, determine when and in what circumstances actual prejudice resulting from pre-accusation delays requires the dismissal of the prosecution. Actual prejudice to the defense of a criminal case may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution.... [T]he rights of the defendant to a fair trial will necessarily involve a delicate judgment based on the circumstances of each case.

*Id.* at 324–25, 92 S.Ct. at 465–66 (footnotes omitted); *accord, United States v. Lovasco*, 431 U.S. 783, 789–90, 796–97, 97 S.Ct. 2044, 2048–49, 2052, 52 L.Ed.2d 752, *reh'g denied*, 434 U.S. 881, 98 S.Ct. 242, 54 L.Ed.2d 164 (1977). "*Marion* makes clear that proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the ac-

---

**37.** In *Marion,* the Court addressed the issue of lengthy pre-indictment delay for purposes of the Speedy Trial Clause of the Sixth Amendment. 404 U.S. 307, 92 S.Ct. 455. The Court held pre-indictment delay does not violate the Sixth Amendment. *Id.* at 320–21, 92 S.Ct. at 463–64.

cused." *Lovasco*, 431 U.S. at 790, 97 S.Ct. at 2048–49.

The *Lovasco* Court described its task in determining whether pre-indictment delay violates the Due Process Clause as one to determine "only whether the action complained of . . . violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' and which define 'the community's sense of fair play and decency.'" *Id.* (citations omitted). The Court stated where the delay results from the prosecution's decision to continue its investigation, the delay would not warrant dismissal of the indictment. *Id.* at 791–96, 97 S.Ct. at 2049–52.

In *Lovasco*, the Government appealed the dismissal of an indictment for pre-indictment delay. The Government indicted the defendant for possession of firearms stolen from the United States mails and for dealing in firearms without a license eighteen months after the alleged offenses occurred. 431 U.S. at 784, 97 S.Ct. at 2046. The defendant moved to dismiss the indictment for pre-indictment delay arguing that little additional evidence was uncovered during the seventeen months preceding the indictment and that he suffered prejudice as a result of the death of two material witnesses. *Id.* at 785, 97 S.Ct. at 2046. The Government argued it kept the investigation open for eighteen months to determine the validity of its theory that the defendant's son was responsible for the thefts. *Id.* at 786, 97 S.Ct. at 2047.

The Supreme Court reversed the dismissal of the indictment. It held that in the interest of law enforcement, potential defendants, the public and the courts, no time frame can be imposed during which the Government must bring an indictment. *Id.* at 791–95, 97 S.Ct. at 2049–51. The Court explained the Fifth Amendment does not require the Government to bring an indictment the moment it has probable cause to so. *Id.* at 791, 97 S.Ct. at 2049. The Court stated:

> [I]nvestigative delay is fundamentally unlike delay undertaken by the Government solely "to gain tactical advantage over the accused," precisely because in-

vestigative delay is not so one-sided. Rather than deviating from elementary standards of "fair play and decency," a prosecutor abides by them if he refuses to seek indictments until he [or she] is completely satisfied that he [or she] should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of "orderly expedition" to that of "mere speed[.]" This the Due Process Clause does not require.

*Id.* at 795–96, 97 S.Ct. at 2051 (citations and footnote omitted).

Relying on the Government's representations that it continued the investigation to learn the identity of additional participants during the eighteen month hiatus between the crimes and the indictment, the Court reversed the dismissal of the indictment. *Id.* at 796–97, 97 S.Ct. at 2051–52.

In *Ismaili*, the Circuit affirmed the district court's denial of the motion to dismiss for pre-indictment delay. 828 F.2d at 167–69. The first grand jury investigation into the charged fraud scheme involving the promotion and sale of customized vans began in January 1981. *Id.* at 166. This grand jury was unable to complete the investigation and did not return an indictment. *Id.* In 1982 the Government received a report of an investigation from a Federal Bureau of Investigation ("F.B.I.") case agent. Additional information was needed, however, to take the case before a grand jury. Because the prosecutor in charge of the case was also involved in three other felony trials and other activities, the investigation did not resume until the summer of 1983 and an indictment was not returned until the summer of 1984. *Id.* at 166–67.

Ismaili sought to establish prejudice through the death of two potential witnesses and the loss of records which would have been used to establish the success of his sales team and promotional efforts. *Id.* at 168. The Government argued Ismaili was not prejudiced because there was no evidence as to when the witnesses died; therefore, they could have died prior to the

Government having completed its case. *Id.* In addition, the Government argued Ismaili was not prejudiced by the death of the witnesses because their testimony would have been cumulative. *Id.*

The Circuit held the allegations of prejudice were insufficient to warrant dismissal. It stated the fact that witnesses died does not bar prosecution as a result of pre-indictment delay. *Id.* It further reasoned the record did not reflect that the documents did in fact ever exist or could have been found. *Id.* at 169. The court stated a finding of no intentional delay was implicit in the district court's decision. Having found the district court did not err in its decision that Ismaili did not satisfy his burden of proof, the Circuit affirmed the court's decision. *Id.*

In *United States v. Sebetich*, 776 F.2d 412 (3d Cir.1985), *cert. denied*, 484 U.S. 1017, 108 S.Ct. 725, 98 L.Ed.2d 673 (1988), defendants, bank robbers, appealed their conviction arguing, *inter alia*, pre-indictment delay. *Id.* at 429–30. The three robberies charged in the indictment occurred in 1979 and the indictment was returned on 23 March 1984 just five days before the statute of limitations had run. *Id.* at 429. In challenging the delay, the defendants relied on the fact that the F.B.I investigation concluded on 4 February 1982 when it determined there was sufficient evidence to return an indictment. *Id.* The indictment, however, was delayed as a result of confusion as to whether the robberies would be prosecuted by the state or federal government. *Id.* The Government conceded the prosecution fell through the cracks and the investigation was reopened in March 1983. *Id.* The defendants argued they were prejudiced by the delay because potential witnesses, including alibi witnesses, had died and memories had faded for other witnesses. *Id.*

The Circuit affirmed the district court's denial of the motion to dismiss for pre-indictment delay. It stated the defendants "produced no evidence tending to suggest that the delay was a deliberate tactical maneuver by the government." *Id.* at 430. It explained the delay was a result of a mix-up between the federal and state government and the moment the federal Government realized the case was not proceeding it reopened its investigation and returned an indictment within six months. *Id.* Because the court found no intentional delay, it declined to decide whether the defendants satisfied their burden of showing actual prejudice. *Id.* It commented, however, that it had "serious doubts as to whether the allegations of prejudice were specific enough to constitute a showing of actual prejudice." *Id.*

In *United States v. United States Gypsum Co.*, 550 F.2d 115 (3d Cir.1977), *aff'd*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), corporate defendants and individual officers were convicted for antitrust violations. *Id.* at 117. Investigations by the Department of Justice into a conspiracy to violate the Sherman Anti–Trust Act, 15 U.S.C. § 1 *et seq.*, began in 1965 and lasted through 1971. In 1971 a grand jury began inquiries which lasted until 27 December 1973 when an indictment was returned against the defendants. 550 F.2d at 117. Prior to trial, the defendants moved to dismiss the indictment for pre-indictment delay; the motion was denied. *Id.* at 118. During the five-month trial which commenced on 3 March 1975 the Government called thirty-five witnesses and the defendants called thirty witnesses. *Id.*

The defendants appealed their conviction on the ground that the trial court denied their motion to dismiss. The defendants argued the Government purposely postponed empaneling the grand jury to await the outcome of a civil case involving the same conspiracy. *Id.* The Circuit rejected the defendants' contentions of intentional delay and stated: "[A]ny delay in empaneling the grand jury resulted from the Government's reluctance to frame criminal charges against appellants before learning whether plaintiffs in a civil action could carry their burden of proof." *Id.*

The defendants sought to establish actual prejudice because thirty-six potential witnesses died during the eight-year interval between the initial investigation and the indictment. *Id.* at 119. The *Gypsum* court

dismissed the defendants' arguments because there was "no showing that the deceased would have proffered testimony not merely cumulative of the evidence already at [the defendants'] disposal." *Id.* The court further observed that of the thirty-six potential witnesses who had died, the defendants singled out only three witnesses in their efforts to establish prejudice. *Id.*

In this case, the Defendants appear to argue the delay from the time of the initial investigations to the return of the Indictment, Superseding Indictment and Second Superseding Indictment was an intentional act of the Government which was awaiting the death of several key defense witnesses.[38] Pre-Indictment Delay Moving Brief at 5; Bertoli Aff. at 12–13.

The Government argues there is no evidence of intentional delay. Specifically, it contends the Second Superseding Indictment alleges racketeering acts which occurred between December 1982 and October 1984, predicate acts which occurred between August 1985 and September 1988 and overt acts which occurred as late as October 1988. It argues, therefore, the Indictment, which was returned in June 1989, was within nine months of the last racketeering act charged and within eight months of the last overt act charged. Opposition Brief at 29–30. In addition, the Government argues the investigation "involved no less than six separate securities fraud schemes" which required the Government to interview numerous witnesses and to send out numerous grand jury subpoenas. *Id.* at 31. The Government contends its investigation was further hindered because of the difficulties it encountered in obtaining evidence from the Cayman Is-

lands concerning the Defendants' secret Cayman Islands accounts.[39] *Id.*

The Defendants have not carried their burden of demonstrating intentional delay. Although numerous grand juries were empaneled and the time from the initial investigation through the return of the Indictment was lengthy, there is no evidence of Government manipulation. Significantly, Bertoli has provided no evidence to substantiate his assertion that the Government was purposely waiting to return the Indictment until the death of Isaacson or any other witness. Indeed, he has not shown or suggested that the Government was even aware of a life threatening medical condition of Isaacson or any other witness.

In addition, the Government's investigation into the underlying criminal charges met with some set-backs when it had difficulty obtaining evidence from the Cayman Islands. The Government initially sought to gather evidence in 1986 through the Gentlemen's Agreement; however, such attempts were unsuccessful. The investigation was also slowed when the 1987 Cannistraro Indictment was returned and the Government was preoccupied with that prosecution. In light of the absence of evidence showing intentional delay, the Government's representations that the investigation continued during the pre-indictment period must be taken in good faith and is a sufficient basis to defeat a finding of intentional delay. *See, e.g., Lovasco,* 431 U.S. at 796, 97 S.Ct. at 2051–52.

The Defendants have also failed to establish actual prejudice. The Defendants rely on the deaths of nine individuals who they claim would be material witnesses to their defense. Pre-Indictment Delay Moving Brief at 5. They argue the testimony of these witnesses "would have substantially

---

**38.** Bertoli also alleges bad faith in the delay of returning the Indictment on Bertoli's connection with a prior criminal prosecution brought by the Government against the former Mayor of Weehawken, New Jersey. Wally Lindsley ("Lindsley"). Bertoli Aff. at 11–12. Bertoli contends Robert Warren, an Assistant United States Attorney, "remained eager for revenge" as a result of Bertoli's assistance with Lindsley's defense of criminal charges. *Id.* at 12. It is unclear how these assertions are evidence of inten-

tional pre-indictment delay. Indeed, assuming the Government's prosecution is driven by revenge, it would presumably have returned an indictment upon a minimum showing of probable cause. The assertions concerning Lindsley are irrelevant.

**39.** These difficulties were the direct result of the Defendants' and Eisenberg's conduct and tactics through which they sought to block such discovery. *See supra,* pp. 44–45.

undermined the [G]overnment's theory of prosecution regarding each of the three types of misconduct alleged in the [Second Superseding] Indictment." [40] *Id.*

Specifically, Bertoli states Rose Farrell ("Farrell"), chief secretary at Monarch, would have offered favorable testimony to the Defendants' defense. Bertoli Aff. at 4–5. Bertoli states Farrell died during the period of pre-indictment delay.[41] Bertoli relies on Farrell's testimony made before the SEC on 9 February 1984. Bertoli Aff. at 4–5 (citing Appendix, Ex. A (the "Farrell SEC Tr.")). Bertoli states that without the testimony of Farrell, the testimony of Eisenberg will go unchallenged. *Id.* at 5. He states Farrell would have testified as to "mailing confirmations to Parsico Ltd., VPI Ltd., Ventures [sic] Partners and Roger Rowland and the directions and issuance of checks to Euro Bank...." *Id.* at 5. At the SEC hearing Farrell testified that Eisenberg handled the Euro Bank, Venture Partners and Parsico accounts at Monarch. Farrell SEC Tr. at 81. Farrell stated she did not know who the contact person was on those accounts. *Id.* Farrell also recalled taking calls from a man named George who instructed her to transfer by wire funds from Monarch to the three accounts. *Id.* at 82. She did not know if George controlled those accounts. *Id.* at 82–83.

Farrell testified that Bertoli came to Monarch to conduct business for his wife's and children's accounts and his wife's custodian accounts. *Id.* at 89–81. She stated Bertoli occasionally came to Monarch to use the telephone and on one occasion he received a Federal Express package at Monarch. *Id.* at 89. Farrell could not tes-

tify as to whether Bertoli had any affiliation with Toxic Waste, LCI, Euro Bank, Venture Partners or Parsico or whether Bertoli was ever at Monarch's offices when Lindsley was there. *Id.* at 91–92.

Bertoli also claims he has suffered actual prejudice because of the death of Isaacson on 15 January 1988.[42] *Id.* at 6–8. Bertoli offers through the Isaacson Affidavits, asserted to have been prepared prior to his death, the testimony which he would have provided at trial. *Id.;* Appendix B–D. Bertoli states "Isaacson's testimony would have substantially rebutted the [G]overnment's claim that certain Cayman Islands entities, namely Venture Partners, VPI Ltd., Roger Rowland, Parsico, Ltd. and Euro Bank Corp. maintained accounts at Monarch ... and traded in the securities of [LCI], Toxic Waste ..., High Tech ... and others." Bertoli Aff. at 7 (footnote omitted).

Bertoli argues that prior to Isaacson's death on 15 January 1988, the Government lacked sufficient evidence to indict him which he claims is evidenced by the fact that Bertoli was not named in the 1987 Cannistraro Indictment. *Id.* Bertoli argues Isaacson is one of the few persons, aside from Eisenberg, who could testify as to the identity of the beneficial owners of Parsico, VPI, Venture Partners and Roger Rowland.[43] *Id.* at 8.

Bertoli further asserts he was prejudiced by the death of John Scott ("Scott"), Cannistraro's supervisor at Wood Gundy. *Id.* at 8. Bertoli states Scott died during the period of pre-indictment delay.[44] *Id.* He states Scott would have testified that "Wood Gundy had no policy with respect to

**40.** The specific allegations of actual prejudice as a result of these deaths are set forth in the Bertoli Affidavit. Although Cannistraro did not submit an affidavit or statement joining the Bertoli Affidavit, he is deemed to have joined in and adopted the contentions in the Bertoli Affidavit because he signed and adopted the Pre-Indictment Delay Moving Brief.

**41.** Bertoli does not state the date of or the conditions leading to the death of Farrell or that the Government was aware of an impending death.

**42.** Bertoli does not state the conditions leading to the death of Isaacson or that the Government was aware of an impending death.

**43.** Bertoli also states perhaps Farrell could have testified and Cannon could testify as to the real beneficial owners of the questioned accounts. Bertoli Aff. at 8.

**44.** Bertoli does not state the date of or the conditions leading up to the death of Scott or that the Government was aware of an impending death.

its employees owning stock of a company it was recommending." *Id.; see also* Defendants' Reply Ex. 6, testimony of Scott at SEC proceedings, dated 2 November 1983 (the "Scott SEC Tr.") at 39.[45] Bertoli states the testimony of Scott would have been material to the defense of the charge in the Second Superseding Indictment that Cannistraro failed to divulge in his reports that "the [D]efendants, Monarch and others, 'had purchased Astrosystems securities based upon advance knowledge of the reports, and intended to profit on the sale of these securities once the dissemination of the reports had caused the price of Astrosystems Securities to rise.'" *Id.* (quoting Second Superseding Indictment, ¶¶ 14, 23).

Bertoli states he has been further prejudiced by the death of Thomas Renshak ("Renshak"), an order clerk and security trader at Wood Gundy. Bertoli Aff. at 8–9. He states Renshak died during the period of pre-indictment delay.[46] *Id.* at 9. Bertoli states Renshak's testimony during the SEC Action is evidence that Renshak would have been beneficial to his defense. *Id.* He asserts Renshak would have testified he maintained a due diligence file in the trading room which contained a prospectus of LCI naming Cannistraro as an officer. *Id.*

Bertoli states Renshak had knowledge of the trading of the Cannistraro and Godono[47] accounts, the alleged nominee accounts of Cannistraro.[48] *Id.* at 9. In addition, Bertoli states Renshak had knowledge regarding the purchases by the M & I

Trust and that these purchases had no impact on the market. *Id.* Bertoli asserts the testimony of Renshak "would refute the allegations of ... Eisenberg with respect to the control of the trading markets of LCI and Toxic Waste by Bertoli and Eisenberg." *Id.*

Bertoli also refers to the deaths of Lawrence Monberg ("Monberg"), a salesman at Prudential Bache, David Averell ("Averell"), a retail salesman at Monarch, and Irving Orenstein ("Orenstein") a large purchaser of High Tech, to establish actual prejudice. *Id.* at 9–10. Bertoli states these individuals died during the period of pre-indictment delay.[49] *Id.* at 11. He states these three individuals "could have testified regarding the distribution of the prospectus of LCI, Toxic Waste and High Tech[ ], the market size and the availability of the securities, and refute the allegations of ... Eisenberg as to the control of the new issue purchasers of Toxic Waste and High Tech ... by Bertoli and Eisenberg." *Id.* at 9. Bertoli claims their testimony would be "important because the timing of the mailings or failure to mail the prospectus by Monarch would impact on whether any new investors relied upon the prospectus of High Tech, Toxic or LCI." *Id.* at 9–10.

Bertoli further claims prejudice as a result of the death of Stanley Krasnoff ("Krasnoff"), who sold 140,000 shares of Nature's Bounty to Monarch for $5.00 per share on 17 January 1983. *Id.* at 10. Bertoli states Krasnoff died during the period of pre-indictment delay.[50] *Id.* at 11. Ber-

---

**45.** At the SEC proceedings, Scott testified as follows;

 A. We now have a compliance director, definitively. That's new.

 . . . . .

 Q. Between January and June, 1983, who would have responsibility for making policy decisions in these matters?

 A. If there was a policy on it, I imagine it would be me, but inasmuch as I never had this case arise, there just wasn't any policy for it.

Scott SEC Tr. at 39.

**46.** Bertoli does not state the date of or the conditions leading to the death of Renshak or that the Government was aware of an impending death.

**47.** Godono was a relative of Cannistraro. Bertoli Aff. at 9.

**48.** A review of the SEC Transcript of Renshak's testimony does not reveal that he had knowledge of the trading of the Cannistraro and Godono accounts.

**49.** Bertoli does not state the date of or the conditions leading to the deaths of these three individuals or that the Government was aware of any impending deaths.

**50.** Bertoli does not state the date of or the conditions leading to the death of Krasnoff or that the Government was aware of an impending death.

toli states the negotiations for Krasnoff's purchase were part of the negotiations for the 275,580 shares which are subject to the overt acts alleged in the Second Superseding Indictment. *Id.* at 10. He states Krasnoff's testimony would contradict the statement in the Second Superseding Indictment that the purchase was from the investing public. *Id.* Bertoli states without Krasnoff, only Eisenberg can testify about this transaction. *Id.*

Lastly, Bertoli claims he was prejudiced by the death of Lawrence Rohde ("Rohde"), an employee of the Department of Defense, who testified before the grand jury and provided a letter to the court attesting to the accuracy of the Toxic Waste Report. *Id.* Bertoli states because Rohde worked at the Department of Defense, he had knowledge of the "serious nature of the toxic waste problem at [Department of Defense] sites." *Id.* He states Rohde died during the period of pre-indictment delay.[51] *Id.* at 11.

The Defendants have failed to establish actual prejudice as a result of the deaths of the above-mentioned individuals. Although the Defendants do proffer what these individuals would have testified about, they do not establish that the proffered testimony would have exculpated the Defendants. Furthermore, the Defendants have not established prejudice because they have not specified when the nine individuals died. The individuals may have died prior to the completion of the Government's case. *See, e.g., Ismaili,* 828 F.2d at 168.

In addition, the Defendants have not established that the Government intentionally delayed the return of the Indictment, Superseding Indictment or Second Superseding Indictment until the deaths of the above-mentioned individuals to gain a "tactical advantage over the [Defendants]." *Marion,* 404 U.S. at 324, 92 S.Ct. at 465. Absent proof of the Government's knowledge of their impending deaths, the Government faced the same risk that its witnesses would die or the memories of its witnesses would fade as a result of the decision not to bring the Indictment until 1989. Indeed, as a result of the pre-indictment delay, the Government has faced its own hurdles with respect to documents that have been destroyed and money which has been transferred.[52] Count Three, ¶¶ 24–25, 27.

Significantly, the testimony relied on by Bertoli does not appear to exculpate the Defendants. With respect to Farrell, her testimony did not identify the contact persons for the Cayman Islands entities' accounts at Monarch. Farrell Tr. at 81. Similarly, the fact that Farrell would testify that Eisenberg handled the Roger Rowland and the Donna Lee Clarambeau accounts does not exculpate the Defendants. *Id.* at 87, 155. Bertoli also relies on the testimony of Farrell that Bertoli came to Monarch to conduct his own, his wife's and his children's accounts and his wife's custodian accounts. Bertoli Aff. at 5 (citing Farrell SEC Tr. at 89–91). Farrell also stated that Bertoli came to Monarch to use the telephone occasionally and on one occasion received a Federal Express package at Monarch. Farrell SEC Tr. at 89. Farrell could not, however, testify as to whether Bertoli had any affiliation with Toxic Waste, LCI, Euro Bank, Venture Partners or Parsico or whether Bertoli was ever at Monarch's offices when Lindsley was there. *Id.* at 91–92.

With respect to Isaacson's testimony, Bertoli argues he is prejudiced because he

---

**51.** Bertoli does not state the date of or the conditions leading up to the death of Rohde or that the Government was aware of an impending death.

**52.** As previously discussed, the Second Superseding Indictment alleges that the Defendants and Eisenberg traveled to the Cayman Islands to prevent Euro Bank, Butterfield Bank and Richardson Greenshields from producing the documents requested in the Gentlemen's Agreement. Count Three, ¶ 20. It further alleg-

es Bertoli and Cannistraro travelled to the Cayman Islands and destroyed documents in June and November 1987 after Cannistraro was convicted and sentenced. *Id.,* ¶¶ 24–25. Count Three also alleges that in March and April 1990, after the Government requested documents under the Treaty, Bertoli and others, including Eisenberg, caused the proceeds of the RICO acts to be transferred from the Cayman Islands to the principality of Andorra. *Id.,* ¶ 27.

cannot call Isaacson to testify as to the ownership of the accounts in the names of Cayman Islands entities. The Isaacson Affidavits state Isaacson opened the Venture Partners, Parsico, VPI and Roger Rowland accounts at Monarch. Appendix, Exs. C–D. The Isaacson Affidavits further state Isaacson and Cannon were the beneficial owners of these accounts. *Id.* The Government asserts the Isaacson Affidavits are false and fraudulent. To support this contention, it offers testimony from the Cayman Islands Depositions which establishes that Bertoli, Cannistraro or Eisenberg were the beneficial owners of the Cayman Islands accounts.[53] Opposition Brief at 37 (citing Eisenberg's Rule 11 Tr. at 31; Bond Dep. Tr. at 61–62, 255–56, 274–75, 346). It is at best questionable whether Isaacson's testimony would have exculpated the Defendants.

With respect to the testimony of Scott, who Bertoli states would have testified that Wood Gundy had no policy with respect to its employees owning stock of a company it recommended, the Defendants have not established that this evidence is unavailable from other sources. Although Scott testified he would have had responsibility for making such a policy, Scott SEC Tr. at 39, it seems unlikely Scott was the only employee of Wood Gundy who could testify as to the policies of the company. Accordingly, it does not appear that only Scott's testimony on this point would assist the Defendants. The Defendants have not established actual prejudice resulting from Scott's death.

Similarly, it is not clear how the testimony of Renshak would have exculpated the Defendants. The Defendants neither establish Renshak's expertise with respect to the impact of trading on the market such that Renshak would have been qualified to offer an opinion that the M & I Fund purchases had no impact on the market, nor state that other experts are not available. Significantly, with respect to trading in Cannistraro's nominee accounts in the names of Cannistraro and Godono, it is likely that documentary evidence exists with respect to such trading. Although Renshak may have been the trader who actually executed the transactions,[54] such transactions would be documented. This is particularly the case with respect to Renshak's testimony relating to the LCI prospectus. Renshak stated he had a copy of it in his due diligence file; however, Renshak did not maintain the due diligence file for Wood Gundy. Renshak Dep. at 46.

As to the deaths of Monberg, Averell and Orenstein, the Defendants have not established they were the only witnesses available to offer the relevant testimony. Bertoli has offered no evidence to substantiate his claims as to what they would have stated at trial. Indeed, the Government has evidence that Monberg would not testify as Bertoli claims. The Government contends it has evidence that

> Monberg ... told a third party that Bertoli and ... Isaacson had provided Monberg with stock in an initial public offering and had guaranteed that Monberg

---

**53.** Bond, resident manager of Swiss Bank in the Cayman Islands, testified at the Cayman Island depositions as follows:

> A. Mr. Ebanks indicated that certain records ... were missing, certain records of Euro Bank....
> He said that they had been transported to a warehouse for storage and he checked and checked and just could not find those records.
> Q. Did he indicate what those records were?
> A. Yes. He said they were ... account opening papers....
> I think one was Toxco.
> Q. And was that an account of Mr. Bertoli?
> A. I believe so.
> Q. And did he indicate any other names that you recall.

> A. He did mention Venture Partners....
> He showed me the papers. I believe Mr. Bertoli's name was on it.
> Q. Did he indicate an account by the name of Groco?
> A. Yes, I think so.
> Q. And is that also an account of Mr. Bertoli's?
> A. I believe so, yes.

Bond Dep. Tr. at 61–62; *see also id.* at 255–56. Bond could not recall whether Isaacson was a signatory on the Groco or Toxco accounts or any accounts at Euro Bank. *Id.* at 274.

**54.** The SEC testimony and deposition testimony of Renshak do not indicate his knowledge about the trading of the Cannistraro and Godono accounts.

could sell the stock quickly for double the price. In return, Monberg told the third party, Monberg had agreed to promote the stock at his seminars and elsewhere. Monberg also said that there was a group of people around the country doing just what he was doing. Finally, Monberg also told the third party that Bertoli and his group manipulated stocks by controlling the float and then raising the prices of the stocks.

Opp. Brief at 39 (footnote omitted).

As to Krasnoff, it is not clear from the record that he would have been a defense witness. Indeed, the Government asserts he would have been a Government witness because of his involvement in this case. Accordingly, in the absence of proof of the substance of Krasnoff's testimony it is not possible to determine whether the Defendants were prejudiced by the delay in the indictment.

Lastly, the Defendants have not established actual prejudice because of the death of Rohde. As indicated by the Government, the accuracy of the Toxic Waste Report is not at issue in the Indictment, but rather the issues at trial will center around the intentional inflation of the price of Toxic Waste stock. Accordingly, the death of Rohde has not resulted in actual prejudice toward the Defendants.

■ Even assuming the testimony of the deceased defense witnesses would have been exculpatory, the Defendants have not established that the Government was aware of their impending deaths, much less established that their deaths were impending. The loss of exculpatory evidence alone is insufficient to dismiss an indictment. *See e.g., Griffin v. Spratt*, 969 F.2d 16, 20 (3d Cir. 1992) (civil rights action raising right to have evidence preserved for prison disciplinary action); *see also Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) (criminal defendant does not have right under Due Process Clause to have all potentially exculpatory evidence preserved for trial; criminal defendant must show evidence of bad faith failure to preserve potentially useful evidence to establish denial of due process),

*reh'g denied*, 488 U.S. 1051, 109 S.Ct. 885, 102 L.Ed.2d 1007 (1989).

The actual prejudice prong of the *Marion* test as well as the intentional delay prong have not been satisfied. The motion to dismiss the Second Superseding Indictment for pre-indictment delay is denied.

### B. *Selective Prosecution*

The Supreme Court has stated that "the Government retains 'broad discretion' as to whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985) (quoting *United States v. Goodwin*, 457 U.S. 368, 380 n. 11, 102 S.Ct. 2485, 2492 n. 11, 73 L.Ed.2d 74 (1982)). The Court explained:

This broad discretion rests largely on the recognition that the decision to prosecute is particularly illsuited to judicial review.... Judicial supervision in this area, moreover, entails systemic costs of particular concern. Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy.

*Id.*

■ The breadth of prosecutorial discretion, however, "is not 'unfettered. Selectivity in the enforcement of criminal laws is ... subject to [C]onstitutional constraints.'" *Id.* at 608, 105 S.Ct. at 1531 (quoting *United States v. Batchelder*, 442 U.S. 114, 125, 99 S.Ct. 2198, 2205, 60 L.Ed.2d 755 (1979)). The Court stated claims for selective prosecution are subject to the "ordinary equal protection standards." *Id.* It stated that to establish a basis for dismissal because of selective prosecution, the defendant must show "both that the passive enforcement system had a discriminatory effect and that it was motivated by a discriminatory purpose." *Id.* (citing *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450

(1977); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). It noted, however, the defendant need not demonstrate a discriminatory intent if the equal protection claim is based on an overtly discriminatory act. *Wayte*, 470 U.S. at 608 n. 10, 105 S.Ct. at 1531 n. 10.

With respect to the discriminatory purpose prong of the selective prosecution test, the *Wayte* court explained it " 'implies more than ... intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.' " *Id.* at 610, 105 S.Ct. at 1532 (quoting *Personnel Adm'r of Massachusetts*, 442 U.S. at 279, 99 S.Ct. at 2296).

The Third Circuit has stated a defendant bears the burden of proof to establish two factors.

> First, he [or she] must provide evidence that persons similarly situated have not been prosecuted. Second, he [or she] must show that the decision to prosecute was made on the basis of an unjustifiable standard, such as race, religion, or some other arbitrary factor, or that the prosecution was intended to prevent his exercise of a fundamental right.

*United States v. Schoolcraft*, 879 F.2d 64, 68 (3d Cir.) (citing *Government of Virgin Islands v. Harrigan*, 791 F.2d 34, 36 (3d Cir.1986)), *cert. denied*, 493 U.S. 995, 110 S.Ct. 546, 107 L.Ed.2d 543 (1989).

In *Schoolcraft*, the defendant was charged with making a false statement in the acquisition of a firearm and unlawful possession of a firearm by a previously convicted felon. 879 F.2d at 66. In addition, the Government filed a criminal information alleging prior convictions, as permitted under the Armed Career Criminal Act, 18 U.S.C. § 924(e)(1). 879 F.2d at 66. Prior to trial, the defendant moved for dismissal arguing, *inter alia*, selective prosecution. *Id.*

The Circuit affirmed the district court's denial of the motion to dismiss for selective prosecution. *Id.* at 69. It observed the record reflected no efforts taken by de-fense counsel to determine whether there were similarly situated defendants in the state system who had not been transferred to the federal system. *Id.* It further stated there was no evidence the defendant had been prosecuted "on the basis of an unjustifiable standard or for exercising one of his fundamental rights." *Id.*

In *Harrigan*, the defendant was prosecuted and convicted under the habitual criminal statute of the Virgin Islands. 791 F.2d at 35. Harrigan challenged the application of the statute to him arguing, *inter alia*, it denied him of equal protection of the law. *Id.* At his sentencing he argued the government "made its decisions on when to file habitual criminal informations on a racially discriminatory basis;" however, he provided no evidence to support his claim. *Id.* at 36. The first time Harrigan raised evidence to support his claim of selective prosecution was on appeal when he presented a record indicating that the fourteen people sentenced under the habitual criminal statute in the previous twenty years were minorities, including nine African–Americans and five Hispanics. *Id.* Because no evidence had been presented at his sentencing hearing, the Circuit did not consider the evidence first raised on appeal. *Id.*

On appeal Harrigan also argued the government violated his right to equal protection because it arbitrarily chose when to file habitual criminal informations. *Id.* He argued the government, in the past, did not file habitual criminal informations in cases involving grand larceny, the charge against Harrigan. *Id.* The Circuit rejected Harrigan's argument on the ground that the government's change of policy on whether to file information on persons convicted of theft alone is not evidence of arbitrariness. *Id.* It continued: "Prosecutors consider numerous factors in deciding whether to prosecute including the age and record of the offender, the role of the person in the crime, and the resources of the prosecutor's office." *Id.* at 37.

In *United States v. Greene*, 697 F.2d 1229 (3d Cir.1983), *cert. denied*, 463 U.S. 1210, 103 S.Ct. 3542, 77 L.Ed.2d 1391

(1983), three defendants were charged with and convicted for participating in a strike while being employed by the Government. *Id.* at 1231. The defendants appealed their conviction on the ground that the indictment was selectively prosecuted because they were among six air traffic controllers prosecuted out of approximately three hundred who did not report for work. *Id.* at 1234. The Government agreed there had been "some selectivity in singling out the defendants for prosecution." *Id.* The Circuit, therefore, focused on the purpose of the selectivity.

To establish an invidious purpose, the defendants relied on the fact that the F.B.I. had been given information relating to their union status. *Id.* at 1237. They argued "such evidence, combined with an alleged 'pattern' of prosecution of union officials in the Dallas–Fort Worth area, g[ave] rise to the inference that prosecution of defendants was based on their assertion of the right to strike and their union activities." *Id.*

The *Greene* court rejected this argument and stated the record indicated the defendants had been prosecuted because of their status as strike leaders, not as union officials. *Id.* The court relied on the evidence in the record that the defendants had actively participated in the strike and that in the documents submitted, *in camera,* the Government continuously referred to the defendants as strike leaders, not union officials. *Id.* at 1237–38. The court further stated the Government prosecuted all strike leaders of whom it was aware, whether union officials or rank-and-file members. Accordingly, the Circuit found the defendants failed to establish an improper motive in the selective prosecution of the striking air traffic controllers. *Id.* at 1238.

In this case, the Defendants base their argument for selective prosecution on the fact that the prosecution is based on a novel use of RICO which was attempted only once before in which case the Government eventually abandoned the charge. Pre–Indictment Delay Moving Brief at 10. They argue they have been singled out as the targets of such novel application of RICO for conduct which is pervasive and generally accepted within the industry. *Id.* The Defendants further rely on the fact that the Government has immunized "at least a dozen persons" and accepted plea bargains from "at least five [persons]." *Id.*

The Defendants' general averment that their conduct of not revealing their interest in stock while favorably recommending the purchase of the stock was a generally accepted practice within the industry is unsubstantiated. The Defendants provide newspaper or magazine articles discussing the propriety of analysts' conduct of "loading up" on stock prior to making a favorable recommendation on it. Defendants' Reply Ex. 9. These articles do not state it is a generally accepted practice among firms, but rather discuss the debate among brokerage firms as to whether front-loading by analysts should be permitted. *Id.* Indeed, one article refers to SEC action taken against an analyst who purchased stock prior to his recommendation and who knew or should have known his representations contained in his recommendation were false. *Id.,* John R. Dorfman, *Analysts Frequently Own Stocks They Tout,* Wall St. Journ., 7 Jan. 1992, at C1–2.

Even assuming the Government has not previously prosecuted scalping and stock manipulation schemes involving securities analysts, a change in policy alone is not evidence of arbitrariness and selective prosecution. *Harrigan,* 791 F.2d at 35.

Lastly, to the extent the Defendants assert they are being selectively prosecuted because of Bertoli's assistance to Lindsley during his defense in a criminal trial, the Defendants have provided no evidence of such claim. The Second Superseding Indictment makes substantial allegations regarding the various fraudulent and manipulative securities trading schemes of the Defendants. No evidence of an improper motive in prosecuting the Defendants has been presented. *See, e.g., Greene,* 697 F.2d at 1238.

## C. *Vindictive Prosecution*

The analytical framework for evaluating claims of prosecutorial vindictiveness is set forth in *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974). In *Blackledge*, the defendant was convicted of a misdemeanor in Northampton County District Court, located in Northampton County, North Carolina. The defendant then filed a notice of appeal to the Northampton County Superior Court, which he was entitled to do under North Carolina law and which entitled him to a trial *de novo*. Prior to the commencement of the defendant's trial, the prosecutor obtained an indictment from a grand jury, charging the defendant with a felony based on the same conduct charged previously in the misdemeanor.

The Supreme Court held: "[The] Due Process Clause is not offended by all possibilities of increased punishment upon retrial after appeal, but only by those that pose a *realistic likelihood of 'vindictiveness.'*" *Id.* at 27, 94 S.Ct. at 2102 (emphasis added). The Court held while there was no evidence that the prosecutor had acted in bad faith or maliciously in seeking the felony indictment, due process required that there be no "potential for vindictiveness" and ruled that it was impermissible for the State to respond to the defendant's "invocation of his statutory right to appeal by bringing a more serious charge against him...." *Id.* at 28–29, 94 S.Ct. at 2103; *see also United States v. Oliver*, 787 F.2d 124, 125 (3d Cir.1986) ("Actual retaliatory motivation need not exist; the Court's focus is on whether the possibility of increased punishment posed a realistic likelihood of vindictiveness.").

█ A presumption of prosecutorial vindictiveness arises where the "'totality of circumstances surrounding the prosecutorial decision at issue' suggest[s] the 'appearance of vindictiveness.'" *United States v. Robison*, 644 F.2d 1270, 1272 (9th Cir.1981) (quoting *United States v. Griffin*, 617 F.2d 1342 (9th Cir.), *cert. denied*, 449 U.S. 863, 101 S.Ct. 167, 66 L.Ed.2d 80 (1980)). Once the presumption is created, "the court must determine whether the prosecutorial deci-

sion was justified by either independent reasons or intervening circumstances sufficient to dispel the appearance of vindictiveness." *Id.* A "charging decision does not levy an improper 'penalty' unless it results solely from the defendant's exercise of a protected legal right, rather than the prosecutor's normal assessment of the societal interest in prosecution." *Goodwin*, 457 U.S. at 380 n. 11, 102 S.Ct. at 2492 n. 11 (discussing prosecutorial misconduct in pretrial context); *see also Schoolcraft*, 879 F.2d at 67 ("There is no prosecutorial vindictiveness ... where the prosecutor's decision to prosecute is based on the usual determinative factors."). "If ... the course of events provides no objective indication that would allay a reasonable apprehension by the defendant that the more serious charge was vindictive," the presumption is not overcome. *United States v. Krezdorn*, 718 F.2d 1360, 1365 (5th Cir. 1983), *cert. denied*, 465 U.S. 1066, 104 S.Ct. 1416, 79 L.Ed.2d 742 (1984).

In *Blackledge*, the Supreme Court stated in dictum that the case before it would have been different if the State had shown it was unprepared to proceed on the felony at the outset of the case. 417 U.S. at 29 n. 7, 94 S.Ct. at 2103 n. 7. In other cases, the presumption has been found to have been rebutted by a showing of the Government that the decision to bring the subsequent charge was "based upon new facts or evidence not known to the Government at the time of the original indictment." *Krezdorn*, 718 F.2d at 1363. In addition, courts have found a difference between the illegal conduct alleged in the prior and subsequent indictments weighs against a finding of prosecutorial vindictiveness. *Robison*, 644 F.2d at 1272–73; *United States v. Preciado–Gomez*, 529 F.2d 935, 939 (9th Cir.), *cert. denied*, 425 U.S. 953, 96 S.Ct. 1730, 48 L.Ed.2d 197 (1976).

█ In a pretrial setting, however, a court cannot presume vindictiveness. *Goodwin*, 457 U.S. at 372–84, 102 S.Ct. at 2488–94; *Bordenkircher v. Hayes*, 434 U.S. 357, 362–63, 98 S.Ct. 663, 667–68, 54 L.Ed.2d 604, *reh'g denied*, 435 U.S. 918, 98 S.Ct. 1477, 55 L.Ed.2d 511 (1978). To es-

tablish a violation of the Due Process Clause in a pretrial context, the defendant must establish actual vindictiveness. *Goodwin*, 457 U.S. at 384, 102 S.Ct. at 2494. In *Goodwin*, the defendant was originally charged with several misdemeanor and petty offenses. Prior to his trial date, Goodwin fled the jurisdiction and was not returned until three years later. After Goodwin's return, the Government modified the charges against Goodwin by adding a felony indictment. Goodwin moved to set aside his verdict on the ground of prosecutorial vindictiveness arguing that the additional felony indictment gave rise to an appearance of retaliation. *Id.* at 371, 102 S.Ct. at 2488.

The Court held there was "no evidence ... that could give rise to a claim of *actual* vindictiveness; the prosecutor never suggested that the charge was brought to influence the respondent's conduct." *Id.* at 380–81, 102 S.Ct. at 2492 (emphasis in original). The Court distinguished a pretrial setting from a trial setting and stated:

> In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he [or she] simply may come to realize that information possessed by the State has a broader significance.... In contrast, once a trial begins ... it is much more likely that the State has discovered and assessed all of the information against an accused and has made a determination, on the basis of that information, of the extent to which he should be prosecuted. Thus, a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision.

*Id.* at 381, 102 S.Ct. at 2492–93.

In this case, the Defendants recognize there is no presumption of vindictiveness in the pretrial context. Pre–Indictment Delay Moving Brief at 9. They argue, however, "there is enough in the record to make a

prima facie showing—or at least a colorable claim—that this prosecution is the product of vindictiveness in fact." *Id.* The Defendants rely on the previous aggressive defense against prior charges.[55] *Id.* Bertoli also argues vindictiveness is evidenced by the fact that he assisted Lindsley who was previously the target of prosecution by the Government. *Id.* The Defendants argue that the Government's pursuit of a novel theory of RICO prosecution and the Government's institution of this action in "an unusual venue,"[56] give rise to a showing of actual prejudice. *Id.;* 19 June 1992 Oral Arg. Tr. at 13, 15.

 As mentioned, the Defendants have provided no evidence that they are being prosecuted in revenge because Bertoli assisted Lindsley defend criminal charges. Although the Government may have discovered the underlying securities fraud during its investigation of the Hudson County Democratic machine, Bertoli has presented no evidence that the Government chose to prosecute the case solely because of Bertoli's involvement in Lindsley's defense. A prosecutor is given wide latitude to investigate criminal conduct and to determine which conduct to prosecute. There is no basis to assume the Government's response to the discovery of alleged fraudulent and illegal conduct was to retaliate against Bertoli. The facts presented by Bertoli do not "pose a realistic likelihood of 'vindictiveness.'" *Blackledge*, 417 U.S. at 27, 94 S.Ct. at 2102.

Bertoli was not indicted in the Lindsley case. Accordingly, the return of the Indictment did not present a case of increased punishment. *See, e.g., Oliver*, 787 F.2d at 125. The Government raised criminal charges against Bertoli in the Indictment. To the extent Bertoli relies on the fact that the Indictment has since been amended with the Superseding Indictment and the Second Superseding Indictment, these subsequent indictments do not establish actual

---

**55.** Although the Defendants do not specify what charges they are referring to, Bertoli is presumably referring to civil charges brought by the SEC and Cannistraro is presumably referring to the 1987 Cannistraro Indictment.

**56.** Although Bertoli attacks the venue as being unusual, he does not move for a change of venue.

vindictiveness. As stated in *Goodwin*, "[i]n the course of preparing a case for trial, the [Government] may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed ... has a broader significance." 457 U.S. at 381, 102 S.Ct. at 2492.

The fact that the venue of this case is New Jersey is not evidence of actual vindictiveness. Indeed, by the Defendants' own admission, the initial stages of the investigation were conducted in New Jersey. Defendants' Reply Ex. 7. In addition, High Tech is based in New Jersey, Count One, ¶ 6(e), and the Defendants sometimes operated in New Jersey. *See generally* Second Superseding Indictment.

The Constitution guarantees to criminal defendants a trial "in the State where the said Crimes shall have been committed," U.S. Const. art. III, § 2, cl. 3, by a "jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. This right is implemented by Rule 18 of the Federal Rules of Criminal Procedure, which provides: "Except as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed." *Id.* The situs of a crime must be determined by reference to the statute proscribing the criminal act. *Johnston v. United States*, 351 U.S. 215, 220, 76 S.Ct. 739, 742, 100 L.Ed. 1097 *reh'g denied*, 352 U.S. 860, 76 S.Ct. 23, 1 L.Ed.2d 69 (1956); *Eisenberg*, 773 F.Supp. at 694–95.

As discussed, Bertoli does not challenge the propriety of venue of this action, but merely characterizes it as "unusual." Such an assault on the venue of this action, absent a viable motion to change venue, is insufficient to establish actual vindictiveness. *See, e.g., Goodwin*, 457 U.S. at 380–81, 102 S.Ct. at 2492 (in pretrial context defendant must present evidence supporting claim of actual vindictiveness). Moreover, Monarch conducted some of its business in New Jersey. Therefore, the prosecution is in the district in which some of the offenses were committed. Accordingly, Bertoli's motion to dismiss the Second Su-

perseding Indictment for vindictive prosecution because of the venue is denied.

Cannistraro argues the presumption of vindictiveness applies to him because he is not a pretrial defendant. 19 June 1992 Oral Arg. Tr. at 14. He argues the sealed Indictment was returned in this case after he withdrew his guilty plea in the 1987 Cannistraro Indictment. *Id.* He further states that after he refused to make a deal to cooperate with the Government, the Superseding Indictment, which is now the Second Superseding Indictment, was returned. *Id.* Cannistraro raised these same arguments in the first set of pretrial motions. *See Eisenberg*, 773 F.Supp. at 714–17. Cannistraro merely adds to this claim the fact that the Second Superseding Indictment has been returned. 19 June 1992 Oral Arg. Tr. at 14.

As was the case with the Superseding Indictment, the acts charged in the Second Superseding Indictment are different from those charged in the 1987 Cannistraro Indictment. *See supra* pp. 35–36, n. 3. Accordingly, it cannot be inferred from the charges contained in the Second Superseding Indictment that there is a "realistic likelihood" that the Government sought to "up the ante" by filing the Second Superseding Indictment in January 1992 in response to any action taken by Cannistraro. *Blackledge*, 417 U.S. at 27, 94 S.Ct. at 2102. The charges in the Second Superseding Indictment against Cannistraro instead reflect the use of prosecutorial discretion.

As the Third Circuit has stated: " '[P]rosecutors have traditionally enjoyed discretion in deciding which of multiple charges against a defendant are to be prosecuted or whether they are all to be prosecuted at the same time.' " *United States v. Pungitore*, 910 F.2d 1084, 1112 (3d Cir. 1990) (quoting *United States v. Cardall*, 885 F.2d 656, 666 (10th Cir.1989)); *see also United States v. Moscony*, 927 F.2d 742, 755 (3d Cir.1991) ("[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entire-

ly in his discretion.") (quoting *Bordenkircher*, 434 U.S. 357, 98 S.Ct. 663), *cert. denied*, — U.S. —, 111 S.Ct. 2812, 115 L.Ed.2d 984, *reh'g denied*, — U.S. —, 112 S.Ct. 16, 115 L.Ed.2d 1100 (1991); *accord, Eisenberg*, 773 F.Supp. at 717. The motion of Cannistraro to dismiss the Second Superseding Indictment due to prosecutorial vindictiveness is denied.

Lastly, the Defendants argue the novelty of the charges alleged in the Second Superseding Indictment establishes actual vindictiveness. Pre–Indictment Delay Moving Brief at 9–10. This argument was previously addressed with respect to the claim for selective prosecution and fails for the same reasons as stated above. The motion to dismiss for vindictive prosecution is denied.

### III. Motion to Preclude Cayman Islands Depositions

The Defendants seek to exclude from evidence the Cayman Islands Depositions. Specifically, they argue the Cayman Islands Depositions are inadmissible because since they were taken, the Second Superseding Indictment, containing new legal theories, was returned. Cayman Islands Moving Brief at 1. Bertoli contends as a result of the changes in the Second Superseding Indictment his motive during cross-examination of the deposed witnesses has been altered.[57] *Id.* He argues, therefore, the Cayman Islands Depositions are inadmissible because they do not satisfy the requisite identity of motives required by Rule 804(b)(1) of the Federal Rules of

Evidence. *Id.* Bertoli further seeks to exclude the Cayman Islands Depositions on the grounds that he was not permitted to recross certain witnesses or introduce evidence during cross-examination and he was not allowed to call witnesses which the Government had previously subpoenaed.[58] *Id.* at 1–2.

Cannistraro argues the Cayman Islands Depositions are inadmissible because his right to confrontation was violated. *Id.* at 2. Specifically, he argues his right to confrontation was violated because the Rule 15 Letter Request for the Government to pay the travel expenses of his attorney was denied and because he did not waive his right to attend the Cayman Islands Depositions. *Id.*

### A. *Similar Motive*

■ The use of depositions in a criminal case is permitted by Rule 15 of the Federal Rules of Criminal Procedure. Rule 15 provides, in pertinent part: "Whenever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial, the court may ... order that testimony of such witness be taken by deposition...." Fed. R.Crim.P. 15(a). Such depositions, "so far as otherwise admissible under the rules of evidence, may be used as substantive evidence if the witness is unavailable as ... defined in Rule 804(a)...." *Id.*, R. 15(e).

Rule 804(b)(1)[59] establishes an exception to the hearsay rule and governs the admis-

---

**57.** Although the Defendants jointly filed the Cayman Islands Moving Brief, this argument is deemed to be made by Bertoli only because Cannistraro did not attend and thus did not cross-examine the witnesses.

**58.** Bertoli previously challenged the fact that he was not permitted to call witnesses subpoenaed by the Government for the Cayman Islands Depositions. *See* letter-opinion and order, filed 19 December 1991. Bertoli has been given leave to depose these witnesses. A Letter Rogatory has been submitted to the Cayman Authority requesting that these depositions be conducted; as of the date of this opinion, the depositions have not been scheduled. Accordingly, to the extent Bertoli bases the motion to exclude the Cayman Islands Depositions on the ground that he was

not able to call witnesses subpoenaed by the Government, the motion is moot.

**59.** Rule 804(b) provides, in pertinent part:
 (b) **Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
 (1) **Former testimony.** Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, *if the party against whom the testimony is now offered,* or, in a civil action or proceeding, a predecessor in interest, *had an opportunity and similar motive to develop the testimony* by direct, cross, or redirect examination.
 Fed.R.Evid. 804(b)(1) (emphasis added).

sibility of former testimony. Fed.R.Evid. 804(b)(1); *see also United States v. Salerno*, — U.S. —, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992); *United States v. Kelly*, 892 F.2d 255, 262 (3d Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 3243, 111 L.Ed.2d 754 (1990). "Nothing in the language of Rule 804(b)(1) suggests that a court may admit former testimony absent satisfaction of each of the Rule's elements." *Salerno*, — U.S. at —, 112 S.Ct. at 2504. Indeed, in *Salerno*, the Supreme Court rejected the defendants' argument that it was not necessary to establish a similar motive in the interest of "adversarial fairness." *Id.* The Court reasoned: "Congress ... presumably made a careful judgment as to what hearsay may come into evidence and what may not. To respect its determination, we must enforce the words that it enacted.... This Court cannot alter evidentiary rules merely because litigants might prefer different rules in a particular class of cases." *Id.*

In *Salerno*, the defendants sought to introduce grand jury testimony of two witnesses who invoked the Fifth Amendment privilege against self-incrimination at trial. *Id.* at —, 112 S.Ct. at 2506. The district court refused to admit the grand jury testimony and stated "the motive of a prosecutor in questioning a witness before the grand jury in the investigatory stages of a case is far different from the motive of a prosecutor in conducting the trial." *Id.* On appeal, the Second Circuit reversed the trial court's decision and held the trial court erred in excluding the grand jury testimony because it was contrary to adversarial fairness. *Id.* at —, 112 S.Ct. at 2506. The Circuit stated "in order to maintain 'adversarial fairness,' Rule 804(b)(1)'s similar motive element should 'evaporate[e]' when the [G]overnment obtains immunized testimony in a grand jury proceeding from a witness who refuses to testify at trial." *Id.* The Supreme Court reversed the Second Circuit's holding to dispense with the similar motive requirement. *Id.* Rather than consider the issue in the first instance, it remanded the question of whether a similar motive had been established. *Id.* at —, 112 S.Ct. at 2508–09.

In this case, the only element of Rule 804(b)(1) contested by the parties is whether Bertoli had a similar motive in conducting cross-examination while the Superseding Indictment was pending as he would have if conducting cross-examination for the Second Superseding Indictment. Bertoli argues that the legal theories raised in the two indictments are different. He contends as a result of the differences, he would have had a different motive in conducting cross-examination for the Second Superseding Indictment. Cayman Islands Moving Brief at 25–38.

The Government argues Bertoli has the same motive to cross-examine witnesses during the Cayman Islands Depositions as he would have had he cross-examined them after the Second Superseding Indictment. Opposition Brief at 103–112. Specifically, the Government argues both the Superseding Indictment and the Second Superseding Indictment charge the Defendants with establishing nominee brokerage accounts at Monarch in the names of Cayman Islands entities. *Id.* at 105. The Government argues its motive during the Cayman Islands Depositions was to establish that the Defendants and Eisenberg controlled the Cayman Islands entities. *Id.* Accordingly, the Government contends Bertoli's cross-examination was designed to "cast doubt" on the Government's theory. *Id.* It argues, Bertoli would have this same motive if he were to cross-examine the witnesses today. *Id.* at 105–06.

A determination as to whether a party against whom former testimony is being offered had a similar motive is a factual determination. "The opportunity to develop testimony offered at another proceeding is not established by presence alone." *United States v. Taplin*, 954 F.2d 1256, 1258 (6th Cir.1992). In *Taplin*, the court stated presence of the defendant's counsel during a co-defendant's suppression hearing, even where defendant's counsel was asked if he had any questions, does not prove that the defendant was prepared for a full and thorough cross-examination of the witness. *Id.*

"The traditional formulation of the similar motive requirement is that the two proceedings must reflect a 'substantial identity of issues.'" *Id.* at 1259 (quoting 8 James W. Moore et al., *Moore's Federal Practice* § 804.04[3] (2d ed 1989)). Identity of issues is required to ensure that the party against whom the former testimony is being offered had a "meaningful opportunity to develop testimony when it was first offered." *Taplin*, 954 F.2d at 1259 (citing *United States v. Wingate*, 520 F.2d 309, 316 (2d Cir.1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976)). "[T]he question is whether the *issues* are substantially similar such that the incentive to develop testimony is similar in the two proceedings." *Taplin*, 954 F.2d at 1259 n. 1 (emphasis in original).

In *United States v. Lowell*, 649 F.2d 950 (3d Cir.1981), the defendant sought to read to the jury from the plea transcript of a co-conspirator, Montalbano, who had invoked his Fifth Amendment right against self-incrimination. *Id.* at 965. The Circuit affirmed the decision to exclude the testimony because "the prosecutor, although present at Montalbano's plea hearing, had no similar motive or interest." *Id.* It stated: "The only motive at the earlier hearing was to assure that the plea was voluntary and that a factual basis existed for the plea.... Montalbano's implicit denial of receipt of payment from [the defendant], even if untrue, did not deprive his plea of guilty of the conspiracy charge of a 'factual basis.'" *Id.*

In *United States v. Powell*, 894 F.2d 895 (7th Cir.1990), *cert. denied*, 495 U.S. 939, 110 S.Ct. 2189, 109 L.Ed.2d 517 (1990), the defendant sought to call a co-conspirator, who was not named in the indictment, to testify at trial. The co-conspirator informed the judge that if called, he would invoke the Fifth Amendment privilege against self-incrimination. *Id.* at 901. The defendant, therefore, moved to introduce the co-conspirator's statements made at his detention hearing and plea hearing. The district court excluded the testimony from the plea hearing on the ground that the Government did not have the same motive at the plea hearing as it would at trial. *Id.*

It stated the Government was only trying to establish a factual basis for the guilty plea and did not have an incentive to pursue the issue of the defendant's involvement with the co-conspirator. *Id.*

In *United States v. North*, 910 F.2d 843 (D.C.Cir.), *op. withdrawn in part on other grounds*, 920 F.2d 940 (D.C.Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991), the defendant, Oliver North ("North"), sought to introduce a three-to-four-hour excerpted video-tape of John Poindexter's thirty hours of immunized testimony before the congressional committees who investigated the Iran/Contra affair. *Id.* at 905. The district court denied North's motion. On appeal, North argued the video-tape was admissible under Rule 804(b)(1). The Circuit affirmed the district court. The Circuit stated Congress and the independent counsel appointed to investigate and prosecute criminal wrongdoings by government officials in the Iran/Contra affair were not the same party. *Id.* at 905–06.

The *North* court recognized Congress and the independent counsel did not have a similar motive. It commented on the obvious: the independent counsel was prosecuting the case and asking questions to support a criminal conviction. *Id.* at 907. It also observed: "Although Congress in authorizing and conducting the Iran/Contra hearings may have had an intent to determine whether illegal conduct had occurred, and to identify government officials who might have engaged in illegal activity, the political and legislative goals of Congress are far different from the prosecutorial commission of the [independent counsel]." *Id.*

In *United States v. Licavoli*, 725 F.2d 1040 (6th Cir.), *cert. denied sub nom. Calandra v. United States*, 467 U.S. 1252, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984), Ferritto, a witness in a state murder trial, refused to testify at a federal RICO trial because the Government did not comply with the plea agreement. *Id.* at 1047. At trial, the Government moved to read Ferritto's testimony at the state trial. The defendants appealed their conviction, *inter*

*alia,* arguing Ferritto's testimony was inadmissible under Rule 804(b)(1). *Id.* at 1048. The defendants argued although the murder and conspiracy to murder charges in the state court proceeding are the predicate acts for the federal RICO conspiracy, the motive to cross-examine was not the same because there is the additional "enterprise" element in the federal trial. *Id.*

The Court affirmed the district courts' decision to allow the state court testimony. It commented that the "defendants ... failed to point to any matter that they would have raised in cross-examination with respect to the enterprise element that they did not raise in the prior proceedings." *Id.* It further relied on the fact that the jury was given a limiting instruction as to how to consider the different versions of the facts. *Id.* at 1048–49.

In this case, Bertoli had an adequate opportunity to cross-examine the witnesses at the Cayman Islands Depositions with respect to the Superseding Indictment. As the parties are well aware, however, after the Cayman Islands Depositions, the Second Superseding Indictment was returned. It must be determined, therefore, whether there is a substantial identity of issues with respect to the two indictments. The Government contends, with the exception of the obstruction of justice charges, the Second Superseding Indictment has only been altered in so far as the fraudulent securities trading schemes have been "fleshed out a bit more." Letter to court, dated 23 January 1992 at 2. Bertoli argues the underlying theory of the RICO allegations has been changed from scalping and manipulation as to purchases of certain mutual funds to "massive market manipulation over an extended period of time." 19 June Oral Arg. Tr. at 5; Cayman Islands Moving Brief at 31–35.

Most of the charges in the Superseding Indictment remained the same in the Second Superseding Indictment. This is especially true with respect to the list of the securities fraud schemes. Nevertheless, the Government has alleged in the Second Superseding Indictment additional facts and charges which were discovered as a result of the Cayman Islands Depositions. For instance, the Government has added to the list of nominee accounts Berco Trust and Euro Bank.

The addition of facts and entities is, however, distinguished from the facts of *Lowell* and *Powell* where the Government was only attempting to establish a factual basis at a plea hearing as opposed to establishing the truth of statements as is required for trial. During the Cayman Islands Depositions, Bertoli was conducting cross-examination to prepare his defense which would remain the same if he were conducting cross-examination after the return of the Second Superseding Indictment. Although statements relating to new nominee accounts were raised during the Cayman Islands Depositions, Bertoli would presumably have a motive to challenge the validity of such statements.

This case is also distinguished from the facts of *North,* because Bertoli would be defending a criminal prosecution under the Second Superseding Indictment. Moreover, Bertoli's argument, that he would have a different motive in conducting cross-examination at the Cayman Islands Depositions in light of the Second Superseding Indictment, strains credulity because he does not specify the nature of such difference. At oral argument, Bertoli merely stated his motive would have been different, it may have been shorter or pinpointed into different areas. 19 June 1992 Oral Arg. Tr. at 17.

Although Bertoli did not specify what he would have asked differently, it is conceivable he may have included in his cross-examination questions relating to the additional facts alleged in the Second Superseding Indictment. *See, e.g., Licavoli,* 725 F.2d at 1047 (additional element in subsequent proceeding). As discussed, Bertoli is currently scheduled to return to the Cayman Islands to conduct depositions as permitted by the letter-opinion, filed 19 December 1991. No harm will be done by permitting him to recross-examine those witnesses previously deposed as to issues raised in the Second Superseding Indictment. Accordingly, the motion to exclude the Cayman Islands

Depositions on the ground that Bertoli did not have a similar motive is denied; however, Bertoli is given leave to again cross-examine the witnesses in light of the Second Superseding Indictment.

### B. *Right to Conduct Recross*

Bertoli further argues the depositions of Bond and Coleman are inadmissible because he was not given an opportunity to conduct recross examination of them. Cayman Islands Moving Brief at 39. Bertoli argues the denial by the Cayman Authority of his right to conduct recross-examination with respect to Bond and Coleman deprived him of his Sixth Amendment right to confrontation. *Id.* The Government argues there is no basis to conduct recross-examination because no new information was raised during the Government's redirect of Bond and Coleman. Opposition Brief at 113–14.

The right to recross-examination was addressed by the Circuit in *United States v. Riggi*, 951 F.2d 1368 (3d Cir.1991), *reh'g denied* (13 Feb. 1992) (en banc). The court stated: "As a general rule, a trial court has wide discretion to restrict recross-examination, especially when no new matters have been raised on redirect." *Id.* at 1374. (citing *Alford v. United States*, 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931); *United States v. Rockwell*, 781 F.2d 985, 988 (3d Cir.1986); *United States v. Kenny*, 462 F.2d 1205, 1226 (3d Cir.), *cert. denied sub nom. Murphy v. United States*, 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972)).

Although the Federal Rules of Evidence do not directly address a party's right to redirect and recross-examination, Rule 611(b) provides:

> Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

Fed.R.Evid. 611(b). The scope of redirect-examination has traditionally been limited to those matters raised on cross-examina-

tion. *Riggi*, 951 F.2d at 1375. The Circuit stated:

> Ideally, no new material should be presented on redirect, because litigants will in theory have presented all pertinent issues during the direct examination. In reality, however, new information may come out on redirect, when the trial court, in its discretion and in the interest of justice, determines that the information is relevant and admissible.

*Id.* (citations omitted). Where a new subject is raised in direct examination, the "Confrontation Clause of the Sixth Amendment mandates that the opposing party be given the right of recross-examination...." *Id.* (citing *Hale v. United States*, 435 F.2d 737, 752 n. 22 (5th Cir. 1970), *cert. denied*, 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971)).

The *Riggi* court explained, cross-examination and recross-examination of material brought out on direct and redirect are the principal means to test the trustworthiness of the witness. *Id.* at 1376 (citing *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974)). The absence of proper confrontation "calls into question the ultimate integrity of the fact-finding process." *Ohio v. Roberts*, 448 U.S. 56, 64, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597 (1980); *accord*, *Riggi*, 951 F.2d at 1376. The Circuit observed:

> "Where ... new matter is brought out on redirect[-]examination, the defendant's first opportunity to test the truthfulness, accuracy, and completeness of that testimony is on recross[-]examination. To deny recross-examination on a matter first drawn out on redirect is to deny the defendant the right of any cross-examination as to that new matter. The prejudice of the denial cannot be doubted."

*Riggi*, 951 F.2d at 1376 (quoting *United States v. Caudle*, 606 F.2d 451, 458 (4th Cir.1979) (citations omitted)).

■ If a party seeks to conduct recross-examination as to matters not raised on redirect-examination, however, the decision lies within the trial court's discretion. *Riggi*, 951 F.2d at 1376 (citing *United States v.*

*Stoehr*, 196 F.2d 276, 280 (3d Cir.), *cert. denied*, 344 U.S. 826, 73 S.Ct. 28, 97 L.Ed. 643 (1952)).

In *Riggi*, the trial court introduced a blanket rule that there would be no re-cross-examination. *Id.* at 1372. It was not until after thirteen witnesses had been examined on redirect that the court lifted its absolute ban on recross and permitted recross on request. *Id.* One of the thirteen witnesses, Ronald Fino ("Fino"), was a key Government witness. On redirect examination, Fino provided new evidence. *Id.* After the redirect, Riggi objected to the line of redirect questioning and urged the court to reconsider its policy on recross-examination. *Id.* at 1373. The trial court affirmed its policy that there would be absolutely no recross in the trial, be it for the Government or the defendant. *Id.* Riggi challenged his conviction, *inter alia*, on the ground that the trial court deprived him of his right to confrontation. *Id.* at 1374. The Circuit stated the trial court "erred in imposing its blanket prohibition on recross-examination." *Id.* at 1375.

▇ In this case, Bertoli was permitted to conduct recross-examination of a record custodian witness during the depositions taken on 5 September 1991. *See* Bechard Dep. Tr. at 31. Subsequently, however, Bertoli was not permitted to conduct re-cross-examination of Coleman and Bond. *See* Coleman Dep. Tr. at 300–02; Bond Dep. Tr. at 347. Specifically, with respect to the testimony elicited from Bond on redirect, Bertoli argues new material was introduced. He argues the Government offered into evidence Exhibit 2500 an unsigned letter from Euro Bank which it had available at the time of direct examination. Cayman Islands Moving Brief at 42–43.

The Cayman Authority's blanket prohibition of recross-examination appears to have violated the Sixth Amendment right to confrontation. As previously discussed, Berto-

li is going to take additional depositions in the Cayman Islands, at a date to be set. At oral argument, the Government in fact conceded that it would be appropriate to permit recross-examination with respect to Bond and the introduction of Exhibit 2500. 19 June 1992 Oral Arg. Tr. at 18. With respect to the other witnesses, the Government conceded there was no down side to permitting Bertoli to have an opportunity to recross those for whom there was redirect, except it would be an inconvenience to the witnesses. *Id.* at 18–19. The inconvenience of the witnesses does not outweigh the Sixth Amendment right to confrontation. Bertoli is given leave to conduct re-cross-examination of those witnesses he was previously denied the opportunity. Such recross, however, is limited to issues raised on redirect. Bertoli is not permitted to use this opportunity to question the witnesses on issues he should have raised during cross-examination.

### C. *Right to Confrontation*

▇ Cannistraro argues the Cayman Islands Depositions are inadmissible because he was deprived of his Sixth Amendment right to effective assistance of counsel and his Sixth Amendment right to confrontation. Cayman Islands Moving Brief at 48. He argues his attorney was not able to attend the Cayman Islands Depositions because the Rule 15 Letter Request was denied. *Id.* The Government argues Cannistraro's constitutional rights were not violated because Cannistraro voluntarily chose not to attend or pay for his then counsel to attend the Cayman Islands Depositions. Opposition Brief at 119–128.

The merits of the denial of Cannistraro's Rule 15 Letter Request for the Government to pay for his then counsel's travel expenses to the Cayman Islands Depositions will not be readdressed in this opinion.[60] Cannistraro, at the time, had re-

---

**60.** Cannistraro never filed a motion pursuant to Rule 15, but rather, he merely made a request in a letter. *See* Rule 15 Letter Request. Because no formal motion was made, the Rule 15 Letter Request was denied by letter. Letter from court, dated 19 August 1991. Similarly, Cannistraro did not file a motion for reconsideration

of the denial of the Rule 15 Letter Request, but again made the request for reconsideration by means of a letter. *See* Pollack's letter to court, dated 19 August 1991. The letter request for reconsideration was denied. *See* letter from court, dated 23 August 1991.

tained counsel. Cannistraro never provided (or proffered) an affidavit or any similar sworn statement that he was financially unable to send his counsel to the Cayman Islands. Indeed, Cannistraro sent his then counsel to the Cayman Islands in July 1991 to review the documents produced under the Treaty Request. Moreover, the evidence proffered in this case suggests Cannistraro has control of off-shore bank accounts, that Bertoli has paid Cannistraro's former counsel with funds in off-shore bank accounts and that Cannistraro has been and will be paid one million dollars per year for time served in connection with the 1987 Cannistraro Indictment.[61] *Eisenberg*, 773 F.Supp. at 684 (citing Cahill Aff., ¶ 2) (previously submitted).

As discussed in prior opinions, Rule 15(c) does not require a court to order payment of expenses, but states a court "may direct" that the Government pay the costs for depositions. *See* 11 February 1992 Opinion 799 F.Supp. 410, 423–424. Cannistraro voluntarily waived his right to have his counsel represent him at the Cayman Islands Depositions. The motion to exclude the Cayman Islands Depositions on this ground is denied.

Cannistraro also argues he was denied his Sixth Amendment right to confrontation because he was not permitted to attend the Cayman Islands Depositions. Cayman Islands Moving Brief at 49–50. He states he never waived his right to confront witnesses at the Cayman Islands Depositions. *Id.* at 56.

The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const.Amend. VI. A defendant may, however, make a knowing and voluntary waiver of the right to confrontation. *Brookhart v. Janis*, 384 U.S. 1, 4, 86 S.Ct. 1245, 1247, 16 L.Ed.2d 314 (1966). "[F]or a waiver to be effective it must be clearly established that there was 'an intentional relinquishment or abandonment of a known right or privilege.'" *Id.* (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)).

In *Brookhart*, the petitioner sought habeas corpus relief because he was denied an opportunity to cross-examine any of the state's witnesses who testified during his criminal trial. 384 U.S. at 2, 86 S.Ct. at 1246. Prior to trial, the petitioner's appointed counsel informed the trial judge that the petitioner signed waivers of a trial by jury and wanted to be tried by the court. *Id.* at 5, 86 S.Ct. at 1247. The trial judge on the record explained that if tried by the court, there would be no cross-examination of the witnesses because the defendant, " 'in effect admits his guilt and wants the State to prove it.' " *Id.* at 6, 86 S.Ct. at 1248 (quoting state court record). The defendant responded to the trial judge that he wanted to point out he was in no way pleading guilty to the charge. *Id.* The trial court then asked the defendant to determine whether he wanted a full trial or a trial by the court and his counsel stated only a trial by the court. *Id.*

The Court stated the record reflected the petitioner's desire not to plead guilty. It further stated the proposed "prima facie trial" by the court would have been a truncated kind of trial and would in effect be a

---

The absence of a formal opinion with respect to the Rule 15 Letter Request is of no moment. Podvey Sachs, standby counsel to Bertoli, filed a motion seeking attorneys' fees and costs pursuant to Rule 15 for expenses incurred during the Cayman Islands Depositions. *See* Notice of Motion, filed 8 November 1991. This motion was denied. Letter-opinion and order, filed 11 February 1992. The reasons set-forth in that letter-opinion apply with equal force to the facts surrounding Cannistraro's application and this motion.

61. F.B.I. Special Agent Michael J. Cahill ("Cahill") previously submitted an affidavit in which

he asserts: "My investigation has revealed evidence that ... Bertoli and ... Eisenberg have promised ... Cannistraro one million dollars for every year he spent in jail in return for Cannistraro's silence about the illegal activities of the Monarch RICO enterprises." Cahill Aff., ¶ 2 (previously submitted). Cahill's affidavit was previously submitted to oppose a pretrial motion filed by Bertoli for disclosure of certain information; it was not submitted to prove Bertoli's guilt or innocence relative to the charges in the Superseding Indictment or Second Superseding Indictment. *Eisenberg*, 773 F.Supp. at 684 n. 13.

guilty plea which was inconsistent with the petitioner's desire not to plead guilty. *Id.* at 7, 86 S.Ct. at 1248. It stated, therefore, "the constitutional rights of [the] defendant cannot be waived by his counsel under such circumstances." *Id.* The Court held the defendant "neither waived his right nor acquiesced in his lawyer's attempted waiver...." *Id.* at 8, 86 S.Ct. at 1249; *see also United States v. Johnpoll,* 739 F.2d 702, 710 (2d Cir.1984) (defendant waived right to confront witnesses when he chose not to attend foreign depositions after Government indicated willingness to pay expenses), *cert. denied,* 469 U.S. 1075, 105 S.Ct. 571, 83 L.Ed.2d 511 (1984), *reh'g denied,* 469 U.S. 1197, 105 S.Ct. 982, 83 L.Ed.2d 983 (1985). It recognized, however, some circumstances may exist where counsel would be permitted to waive his client's constitutional claims. *Id.* at 7, 86 S.Ct. at 1248.

In this case, unlike the facts in *Brookhart,* Cannistraro did not indicate a contrary intention than that expressed by his then counsel. Moreover, the Government had previously expressed to Cannistraro its willingness to provide a telephone hook-up so that Cannistraro could listen to and participate in the Cayman Islands Depositions. *See* Government's Exhibits, Ex. 14. After the denial of the Rule 15 Letter Request, Cannistraro neither made arrangements for his then retained counsel to attend the Cayman Islands Depositions, nor did he accept the Government's offer and request the Government to provide the proposed telephone hook-up to the Cayman Islands Depositions.

In any event, as discussed during oral argument, because a second set of depositions will be taken in the Cayman Islands and Cannistraro will be afforded an opportunity to attend those depositions, Cannistraro will be given an opportunity to conduct cross-examination and recross-examination, if appropriate. Cannistraro has been given an opportunity to view the videotapes [62] and transcripts of the Cayman Islands Depositions. *See* Order, filed 8 July 1992, and amended 10 July 1992. Cannistraro has identified the witnesses for cross-examination. Cannistraro's Letter to court, dated 16 July 1992, at 2.

## IV. Motion to Dismiss Counts One and Two as Barred by the Statute of Limitations

The Defendants move to dismiss Counts One and Two of the Second Superseding Indictment on the ground that they are barred by the statute of limitations. Statute of Limitations Moving Brief at 1–2. In the alternative, the Defendants argue the obstruction of justice allegations in Counts One and Two should be severed as being improperly joined because Bertoli is not alleged to have participated in Cannistraro's obstructionist behavior and Cannistraro is not alleged to be a part of Bertoli's obstructionist behavior. *Id.* at 2, 11–12. The Government argues the obstruction of justice charges are predicate acts which are properly part of the substantive RICO charge. Opposition Brief at 71.

### A. *Substantive RICO—Count One*

RICO does not contain its own statute of limitation. The general five year statute of limitations period applicable to non-capital offenses contained in section 3282 of Title 18 therefore applies to substantive RICO charges.[63] *United States v.*

---

**62.** The 10 July 1992 Order directed that the Government arrange for a room to be provided in the United States Post Office in Newark, New Jersey in which Cannistraro could view the videotapes. 10 July 1992 Order at 1–2. Cannistraro complains that he was required to "view[ ] the video tapes while locked inside a steel cage like an animal." Cannistraro's Letter to court, dated 16 July 1992. Even assuming Cannistraro was in a cell-type room to view the videotapes, Cannistraro's complaint is curious because he originally requested videotape equipment be provided to him so that he could view the video-

tapes in his jail cell. *See* Cannistraro's letter to court, dated 22 June 1992, at 2.

As a result of viewing the videotaped Cayman Islands Depositions as described, Cannistraro has a tactical advantage because he has additional time to prepare his questions for cross-examination not ordinarily available when cross-examination immediately follows direct examination.

**63.** Section 3282 provides in full:

Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or

*Forsythe,* 560 F.2d 1127, 1134 (3d Cir.1977); *see also* 18 U.S.C. § 3282. A substantive RICO charge under section 1962(c)[64] must be brought within five years of a RICO predicate act by the defendant. *United States v. Persico,* 832 F.2d 705, 714 (2d Cir.1987), *cert. denied sub nom. Russo v. United States,* 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988); *see also* 18 U.S.C. § 3282. The *Persico* court rejected the Government's theory that the limitation. period should run from the last predicate act committed by *any member* of the group. 832 F.2d at 714. It stated: "The focus of section 1962(c) is on the individual patterns of racketeering engaged in by *a defendant,* rather than the collective activities of the members of the enterprise, which are proscribed by section 1962(d)." *Id.* (emphasis added).

The predicate act must be part of the same pattern of racketeering. *United States v. Gatto,* 746 F.Supp. 432, 462 (D.N.J.1990), *rev'd on other grounds,* 924 F.2d 491 (3d Cir.1991). The definition of a "pattern" requires at least two acts of racketeering activity within a ten-year period. 18 U.S.C. § 1961(5). The Supreme Court has held "two isolated acts of racketeering activity do not constitute a pattern." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985); *see also Insurance Consultants of Am., Inc. Employee Pension Plan v. Southeastern Ins. Group, Inc.,* 746 F.Supp. 390, 413 (D.N.J.1990). The essential characteristics of a pattern of racketeering activity are "continuity plus relationship" and the "threat of continuing activity." *Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14.

In *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court reiterated: " 'The term pattern itself requires the showing of a relationship' between the predicates ... and of the 'threat of continuing activity. It is this factor of *continuity plus relationship* which combines to produce a pattern.' " *Id.* at 239, 109 S.Ct. at 2900 (quoting 116 Con.Rec. 18940 (1970) (Sen. McClellan), as quoted in *Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14)) (emphasis added by *H.J. Inc.* Court). The Court observed: "Congress[ ] inten[ded] that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* (emphasis in original); *see also United States v. Pelullo,* 964 F.2d 193, 207 (3d Cir.1992).

As to the relatedness requirement, the Court repeated the principle that "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.,* 492 U.S. at 240, 109 S.Ct. at 2901 (citing *Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14); *see also Pelullo,* 964 F.2d at 207. The Court found it necessary to analyze the continuity requirement at greater length than the relatedness requirement. The Court commenced by stating that in order to form a pattern, "the predicates themselves [must] amount to, or ... they [must] otherwise constitute a threat of, *continuing* racketeering activity." *Id.* (emphasis in original). The Court eschewed the requirement that continuity be demonstrated through allegations of multiple schemes, holding: "What a plaintiff or prosecutor must prove is continuity of racketeering activity, or its threat, *simpliciter.* This may be done in a variety of ways, thus making it difficult to formulate

---

punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.
18 U.S.C. § 3282.

**64.** Section 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....
18 U.S.C. § 1962(c).

in the abstract any general test for continuity." *Id.* 492 U.S. at 241, 109 S.Ct. at 2901.

In fleshing out the meaning of the continuity requirement, the Court stated: "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.; see also Pelullo,* 964 F.2d at 208. It stated that a party alleging a RICO violation "may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. at 2902; *see also Pelullo,* 964 F.2d at 208.

The Court further explained:

Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.

Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case. Without making any claim to cover the field of possibilities—preferring to deal with this issue in the context of concrete factual situations presented for decision—we offer some examples of how this element might be satisfied. A RICO pattern may surely be established if the related predicates themselves involve *a distinct threat of long-term racketeering activity,* either implicit or explicit.... The continuity requirement is likewise satisfied where it is shown that *the predicates are a regular way of conducting defendant's ongoing legitimate business....*

The limits of the relationship and continuity concepts that combine to define a RICO pattern, and the precise methods by which relatedness and continuity or its threat may be proved, cannot be fixed in advance with such clarity that it will always be apparent whether in a particular case a "pattern of racketeering activity" exists. The development of these concepts must await future cases, absent a decision by Congress to revisit RICO to provide clearer guidance as to the Act's intended scope.

*H.J. Inc.,* 492 U.S. at 242–43, 109 S.Ct. at 2902 (emphasis added) (citations and footnote omitted).

In *H.J. Inc.,* customers of a telephone company brought suit alleging the telephone company had been bribing state regulatory officials to gain approval for excessive telephone rates. The Court found the fact that the "racketeering predicates occurred with some frequency over at least a 6–year period ... may be sufficient to satisfy the continuity requirement." 492 U.S. at 250, 109 S.Ct. at 2906. The Court also held trial may establish the "alleged bribes were a regular way of conducting [the defendant's] ongoing business, or a regular way of conducting or participating in the conduct of the alleged and ongoing RICO enterprise." *Id.* Accordingly, the Court found the requisite continuity.

The Third Circuit has declined to read *H.J. Inc.* as defining continuity solely as a temporal concept, "though duration remains the most significant factor." *Pelullo,* 964 F.2d at 208; *see also Hindes v. Castle,* 937 F.2d 868, 873 (3d Cir.1991); *Marshall–Silver Constr. Co. v. Mendel,* 894 F.2d 593, 596–977 (3d Cir.1990); *Casper v. Paine Webber Group, Inc.,* 787 F.Supp. 1480, 1506 (D.N.J.1992); *Insurance Consultants,* 746 F.Supp. at 414. The Third Circuit stated:

[I]f the Court in *H.J. Inc.* intended that the *duration* of the predicate acts or the threat arising therefrom should be determinative without reference to whether the societal threat was limited to a single, one time injury, we would not have expected the Court to eschew providing a specific standard in favor of a fact oriented, case-by-case development.

*Marshall–Silver,* 894 F.2d at 597. "However, where there is no threat of continuing racketeering activity, 'duration is the *sine qua non* of continuity.'" *Pelullo,* 964

F.2d at 288 (quoting *Hindes*, 937 F.2d at 873).

In *Pelullo*, the Circuit explained the differences in proving an open- and close-ended period. The Third Circuit observed:

> Continuity in an open-ended period, *i.e.* a period involving a series of predicate acts that project into the future, may be established by proving a threat of continuity, which exists where the predicate acts themselves involve threats of long-term racketeering activity, or where the predicate acts are part of an entity's regular way of doing business.

*Id.*

It stated, however, that the factors identified in its decision in *Barticheck v. Fidelity Union Bank/First Nat'l State*, 832 F.2d 36, 39 (3d Cir.1987), such as the number of unlawful acts, the length of time involved, the similarity of the unlawful acts, the number of victims, the number of perpetrators, and the nature of the unlawful activities, remain relevant to the issues of continuity and relatedness. *Pelullo*, 964 F.2d at 208 (citing *Banks v. Wolk*, 918 F.2d 418, 423 (3d Cir.1990)); *see also Marshall–Silver*, 894 F.2d at 597 (pointing to case-by-case analysis of pattern requirement which considers size and magnitude of fraud as being part of pattern analysis).

The *Pelullo* court further observed "that unless the Government can prove that there was a threat of continuity, it must be able to demonstrate that the pattern of racketeering occurred over a 'substantial' period of time." 964 F.2d at 209. It stated although the Circuit has not defined a bright line test for what constitutes a sufficient period of time, "we have never found such a period to exist where the racketeering activity occurred over a period of one year or less." *Id.* at 209 (citing *Hughes v. Consol–Pennsylvania Coal Co.*, 945 F.2d 594, 611 (3d Cir.1991) (twelve months), *cert. denied*, —— U.S. ——, 112 S.Ct. 2300, 119 L.Ed.2d 224 (1992); *Hindes*, 937 F.2d at 875 (eight months); *Banks*, 918 F.2d at 423 (eight months); *Marshall–Silver*, 894 F.2d at 597 (seven months).

██ In this case, the last predicate acts of Cannistraro alleged in the Second Su-

perseding Indictment are the obstruction of justice acts. It alleges that

> in or about January 1986 to in or about February 1987, at Newark, in the District of New Jersey ... Cannistraro unlawfully, willfully, knowingly, and corruptly influenced, obstructed, and impeded, and endeavored to influence, obstruct, and impede, the due administration of justice in connection with the ... investigation by United States grand juries, in that ... Cannistraro instructed and directed his nominee, in return for cash payments, to conceal from the United States grand juries ... Cannistraro's beneficial ownership of the nominee's brokerage account at Monarch....

Second Superseding Indictment, Count One, ¶ 94.

As to Bertoli, the Second Superseding Indictment alleges he obstructed justice beginning June 1987 through December 1991 by shredding and destroying documents, removing documents and hiding the proceeds of the racketeering activity and by submitting false and fraudulent affidavits to the court. *Id.*, ¶ 95. The threshold inquiry is whether the obstruction of justice acts alleged satisfy the continuity plus relatedness requirement with respect to the predicate acts of mail fraud, wire fraud and securities fraud of Monarch.

Applying the foregoing principles to the case at bar, it appears the Second Superseding Indictment establishes a continuity plus relationship as to the obstruction of justice predicate acts and the other predicate acts alleged. The Defendants argue the final securities predicate, the mail fraud on 21 June 1987, is remote in time from Cannistraro's obstructionist conduct in January 1986 and February 1987 and Bertoli's obstructionist conduct in June 1987 and December 1991. Statute of Limitations Moving Brief at 11. The Government argues the predicate acts are continuous and related because of the additional conduct taken by the Defendants during the intervening time frame. Opposition Brief at 74–75.

Count Three of the Second Superseding Indictment alleges Bertoli induced SEC wit-

nesses to lie in the SEC Action and Cannistraro induced a witness to lie before the grand jury for the 1987 Indictment. Second Superseding Indictment, Count Three, ¶¶ 17–19. It further alleges Bertoli instructed Eisenberg to withhold Monarch documents from a grand jury subpoena. *Id.*, ¶¶ 21–23. It alleges the Defendants and Eisenberg ensured that Cayman Islands entities would not comply with the Gentlemen's Agreement initially · used by the Government as a means to obtain evidence from the Cayman Islands. *Id.*, ¶ 20. Count Three further alleges Cannistraro lied to the United States Probation Department regarding the amount of his assets. *Id.*, ¶ 26. It alleges Bertoli caused the racketeering proceeds to be moved from the Cayman Islands and related documents to be destroyed so that the Government could not obtain them. *Id.*, ¶¶ 24–25, 27.

The obstruction of justice predicates are not remote from the securities fraud predicates which ended in October 1984. Count One, ¶ 69(5)(e). Indeed, many of the acts alleged in Count Three occurred prior to the obstruction of justice predicates alleged in Count One. For instance, false testimony was provided to the SEC by a G.K. Scott broker at the behest of Bertoli and Eisenberg in March 1983 and again at the behest of Bertoli in August 1983. Count Three, ¶ 28(1)–(6). In March and August 1984 Eisenberg provided false testimony to the SEC in connection with the SEC Action. *Id.*, ¶ 28(7) & (8).

The next related conduct occurred in January 1986 when Cannistraro contacted one of his nominees and instructed him to tell a false story regarding the trading activities at the Monarch account to the law enforcement authorities. *Id.*, ¶ 28(9). That same month, the nominee gave a false story to law enforcement authorities in Newark, New Jersey. *Id.*, ¶ 28(10). The scheme to cover-up and conceal the racketeering activities continued into February 1986 when the Defendants and Eisenberg traveled to the Cayman Islands and then to Miami

where Cannistraro paid his nominee $2,000. *Id.*, ¶ 28(12)–(16).

Count Three alleges that in January 1987 Cannistraro bribed a grand jury witness. *Id.*, ¶ 28(17)–(21). It charges that in June 1987 Bertoli and Eisenberg and in November 1987 Bertoli shredded documents in the Cayman Islands which they obtained from Euro Bank. *Id.*, ¶ 28(25) & (27). It further alleges that in September 1988 Eisenberg caused a records custodian from Monarch to provide false and misleading testimony to a grand jury in Newark, New Jersey. *Id.*, ¶ 28(28).

The alleged events satisfy the continuity plus relationship test. The obstruction of justice predicates are part of a continuing pattern to conceal the securities and mail predicates. Moreover, many of the documents destroyed and false testimony obtained related to the conduct of Monarch. Accordingly, the continuous pattern of obstructionist conduct is sufficiently related to the other alleged RICO predicates. The obstruction of justice predicates are properly alleged in the Second Superseding Indictment and should not be redacted. Therefore, Count One is not barred by the statute of limitations; the motion to dismiss Count One of the Second Superseding Indictment as being barred by the statute of limitations is denied.

### B. *RICO Conspiracy—Count Two*

 The statute of limitations for a RICO conspiracy under section 1962(d) [65] is five years which begins running upon the accomplishment or abandonment of the objective of the conspiracy. Under conspiracy statutes " 'the conspiracy may be deemed terminated,' " for statute of limitations purposes, " 'when ... its objectives have either been accomplished or abandoned, not when its last overt act was committed.' " *Persico*, 832 F.2d at 713 (quoting *United States v. Grammatikos*, 633 F.2d 1013, 1023 (2d Cir.1980)); *see also United States v. Long*, 917 F.2d 691, 698 (2d Cir.1990); *Gatto*, 746 F.Supp. at 463;

---

**65.** Section 1962(d) provides: "It shall be unlawful for any person to conspire to violate any of

the provisions of subsections (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).

*United States v. Di Gilio,* 667 F.Supp. 191, 194 (D.N.J.1987).

The *Persico* court explained the statute of limitations begins to run at the point at which the crime is complete. 832 F.2d at 713; *see also* 18 U.S.C. § 3282. The court held "[b]ecause the RICO conspiracy statute does not require proof of an overt act, we believe that the crime of RICO conspiracy is not complete until the purposes of the conspiracy either have been accomplished or abandoned." *Persico,* 832 F.2d at 713. It stated there was no reason to analyze "the RICO conspiracy statute ... in a manner inconsistent with other conspiracy statutes not requiring proof of overt acts." *Id.*

Significantly, the "defendant need not commit an act within the five year limitations period; the statute of limitations does not bar an action for RICO conspiracy against that individual if he or she continues as a coconspirator and another conspirator acted within the five year period." *Gatto,* 746 F.Supp. at 463. The rationale is that a member of a conspiracy is presumed to continue as a member until he or she affirmatively withdraws from the conspiracy. *Id.* (citing *Hyde v. United States,* 225 U.S. 347, 369, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912)). Once an individual conspirator affirmatively withdraws from the conspiracy, however, the statute of limitations commences as to that individual. *Id.* (citing *United States v. Salerno,* 868 F.2d 524, 534 n. 4 (2d Cir.), *cert. denied sub nom. Furnari v. United States,* 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 700 (1989)).

The Supreme Court in *Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), addressed the issue of the object of a conspiracy with respect to acts of concealment. The defendants were convicted of conspiracy to defraud the United States by fixing tax fraud cases and taking actions to conceal their scheme from a congressional investigation committee. *Id.* at 393–94, 77 S.Ct. at 968. The indictment alleged that part of the conspiracy

was an agreement to conceal the acts of the conspirators. *Id.* at 394 n. 3, 77 S.Ct. at 968 n. 3. The Supreme Court was faced with the issue of whether the prosecution was barred by the applicable statute of limitations. *Id.* at 394, 77 S.Ct. at 968. The Court stated the "crucial question in determining whether the statute of limitations has run the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." *Id.* at 397, 77 S.Ct. at 970.

The Court rejected the Government's argument that the cover-up should be regarded as part of the conspiracy. Applying the standards set forth in *Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949) and *Lutwak v. United States,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593, *reh'g denied,* 345 U.S. 919, 73 S.Ct. 726, 97 L.Ed. 1352 (1953),[66] the Court stated:

> The crucial teaching of *Krulewitch* and *Lutwak* is that after the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment.

*Grunewald,* 353 U.S. at 401–02, 77 S.Ct. at 972.

The Court explained:
> For every conspiracy is by its very nature secret; a case can hardly be supposed where [people] concert together for crime and advertise their purpose to the world. And again, every conspiracy will inevitably be followed by actions taken to cover the conspirators' traces. Sanctioning the Government's theory would for all practical purposes wipe out the statute of limitations in conspiracy

---

**66.** In both *Krulewitch* and *Lutwak,* the Government sought to "extend the life of the conspiracy by an alleged subsidiary conspiracy to conceal" in order to gain the admissibility of hear-

say statements of co-conspirators which were made after the completion of the main purpose of the conspiracy. *Grunewald,* 353 U.S. at 401, 77 S.Ct. at 972.

cases, as well as extend indefinitely the time within which hearsay declarations will bind co-conspirators.

*Id.* at 402, 77 S.Ct. at 972.

In analyzing the record in *Grunewald*, the Court rejected the Government's claim that the agreement to conceal was part of the original conspiracy. It observed: "There is not a shred of direct evidence in this record to show anything like an express original agreement among the conspirators to continue to act in concert in order to cover up, for their own self-protection, traces of the crime after its commission." *Id.* at 404, 77 S.Ct. at 973–74. It noted, "the essential missing element is a showing that the act was done in furtherance of a prior criminal agreement of the conspirators." *Id.* at 404 n. 16, 77 S.Ct. at 974 n. 16.

▆ The Court, however, cautioned:

By no means does this mean that acts of concealment can never have significance in furthering a criminal conspiracy. But a vital distinction must be made between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime.

*Id.* at 405, 77 S.Ct. at 974 (emphasis in original). The Court concluded that where the conspiratorial agreement included an agreement to conceal the conspiracy, the statute of limitations does not commence until after the acts of concealment are completed. *Id.* at 406, 77 S.Ct. at 974. The ultimate question of whether acts are in furtherance of the conspiracy or only for purposes of concealment depends on the objectives of the conspiracy, a determination of which is a question of fact for the jury. *United States v. Young & Rubicam, Inc.*, 741 F.Supp. 334, 343 (D.Conn.1990) (citing *United States v. Finkelstein*, 526 F.2d 517, 522 (2d Cir.1975), *cert. denied sub nom. Scardino v. United States*, 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976)).

Cases applying *Grunewald* have consistently interpreted it as not ruling out the possibility of acts of concealment being part of the original conspiracy. *See, e.g., United States v. Masters*, 924 F.2d 1362 (7th Cir.) (RICO conspiracy), *cert. denied,* —— U.S. ——, 111 S.Ct. 2019, 114 L.Ed.2d 105 (1991); *Steele*, 685 F.2d at 803 (conspiracy under 18 U.S.C. 371); *Young & Rubicam*, 741 F.Supp. at 342–45 (RICO conspiracy).

In *Masters*, the defendants, two police officers and an attorney, were charged with substantive and conspiracy RICO violations.[67] 924 F.2d at 1365. The defendants appealed the RICO conspiracy charge on the ground that the statute of limitations had run. *Id.* at 1368. The conspiracy charge alleged, among other elements, that the defendants had agreed to conceal their actions involving the underlying murder and to participate in such concealment indefinitely. *Id.* The defendants did "not deny that if there was such an agreement it was still in force five years before the indictment." *Id.*

On appeal, the court stated there was an " 'express original agreement among the conspirators to continue to act in concert in order to cover up ... traces of the crime....' " *Id.* (quoting *Grunewald*, 353 U.S. at 404, 77 S.Ct. at 974). It stated:

The conspirators in this case, ... intended from the first to exert strenuous efforts to prevent discovery of the crime ...; the fact that two of the three conspirators were policemen supports the inference that concealment was part of the original conspiracy and not a spontaneous reaction to fear of arrest and prosecution. It was also a fair inference that the defendants agreed to keep trying to conceal the conspiracy for as long as they could, using their official positions where possible.

*Masters*, 924 F.2d at 1368.

In *Young & Rubicam*, the defendants moved to dismiss a RICO conspiracy count because it alleged subsequent acts of con-

---

**67.** The defendants were only convicted of RICO conspiracy because the statute of limitations

had run on the substantive RICO count. 924 F.2d at 1368.

cealment and perjury. 741 F.Supp. at 342–43. The alleged conspiracy was to obtain and retain an account for defendant. *Id.* The indictment alleged that as part of the conspiracy the defendants entered a contract through which they were able to funnel kickbacks. It further alleged various other means by which the defendants concealed and covered up their unlawful activities which included testifying falsely to a grand jury. *Id.* at 344. The defendants argued the object of the conspiracy was accomplished before false testimony was given before the grand jury. *Id.*

The defendants, relying on *Grunewald,* argued the alleged acts of concealment were distinct from the alleged underlying criminal conspiracy. *Id.* at 343. The court stated its inquiry for a motion to dismiss was limited to the sufficiency of the indictment because the issue of the object of the conspiracy was a question of fact for the jury. *Id.*

The court held the indictment properly alleged acts of concealment as part of the original conspiracy. *Id.* In making its ruling, it relied on the fact that the indictment charged the defendant with conspiring to bribe persons to obtain and retain an account. It stated the relationship with the account was not severed until after the grand jury returned the indictment. It stated: "Concealment of the purported scheme was necessary to avoid detection and ensure retention of the account...." *Id.*

■ In this case, the Second Superseding Indictment sufficiently alleges the Defendants and Eisenberg intended from the outset of the conspiracy to engage in efforts to prevent discovery of the alleged crime and their involvement in it. It alleges the means and methods of the conspiracy included "attempts to conceal and coverup their fraudulent activity." Count One, ¶ 9. Moreover, it alleges the Defendants used, as part of their scheme, accounts at Monarch in the names of Cayman Islands entities. The fact that the Defendants funnelled the proceeds of the scalping and stock manipulation schemes in to Cayman Islands entities is evidence that they intended to take advantage of the secrecy laws of the Cayman Islands and thereby conceal their profits. The facts alleged do not present a case where the Defendants made a spontaneous agreement after the crime to conceal their conduct.

Whether the Government can satisfy its burden of establishing evidence from which it can be "shown or ... implied," *Grunewald,* 353 U.S. at 406, 77 S.Ct. at 974, that there was "an express original agreement among the conspirators to continue to act in concert in order to cover up, for their own self-protection traces of the crime...." is an issue for trial. *Id.* at 404, 77 S.Ct. at 974; *Young & Rubicam,* 741 F.Supp. at 343. The Statute of Limitations Motion is denied on this ground.

■ To the extent Cannistraro challenges Count Two because he has been incarcerated since 1987, his argument is without merit. As discussed, a co-conspirator remains liable until the object of the conspiracy is accomplished regardless of whether he or she participated in the last predicate acts. *Persico,* 832 F.2d at 713.

■ Arrest or incarceration alone does not terminate a co-conspirators participation in a conspiracy. *Gatto,* 746 F.Supp. at 463. It is the burden of the defendant to prove withdrawal from a conspiracy. *United States v. Gillen,* 599 F.2d 541, 548 (3d Cir.), *cert. denied,* 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979); *see also Gatto,* 746 F.Supp. at 463. The defendant must show "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators...." *United States v. United States Gypsum Co.,* 438 U.S. 422, 464, 98 S.Ct. 2864, 2887, 57 L.Ed.2d 854 (1978). The Circuit stated withdrawal is typically shown by a full confession to the authorities or a communication to his or her co-conspirators that the defendant has abandoned the goals of the conspiracy. *Steele,* 685 F.2d at 803–04; *see also United States v. Rosa,* 891 F.2d 1063, 1069 (3d Cir.1989); *United States v. De Peri,* 778 F.2d 963, 980 (3d Cir.1985), *cert. denied sub nom. Pecic v. United States,* 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986); *United States v. Toth,* 776 F.Supp. 1030, 1033 n. 3 (E.D.Pa.1991).

Although Cannistraro has been incarcerated for the past five years, during which time the conspiracy allegedly continued, he has presented no evidence which suggests he has withdrawn from the conspiracy. To the extent he based the motion to dismiss the RICO conspiracy count on the ground he has been incarcerated since 1987, it is denied.

V. Motion to Dismiss Counts One, Two and Eight for Failure to State a Securities Laws Offense

The Defendants argue the mail and wire fraud acts relating to the alleged scalping and manipulation schemes should be stricken from the Second Superseding Indictment and Counts One, Two and Eight should be dismissed. Securities Fraud Moving Brief at 1. The Defendants acknowledge they previously challenged the Superseding Indictment on the ground that scalping does not state a crime; however, they state this motion is designed to address two specific issues. *Id.* First, they argue the reports prepared by Cannistraro did state that relevant persons might hold positions in the recommended stock. They contend, therefore, the Government's argument based on non-disclosure of the Defendants' and Eisenberg's positions in the securities Cannistraro recommended is baseless. *Id.* at 1–6. Second, the Defendants argue that, contrary to the decision in *Eisenberg*, 773 F.Supp. at 717–725, the alleged scalping schemes do not allege a violation of the securities laws absent a breach of fiduciary duty. Securities Fraud Moving Brief at 2, 6–17.

A. *Disclosures in the Wood Gundy Reports*

■ The Defendants' first argument appears to challenge the Second Superseding Indictment because it is based upon a theory of non-disclosure when, they argue, there was in fact disclosure. *Id.* at 5. The Defendants rely on the fact that every report named in the Second Superseding Indictment included the following declaration:

The statements and statistics contained herein have been obtained from sources we believe to be reliable but we cannot represent that they are complete and accurate. This publication is for the information of investors and does not constitute an offer of or solicitation of the sale of securities. *Wood Gundy ... and its affiliated companies together with their Directors and Officers, may from time to time have a position in the securities mentioned.*

*Id.* (emphasis added by Defendants) (footnote omitted). The Defendants state the Second Superseding Indictment charges securities fraud based on nondisclosure because the "reports were false and misleading in that the reports failed to disclose, ... that the defendants ... had purchased ... securities based upon advance knowledge of the reports, and intended to profit on the sale of these securities once the dissemination of the reports had caused the price of ... [the] securities to rise...." *Id.* at 3–4. They argue because the reports contained a disclosure of the possibility of ownership in the recommended securities, the premise of the scalping charge is false. *Id.* at 6.

■ The Defendants' argument is based on a game of semantics without recognition of the applicable securities law. As explained in *Eisenberg*, securities fraud can be grounded in nondisclosure where there is a fiduciary duty to disclose [68] and

---

**68.** As set forth in *Eisenberg*, the decisions in *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) and *Dirks v. SEC*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983), define the parameters of when trading on inside information violates the securities laws. *Eisenberg*, 773 F.Supp. at 718–19. As stated:

In *Chiarella*, the defendant was a financial printer who in the course of conducting business came across information in certain documents from which he deduced the identities of the targets of takeovers. The defendant then purchased stock in the target companies and sold the stock after the takeover attempts became public and the price of the stock rose. The defendant was convicted of violating Sec-

inadequate disclosure which arises when a public statement is made that is false or misleading or is so incomplete as to be rendered false or misleading. 773 F.Supp. at 721–23. It is a well settled principle that once disclosures are made, there is a duty to disclose all material information regardless of a fiduciary duty owed to the shareholders. *Greenfield v. Heublein, Inc.*, 742 F.2d 751, 756, 758 (3d Cir.1984), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985) (citing *SEC v. Texas Gulf Sulphur Corp.*, 401 F.2d 833, 862 (2d Cir.1968), *cert. denied sub nom. Coates v. SEC*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 235 n. 13, 108 S.Ct. 978, 985 n. 13, 99 L.Ed.2d 194 (1988) (" 'Rule 10b–5 is violated whenever assertions are made ... in a manner reasonably calculated to influence the investing public ... if such assertions are false or misleading or so incomplete as to mislead.' "); *accord, Eisenberg*, 773 F.Supp. at 723.

The allegations in the Second Superseding Indictment cannot be read as asserting only a case based on non-disclosure where there is a fiduciary duty to disclose. Indeed, the terms non-disclosure or fiduciary duty are not used. The Second Superseding Indictment repeatedly alleges:

> [The] ... research reports were *false and misleading* in that the reports failed to disclose, among other things, that the

tion 10(b) and Rule 10b–5 by trading on stock with inside information without publicly disclosing his knowledge.

The conviction was reversed by the Supreme Court. The Court found that the jury instructions were erroneous, in that they did not require the jury to ascertain whether the defendant had a duty of disclosure but only required it to determine whether the defendant failed to disclose the inside information. *Chiarella*, 445 U.S. at 231, 100 S.Ct. at 1116. In reversing the conviction, the Supreme Court stated that liability for nondisclosure was

premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction. Application of a duty to disclose prior to trading guarantees that corporate insiders, who have an obligation to place the shareholder's welfare before their own, will not benefit personally through fraudulent use of material, nonpublic information.

*Chiarella*, 445 U.S. at 230, 100 S.Ct. at 1115–16. The Supreme Court reasoned that a defendant could not be held criminally liable for failure to disclose non-public information when he was not a corporate insider with a concomitant duty to refrain from using inside information and when no other basis for a duty of disclosure was apparent. *Id.* at 231–32, 100 S.Ct. at 1116. The Supreme Court did not make any determination of whether the defendant had a duty of disclosure but remanded the case for such determination. *Id.* at 236–27, 100 S.Ct. at 1119.

In *Dirks*, the defendant was an officer of a broker-dealer who received a tip from a former officer of an insurance company that the assets of the insurance company were overstated as a result of fraudulent corporate practices. The defendant investigated the allegations of fraud and discovered information which substantiated them. In the course of investigating the allegations, the defendant spoke openly about the fraud with clients and investors, including individuals who then sold their stock in the insurance company. After the price of the stock of the insurance company declined, the New York Stock Exchange halted trading in the stock and California insurance authorities commenced an investigation of the insurance company. The SEC then filed a complaint against the insurance company and subsequently found that Dirks aided and abetted the fraud by trading on material non-public ... information. The SEC only sanctioned Dirks, however, given his "important role in bringing ... [the] massive fraud to light." *Dirks*, 463 U.S. at 651–52, 103 S.Ct. at 3260.

On Dirks' appeal to the Supreme Court from the ruling of the SEC, the Supreme Court reiterated the principle that "there can be no duty to disclose where the person who has traded on inside information 'was not [the corporation's] agent, ... was not a fiduciary, [or] was not a person in whom the sellers [of the securities] had placed their trust and confidence.' " *Dirks*, 463 U.S. at 654, 103 S.Ct. at 3261 (quoting *Chiarella*, 445 U.S. at 232, 100 S.Ct. at 1117). The Court further observed: "Unlike insiders who have independent fiduciary duties to both the corporation and its shareholders, the typical tippee has no such relationships." *Id.* 463 U.S. at 655, 103 S.Ct. at 3261–62. The Court held that the duty of the defendant, *i.e.,* the "tippee," is coextensive with the duty of the "tippor" to make disclosure or to refrain from trading in the absence of disclosure. *Id.* at 661, 103 S.Ct. at 3265. It held the tippor in this case, the former officer of the insurance company, did not breach his duty by making disclosure of the fraud to the defendant, because the disclosure was not made for the improper purpose of trading on such information but was made for the purpose of exposing the fraud. *Id.* at 667, 103 S.Ct. at 3268.

*Eisenberg*, 773 F.Supp. at 718–19.

[D]efendants ..., and others, including ... Eisenberg, had purchased [the] securities based upon advance knowledge of the reports, and intended to profit on the sale of these securities once the dissemination of the reports had caused the price of [the] securities to rise.

Count One, ¶ 14 (emphasis added); *see also, id.,* ¶¶ 23, Count Eight, ¶ 5. As was held in *Eisenberg,* these allegations charge the Defendants with disseminating to the investing public "misleading and incomplete statements regarding certain securities...." 773 F.Supp. at 723. The disclaimer in the reports prepared by Cannistraro is, at best, incomplete to be false *and* misleading. The motion to dismiss Counts One, Two and Eight because the premise of the Second Superseding Indictment is nondisclosure is denied.

### B. *Scalping Schemes*

The Defendants argue the alleged scalping schemes do not state a violation of the securities laws. Specifically, they argue a Section 10(b) violation cannot be premised on allegations of scalping absent a fiduciary duty. Securities Fraud Moving Brief at 7. They further argue that the reliance on *Zweig v. Hearst Corp.,* 594 F.2d 1261 (9th Cir.1979), is unjustified because it is a pre-*Chiarella* decision. Securities Fraud Moving Brief at 8. They further argue *Eisenberg* is erroneous in that it distinguished between mandating disclosure under *Chiarella* because of a fiduciary duty and mandating full disclosure once a public statement has been made omitting material facts. Securities Fraud Moving Brief at 8–9.

The Defendants fail to recognize, however, that the Third Circuit has interpreted *Chiarella* and *Dirks* to "involve only the question of when outsiders and nonfiduciaries will be treated as insiders or fiduciaries for purposes of the affirmative duty to disclose or refrain from trading."

*Deutschman v. Beneficial Corp.,* 841 F.2d 502, 506 (3d Cir.1988), *cert. denied,* 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1037 (1989); *accord Eisenberg,* 773 F.Supp. at 719 n. 57. It further stated: "Nothing in those opinions, however, can be construed to require the existence of a fiduciary relationship between a section 10(b) defendant and the victim of that defendant's affirmative misrepresentation." *Deutschman,* 841 F.2d at 506. Once a defendant chooses to speak, he or she is not free to lie or mislead. *Id.* A misrepresentation of a material fact is subject to Section 10(b) and Rule 10b–5 liability.

■ As stated in *Eisenberg:* "The purpose of Section 10(b) and Rule 10b–5 is to ensure that 'investors obtain disclosure of material facts in connection with their investment decisions regarding the purchase or sale of securities.'" 773 F.Supp. at 721 (citations omitted). An omitted fact is material if there is substantial likelihood the investor would consider it important in making an investment decision. *Basic Inc.,* 485 U.S. at 231, 108 S.Ct. at 983 (adopting definition of materiality in context of Section 14(a) of Exchange Act set forth in *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)); *see also Eisenberg,* 773 F.Supp. at 722.

■ The Defendants' criticism of *Eisenberg*'s reliance on *Zweig* [69] is misplaced. The Defendants fail to recognize that *Eisenberg* acknowledged the vitality of *Zweig*'s holding, that the columnist had a fiduciary duty, is questionable in light of *Chiarella.* 773 F.Supp. at 722. It relied, however, on the fact that *Zweig* "was premised in part on the [court's] conclusion that the columnist made affirmative misrepresentations which were rendered misleading by virtue of omissions of material facts." *Id.* at 722 (citing *Zweig,* 594 F.2d at 1271).

---

**69.** *Eisenberg* summarized the facts of *Zweig* as follows:

> In *Zweig* ..., the parties to a corporate merger sued a newspaper columnist under Section 10(b). The columnist had purchased stock in a company and had then written a favorable

article about the company. The plaintiffs asserted the columnist violated Section 10(b) because he had a duty to disclose to his readers his financial interest in the stock and failed to make such disclosure.

773 F.Supp. at 722.

The Defendants also disapprove of the reliance in *Eisenberg* on *SEC v. Blavin,* 557 F.Supp. 1304 (E.D.Mich.1983), *aff'd,* 760 F.2d 706 (6th Cir.1985). The Defendants argue *Blavin* does not support a finding of a distinction between insider trading cases and other cases where the liability is premised on the misleading nature of statements. Securities Fraud Moving Brief at 13. The district court's holding in *Blavin* is set forth in *Eisenberg.*[70] 773 F.Supp. at 722–23. On appeal, the Circuit affirmed the trial court's finding that Blavin was liable under Section 10(b) and the Investment Advisors Act of 1940, 15 U.S.C. § 80b–6. *Blavin,* 760 F.2d at 710–12. The Circuit focused on the materiality of the misstatements contained in the newsletter regarding Blavin's holdings in the securities he recommended. *Id.* at 711. The newsletter included a disclaimer that the investment advisor may trade in the recommended securities for his own account; it did not state that Blavin had invested in ten to twenty-five percent of the publicly available stock of the companies he recommended. *Id.* Although Bla-

vin did not contest that the disclaimer was misleading he argued that a reasonable investor would not consider the misstatements material. *Id.* (citing *TSC Indus.,* 426 U.S. at 449, 96 S.Ct. at 2132).

The Circuit affirmed the trial court's grant of summary judgment and held the disclaimer was a material misstatement. *Id.* It stated: "The effect of such large holdings on Blavin's objectivity in making investment recommendations would be particularly important to his clients." *Id.* (citing *Zweig,* 594 F.2d at 1266). As stated in *Eisenberg,* the reliance on *Blavin* was based on the fact that the court "analyzed the legality of the defendant's conduct by viewing the case as one in which the defendant made a statement rendered misleading due to an omission of material fact, where violation of the securities law is not premised on a duty of disclosure." 773 F.Supp. at 723. Although the *Blavin* court did find a fiduciary duty under the Investment Advisors Act, the fiduciary duty was not the basis of Blavin's liability for the affirmative misrepresentation.[71]

**70.** As stated in *Eisenberg,*

In [*Blavin* ], the SEC filed an action against the defendant alleging violations of Section 10(b), Rule 10b–5 and various provisions of the Investment Advisers Act of 1940. The SEC alleged the Defendant was an unregistered investment adviser who had purchased large amounts of securities in certain companies, touted the securities in materially false and misleading terms through a newsletter mailed to approximately 5,500 subscribers or potential subscribers and then sold the securities at a substantial profit. In granting summary judgment for the SEC on its Section 10(b) claim, the court found that the defendant's failure to disclose his financial interest in the touted securities was a material omission. *Id.* at 1311. The court stated:

[The defendant] did not reveal his scalping scheme, and it is clear to the court that it was a scheme that should have been disclosed to those to whom he sent his investment newsletter. It is obvious, of course, that if he revealed his scalping scheme to those receiving the newsletter, those parties would not have bought the stock.

It is undisputed that Blavin purchased large amounts of securities in companies and then touted those companies in glowing terms to other prospective investors....

There can be no doubt that this conflict of interest was material to the readers of Bla-

vin's newsletters and that the defendant failed to inform his readers of the conflict. The protection of the securities laws would be shallow indeed if such "scalping" schemes were permitted. Courts have uniformly held that such schemes violate the securities [laws] and that a failure to disclose such a "scalping" scheme is a material omission prohibited by § 10(b).

*Id.* at 1311.

*Eisenberg,* 773 F.Supp. at 722–23.

**71.** The Defendants urge that this interpretation of *Blavin* is erroneous and contrary to the Fifth Circuit's interpretation of *Blavin* in *Laird v. Integrated Resources, Inc.,* 897 F.2d 826 (5th Cir. 1990). In discussing the standard for affirmative misrepresentations, the *Laird* Court stated the status of a defendant as an investment advisor is significant because it reflects on the amount of reliance placed on the individual's statements. *Id.* at 832–33. The *Laird* court premised its discussion on the fact that a fiduciary duty has been recognized for an investment advisor. *Id.* (citing *SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 187, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963)). It also interpreted *Blavin* as a case where the court relied on an investment advisor's fiduciary status to require disclosure of any conflicts of interest for purposes of Rule 10b–5. *Id.* at 833–34. The *Laird* court, however, relied on the discussion involv-

As discussed in *Eisenberg*, the Defendants are charged with several scalping schemes whereby they disseminated statements to the investing public concerning the merits of certain securities without disclosing the extent of their financial interest in such securities. The allegations in the Second Superseding Indictment adequately allege that the statements of the Defendants [72] were rendered incomplete and misleading in that they failed to provide the complete picture, *i.e.*, that the author and disseminators of the statements were financially interested in the success of the securities in the market. The extent of the Defendants' financial interest in the recommended securities and their purpose of holding those securities would certainly be viewed as material by the investing public. The Defendants purchased the securities only to profit from the rise in price as a result of the dissemination of the research reports; the investing public, however, purchased the securities for long term purposes. Had the investing public been apprised that the Defendants intended to sell their securities after an increase in price, they most likely would not have purchased the stock.[73]

The Second Superseding Indictment sufficiently pleads an affirmative misrepresentation by the Defendants. The issue of whether the misrepresentation is material is an issue for the jury. *See TSC Indus.*, 426 U.S. at 450, 96 S.Ct. at 2132–33 ("The issue of materiality may be characterized as a mixed question of law and fact...."). The motion to dismiss Counts One, Two and Eight on the ground that scalping is not an actionable securities violation is denied.

## VI. Bertoli's Motion to Dismiss Count Seven Charging Obstruction of Justice

Count Seven charges Bertoli with obstruction of justice on the ground that he submitted the allegedly false and fraudulent Isaacson Affidavits. Count Seven, ¶¶ 4–5. Bertoli argues Count Seven should be dismissed because it alleges perjury, not obstruction of justice. Obstruction of Justice Moving Brief at 1. In the alternative, Bertoli argues Count Seven should be severed because it will unfairly prejudice him. *Id.* at 2.

### A. *Dismissal of Count Seven*

Count Seven alleges a violation of section 1503 of Title 18. Section 1503 is an omnibus clause which penalizes any person who "endeavors to influence, obstruct, or impede, the due administration of justice." [74] 18 U.S.C. § 1503. Section 1503 was enacted, in part, to "prevent 'miscarriage[s] of justice by corrupt methods.'" *United States v. Williams*, 874 F.2d 968, 976 (5th Cir.1989) (quoting *United States v. Vesich*, 724 F.2d 451, 453 (5th Cir.1984)). It "forbids *all* corrupt endeavors to obstruct or impede the due administration of justice."

---

ing Blavin's liability under the Investment Advisor's Act and did not address the fact that Blavin was found liable under Section 10(b). Accordingly, the Defendants' reliance on *Laird* is misplaced.

**72.** The statement in the Wood Gundy reports was that "Wood Gundy ... and its affiliated companies together with their Directors and Officers, may from time to time have a position in the securities mentioned." Securities Fraud Moving Brief at 5.

**73.** The Defendants' argument that there is no distinction between "scalping-type nondisclosure and insider trader-type non-disclosure" is curious. Securities Fraud Moving Brief at 8. By the Defendants' own statement, this does not appear to be a non-disclosure case because the Wood Gundy reports contained the disclaimer that Wood Gundy and its affiliates may trade in the recommended securities. *Id.* at 5. The Defendants rely on the disclaimer in one argument and disavow it in the next. Such manipulation of the facts is rejected. As previously discussed, this is not a misappropriation of information case where a fiduciary duty must be found to establish Section 10(b) liability. Rather, it is the misleading nature of the disclaimer which subjects the Defendants to Section 10(b) and Rule 10b–5 charges.

**74.** Section 1503 provides in pertinent part:

Whoever corruptly, or by threats or force, or by any threatening letter or communication, ... influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

*Williams,* 874 F.2d at 976 (emphasis in original) (footnote omitted).

■ The Third Circuit has stated, however, that an allegation of perjury is insufficient to secure a conviction for obstruction of justice. *United States v. Rankin,* 870 F.2d 109, 111 (3d Cir.1989); *see also In re Michael,* 326 U.S. 224, 228, 66 S.Ct. 78, 80, 90 L.Ed. 30 (1945) (reversing punishment for contempt resulting from perjured testimony). In *Rankin,* the defendant was charged with obstruction of justice because he submitted an affidavit which the defendant knew contained false allegations.[75] 870 F.2d at 111. The defendants argued on appeal that the submission of false testimony could not alone constitute an obstruction of justice charge. *Id.* They argued the Government must allege "the particular manner in which the defendants' conduct obstructed the due administration of justice." *Id.*

The Circuit agreed with the trial court that an allegation of mere perjury was insufficient to establish an obstruction of justice charge. However, because the *Rankin* court was only faced with the issue of the sufficiency of the indictment, it declined to determine "how much more than a perjurious act the [G]overnment must prove...." 870 F.2d at 112. It stated that at the pretrial stage the only inquiry was whether the obstruction of justice count constitutes " 'a plain, concise and definite written statement of the essential facts constituting' an obstruction of justice and ... whether [it is] in compliance with Federal Rule of Criminal Procedure 7(c) and [the] Fifth and Sixth Amendments." *Id.*

It observed:

An indictment is generally deemed sufficient if it: 1) "contains the elements of the offense intended to be charged," 2) "sufficiently apprises the defendant of what he must be prepared to meet," and 3) allows the defendant to "show[ ] with

accuracy to what extent he may plead a former acquittal or conviction" in the event of a subsequent prosecution.

*Id.* (quoting *Russell v. United States,* 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962)). It stated the elements of section 1503 are " '(1) endeavoring to (2) corruptly (3) influence ... the due administration of justice.' " *Id.* (quoting *United States v. Tedesco,* 635 F.2d 902, 907 (1st Cir.1980), *cert. denied,* 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 974 (1981)). The *Rankin* court stated where the obstruction elements are alleged in the indictment it satisfies the pleading requirements without specifying the manner in which the conduct obstructed justice. 870 F.2d at 112.

■ Bertoli recognizes that *Rankin* permits the development of the facts at trial to determine whether the Government has proved more than perjury. Defendants' Reply Brief at 8. Bertoli argues, however, that the Government would not present any additional facts at trial than those alleged in the Second Superseding Indictment. *Id.* He argues "the only purpose served by letting the [G]overnment prove this claim at trial would be to unfairly prejudice [him] with evidence which pertains to a wrongly-brought charge." *Id.* at 9.

Count Seven of the Second Superseding Indictment alleges the Isaacson Affidavits "were false and fraudulent in that ... the Cayman Islands accounts were actually beneficially owned in whole or in part by ... Bertoli, ... Cannistraro, and ... Eisenberg." Count Seven, ¶ 4. It alleges: "Bertoli knew that the Isaacson Affidavits were false and fraudulent and that they had been prepared for the use of ... Bertoli ... Cannistraro ... and Eisenberg, in attempting to fraudulently exculpate themselves in any civil or criminal proceedings involving securities trading in these Cayman Islands accounts." *Id.* It alleges:

18 U.S.C. § 1503.

**75.** The obstruction of justice charge in *Rankin* was as follows:

[The defendant] did corruptly endeavor to influence, obstruct and impede the due administration of justice and did aid, abet, pro-

cure, counsel, induce, and willfully cause such an endeavor by submitting and filing KEVIN RANKIN's Affidavit, which KEVIN RANKIN then well knew contained false allegations....

870 F.2d at 111.

Bertoli unlawfully, willfully, knowingly, and corruptly endeavored to influence, obstruct, and impede the due administration of justice in connection with the present RICO prosecution, in that ... Bertoli submitted false and fraudulent affidavits to the court in an attempt to have the charges against him in the present RICO prosecution dismissed."

*Id.*, ¶ 5.

Count Seven sufficiently alleges the elements of an obstruction of justice offense. It concisely alleges that Bertoli corruptly endeavored to obstruct the administration of justice. It further alleges that the act which caused the obstruction of justice was the introduction of the false and fraudulent Isaacson Affidavits. Bertoli's argument that the production of evidence at trial will not establish anything more than what is already alleged in the Second Superseding Indictment and should be foregone because it will only result in prejudice to him is contrary to the holding in *Rankin*. As was the case in *Rankin*, the Second Superseding Indictment only alleges that Bertoli impeded the due administration of justice. It is the Government's burden at trial to prove the submission of the Isaacson Affidavits was intended to or did, in fact, impede justice. Moreover, the argument that he will be prejudiced by the introduction of the evidence is more properly an argument to be advanced in his motion for severance which is discussed below. The motion to dismiss Count Seven is denied.

### B. *Severance of Count Seven*

 Bertoli argues Count Seven should be severed to afford him a fair trial. Obstruction of Justice Moving Brief at 4. He argues one of the central issues at trial will be the identity of the beneficial owners of certain Cayman Islands accounts. *Id.* He argues it is inappropriate for the Government to charge him in this case with obstruction of justice for filing an affidavit which attacks one of the Government's central claims. *Id.*

The Government argues severance is inappropriate because the preparation and submission of the Isaacson Affidavits were part of the Defendants' RICO activities. Opposition Brief at 54. It argues Count Seven must be tried with the other Counts in the Second Superseding Indictment because the evidence offered in connection with the other counts will establish a motive for the conduct alleged in Count Seven. *Id.* Additionally, the Government argues Bertoli has not demonstrated prejudice that would result in a manifestly unfair trial. *Id.* at 55. It argues even if Bertoli were able to establish prejudice, it would be illusory because the evidence relating to Count Seven will be introduced in connection with the RICO counts. *Id.* at 56.

Rule 14 of the Federal Rules of Criminal Procedure provides: "If it appears that a defendant ... is prejudiced by a joinder of offenses or of defendants in an indictment ..., the court may order ... separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires." Fed.R.Crim.P. 14.

Although a request for severance is made under Rule 14,[76] Rule 8 of the Federal Rules of Criminal Procedure merits consideration. Rule 8 permits joinder of offenses and defendants.[77] Joinder of offenses and defendants promotes economy

---

**76.** Although Bertoli does not state that he is moving for severance pursuant to Rule 14, he is deemed to so move because his argument is based on the prejudicial nature of Count Seven.

**77.** Rule 8 provides:

(a) Joinder of Offenses. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

(b) Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Fed.R.Crim.P. 8.

of judicial and prosecutorial resources, as well as the public interest in avoiding expensive and duplicative trials. *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814, *reh'g denied*, 475 U.S. 1104, 106 S.Ct. 1507, 89 L.Ed.2d 907 (1986); *United States v. Gorecki*, 813 F.2d 40, 42 (3d Cir.1987); *United States v. Jackson*, 649 F.2d 967, 973 (3d Cir.), *cert. denied*, 454 U.S. 1034, 102 S.Ct. 574, 70 L.Ed.2d 479 (1981). When distinct offenses have both a logical and temporal relationship, joinder permits the Government to present its evidence in an efficient manner. Such evidentiary overlap "strongly counsels in favor of joinder." *United States v. McDonnell*, 699 F.Supp. 1348, 1351 (N.D.Ill.1988) (citing *United States v. Shue*, 766 F.2d 1122, 1134 (7th Cir.1985), *cert. denied*, 484 U.S. 956, 108 S.Ct. 351, 98 L.Ed.2d 376 (1987)).

In this case, the literal requirements of Rule 8 are met. As discussed, the Second Superseding Indictment alleges Bertoli's preparation of the Isaacson Affidavits were part of the Defendants' racketeering activities. Therefore, a presumption arises in favor of joinder. *See United States v. Swift*, 809 F.2d 320, 322 (6th Cir.1987) (Rule 8(b) "can, and should, be 'broadly construed in favor of initial joinder'....") (quoting *United States v. Isaacs*, 493 F.2d 1124, 1158 (7th Cir.), *cert. denied sub nom. Kerner v. United States*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974)). Indeed, there is a presumption against severance because it is "assume[d] that closely related charges are being tried together...." *United States v. Velasquez*, 772 F.2d 1348, 1355–56 (7th Cir.1985), *cert. denied*, 475 U.S. 1021, 106 S.Ct. 1211, 89 L.Ed.2d 323 (1986); *see also United States v. Serubo*, 604 F.2d 807, 819 (3d Cir.1979).

If, however, offenses or defendants have been improperly joined, severance is required as a matter of law under Rule 8. *United States v. Andrews*, 765 F.2d 1491, 1496 (11th Cir.1985) ("Misjoinder under Rule 8(b) is prejudicial *per se*....") (emphasis in original), *cert. denied sub nom. Royster v. United States*, 474 U.S. 1064, 106 S.Ct. 815, 88 L.Ed.2d 789 (1986);

*United States v. Bledsoe*, 674 F.2d 647, 654 (8th Cir.) ("[M]isjoinder of defendants is inherently prejudicial."), *cert. denied sub nom. Phillips v. United States*, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982); *United States v. Vastola*, 670 F.Supp. 1244, 1261 (D.N.J.1987) (citing *United States v. Somers*, 496 F.2d 723, 729 (3d Cir.), *cert. denied*, 419 U.S. 832, 95 S.Ct. 56, 57, 42 L.Ed.2d 58 (1974)).

When a number of offenses are joined in one indictment or multiple defendants are jointly charged with a single offense, "some prejudice almost necessarily results." *Vastola*, 670 F.Supp. at 1261 (quoting *Cupo v. United States*, 359 F.2d 990, 993 (D.C.Cir.1966), *cert. denied*, 385 U.S. 1013, 87 S.Ct. 723, 17 L.Ed.2d 549 (1967)). This level of prejudice, however, is permissible so long as the technical strictures of Rule 8 are met. Thus, Rule 8(a) is generally satisfied if the indictment charges offenses which are temporally or logically connected to support the conclusion that the offenses are part of the same plan. *Gorecki*, 813 F.2d at 42; *see also United States v. Gonzalez*, 918 F.2d 1129, 1136 n. 6 (3d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1637, 113 L.Ed.2d 733 (1991); *United States v. Di Pasquale*, 561 F.Supp. 1338, 1347 (E.D.Pa.1983), *aff'd*, 740 F.2d 1282 (3d Cir.1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985).

Severance under Rule 14 is within the discretion of the trial court. *United States v. Eufrasio*, 935 F.2d 553, 568 (3d Cir.), *cert. denied sub nom. Idone v. United States*, —— U.S. ——, 112 S.Ct. 340, 116 L.Ed.2d 280 (1991); *United States v. Boyd*, 595 F.2d 120, 125 (3d Cir.1978). Rule 14 authorizes a trial court to sever counts or defendants where, despite an indictment's technical compliance with Rule 8, joinder would result in a "manifestly unfair trial." *Vastola*, 670 F.Supp. at 1261 (citing *United States v. Reicherter*, 647 F.2d 397, 400 (3d Cir.1981)). A defendant bears a heavy burden when he or she moves for severance under Rule 14. *See United States v. McGlory*, 968 F.2d 309, 339–40 (3d Cir.1992); *Eufrasio*, 935 F.2d at

568; *United States v. Sandini*, 888 F.2d 300, 305 (3d Cir.1989), *cert. denied, sub nom. Thomson v. United States*, 494 U.S. 1089, 110 S.Ct. 1831, 108 L.Ed.2d 959 (1990); *United States v. De Peri*, 778 F.2d at 983; *United States v. Di Pasquale*, 740 F.2d 1282, 1293 (3d Cir.1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985). Mere allegations of prejudice are insufficient to meet this burden. A defendant "must demonstrate 'clear and substantial prejudice.'" *Gorecki*, 813 F.2d at 43 (quoting *Sebetich*, 776 F.2d at 427); *United States v. Wright–Barker*, 784 F.2d 161, 175 (3d Cir.1986). "It is not enough to show that severance would have increased the defendant's chances of acquittal." *McGlory*, 968 F.2d at 340.

Prejudice cannot be shown merely because the jury may consider the facts alleged in one count during their considerations of another count. *Eufrasio*, 935 F.2d at 570–71. The jury can reasonably be expected to confine its considerations of evidence to the proper charges. *Id.* "[T]he defendant must demonstrate that in light of the evidence to be submitted against him, the evidence in the case as a whole is so complex or confusing, that a reasonable jury would be unable to 'compartmentalize' the evidence as to each [count] and would thus be unable to make an individualized determination of the prejudiced defendant's innocence or guilt." *United States v. Zolp*, 659 F.Supp. 692, 701 (D.N.J.1987); *see also McGlory*, 968 F.2d at 340.

In determining whether to sever a trial, the "court should balance the public interest in joint trials against the possibility of prejudice inherent in the joinder of defendants." *Eufrasio*, 935 F.2d at 568 (citing *De Peri*, 778 F.2d at 984); *see also McGlory*, 968 F.2d at 340. Joint trials "conserve [public] funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial." *Bruton v. United States*, 391 U.S. 123, 134, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968). Moreover, "joint trials generally serve the interests of justice by avoiding inconsistent verdicts and ... [other] advantages which sometimes operate to the defendant's benefit." *Richardson v. Marsh*, 481 U.S. 200, 210, 107 S.Ct. 1702, 1708, 95 L.Ed.2d 176 (1987). Significantly, the "public interest in judicial economy favors joint trials where the same evidence would be presented at separate trials of defendants charged with a single conspiracy." *Eufrasio*, 935 F.2d at 568.

In support of the request for severance, Bertoli argues the introduction of evidence that the Isaacson Affidavits are false and fraudulent would prejudice the jury against him with respect to the other Counts in the Second Superseding Indictment. But as the Government argues, the Government will introduce the Isaacson Affidavits as part of the evidence in the RICO Counts. Accordingly, joinder of Count Seven will not result in "clear and substantial prejudice" resulting in an unfair trial. *Eufrasio*, 935 F.2d at 568, 571.

Moreover, the trial is projected to last two to four months. To sever Count Seven will require that many of the same witnesses be reassembled and would result in a gross waste of judicial resources, time and effort. The substantial public interest in judicial economy outweighs any prejudice to Bertoli by not severing Count Seven. The motion to sever Count Seven is denied.

## VII. Motion for Discovery

Bertoli makes fourteen discovery requests pursuant to Rule 16 of the Federal Rules of Criminal Procedure seeking the following material: (1) all tape recordings or transcripts of telephone conversations involving Bertoli which the Government received subsequent to 9 February 1990 ("Request Number One"), (2) all tape recordings or transcripts of telephone conversations involving Cannistraro which the Government received subsequent to 9 February 1990 ("Request Number Two"), (3) all documents in connection with this matter received by the Government subsequent to 9 February 1990 ("Request Number Three"),[78] (4) copies of all bank statements,

---

**78.** Specifically, Bertoli requests documents re-

ceived from Leo Eisenberg, Paul Eisenberg, Mi-

canceled checks and tax returns for the years 1982 through 1984 of various individuals ("Request Number Four"),[79] (5) copy of a letter of intent between Solar Age and Citywide Securities ("Request Number Five"), (6) copy of a check issued to Citywide Securities on behalf of Solar Age ("Request Number Six"), (7) all due diligence files with respect to Solar Age, Nature's Bounty and Astrosystems maintained by Citywide Securities or Wood Gundy ("Request Number Seven"), (8) a tape recording of a conversation in 1987 between Carl Alan Key and Cannistraro ("Request Number Eight"), (9) a tape recording of a conversation between Eisenberg and Gary Nudelman ("Request Number Nine"), (10) a list of the names of the alleged co-conspirators ("Request Number Ten"),[80] (11) names of all witnesses the Government heard before the Grand Jury but did not intend to call as witnesses who have contradicted the statements of various individuals ("Request Number Eleven"), (12) any deals, promises or inducements made to Government witnesses in exchange for testimony ("Request Number Twelve"), (13) any statements tending to impeach credibility of Government witnesses ("Request Number Thirteen"), and (14) all offers of immunity to Government witnesses ("Request Number Fourteen"). Discovery Notice of Motion.

### A. Tape Recordings or Transcripts of Conversations—Request Numbers One, Two, Eight and Nine

With respect to Request Numbers One and Two for tape recordings of the Defendants received after 9 February 1990, the Government concedes that any such tape recordings would be within paragraph 1(a)

of the discovery order, dated 23 May 1990 (the "Discovery Order").[81] Opposition Brief at 88. It states, however, that it "possesses no relevant tape recordings of Bertoli or Cannistraro that were received after February 9 1990." *Id.*

With respect to Request Number Eight for a tape recording or transcript between Cannistraro and Carl Alan Key, Cannistraro stated, at oral argument, that Assistant United States Attorney, Robert Warren "represented ... to Mr. Bob Talcot in Los Angeles when I was arrested, saying that I should cooperate immediately because he had this conversation with Carl Alan Key and myself on tape, which was supposed to be extremely beneficial to the Government, or at least in Mr. Warren's eyes." 19 June 1992 Oral Arg. Tr. at 10. The Government states it "does not have a tape recording of a conversation between Carl Alan Key and Cannistraro and never indicated to Bertoli that it did." Opposition Brief at 88; *see also* 19 June 1992 Oral Arg. Tr. at 9 ("As far as the tapes, there is no tape between Carl Alan Key and ... Cannistraro. I have represented that to the Court and to the defendants in our papers and, as far as I know, Mr. Warren has never made that representation.").

As to Request Numbers One, Two and Eight, the Government has made affirmative representations that the requested tape recordings do not exist. The representations of the Government will be relied on and accepted. Request Numbers One, Two and Eight are denied.

Request Number Nine seeks a tape recording of a conversation between Eisen-

---

chael Eisenberg, the SEC, American Express, Joseph Lugo, Jose Camprubi, Eric Moss and the National Association of Securities Dealers ("NASD"). Discovery Notice of Motion, ¶ 3.

**79.** Bertoli requests such information regarding twenty-four individuals. Discovery Notice of Motion, ¶ 4.

**80.** At oral argument the Government represented that it was in the process of preparing a list of the alleged co-conspirators and would be

providing a copy to Bertoli. Accordingly, this request is moot.

**81.** The Discovery Order provides that the Government shall "[p]ermit defendant's attorney to inspect and copy or photograph any relevant written or recorded statements or confessions made by the defendant, or copies thereof, within the possession, custody or control of the Government, the existence of which is known, or may become known, to the attorney for the Government." Discovery Order, ¶ 1(a).

berg and Gary Nudelman. Discovery Notice of Motion, ¶ 9. Bertoli does not specify the grounds upon which he asserts he is entitled to this tape. To the extent Bertoli seeks the tape recording as a statement of a co-conspirator, the request is denied. *Eisenberg* previously dealt with a motion for discovery of co-conspirator's statements. 773 F.Supp. at 680–83.

As stated in *Eisenberg*, "[e]ven under [a] broad interpretation of Rule 16(a)(1)(A), . . . discovery of the statements of co-conspirators may only be permitted on a Rule 16 motion if the Government does not intend to call such co-conspirators as witnesses at trial." 773 F.Supp. at 682 (quoting *United States v. Jackson*, 757 F.2d 1486, 1491 (4th Cir.), *cert. denied*, 474 U.S. 994, 106 S.Ct. 407, 88 L.Ed.2d 358 (1985); *United States v. Konefal*, 566 F.Supp. 698, 706 (N.D.N.Y.1983)). If the Government intends to call Eisenberg as a witness at trial, his statements are not discoverable until Eisenberg testifies at trial. *Id.* (citing Jencks Act, 18 U.S.C. § 3500 ("Jencks material")).[82]

To the extent the tape constitutes impeachment material discoverable under *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) ("*Giglio*" material), the Government states it will be disclosed on the day before the witness testifies. Opposition Brief at 90. Because Bertoli has presented no basis for the production of the tape between Eisenberg and Gary Nudelman, Request Number Nine is denied.

### B. *Production of Documents—Request Numbers Three through Seven*

1. Documents Obtained Subsequent to 9 February 1990—Request Number Three

Request Number Three asks for production of all documents received by the Government subsequent to 9 February 1990, the date of the last inspection by Bertoli of the document room. Discovery Notice of Motion, ¶ 3. Specifically, Bertoli requests documents received from Eisenberg, Paul Eisenberg, Michael Eisenberg, the SEC, American Express, Joseph Lugo, Jose Camprubi, Eric Moss and the NASD. *Id.* Bertoli cites no authority for the proposition that he is entitled to these documents as a matter of right. It appears Bertoli relies on the fact that during the Cayman Islands Depositions, the Government introduced Exhibit 2500 which Bertoli had not previously seen. Discovery Affidavit, ¶ 8. He argues, therefore, the Government has documents in its possession which it did not provide under the Discovery Order. *Id.*, ¶ 9.

As stated, Bertoli neither cites authority nor advances arguments as to why he is entitled to any documents the Government has received subsequent to 9 February 1990. Former counsel to Bertoli, in fact, reviewed documents in the storage room on forty-two occasions since 9 February 1990. Opposition Brief at 82. As a result of such investigations, Bertoli had additional documents photocopied in June 1991. *Id.* at 82–83. The Government represents that pursuant to the Discovery Order, it "will allow Bertoli to inspect and copy the documents it intends to introduce on its direct case approximately 30 days before trial." *Id.* at 91. In addition, the Government states that if any of the requested documents constitute exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ("*Brady*" material),

---

**82.** The Jencks Act provides in relevant part:

(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena [sic], discovery, or inspection until said witness has testified on direct examination in the trial of the case.

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall

it will make such documents available.[83] *Id.* at 92. Lastly, the Government states it will provide all Jencks [84] and *Giglio* material the day before a witness testifies at trial. *Id.*

Although the Defendants are not entitled to more discovery, the Government has provided no reason why it should not permit Bertoli to continue to inspect the boxes of documents in the Government's possession. Accordingly, Bertoli is given leave to access the documents in the Government's possession; the Government is not, however, required to locate and identify those documents, it has received subsequent to 9 April 1990. Request Number Three for production of documents obtained subsequent to 9 February 1990 is denied.

### 2. Bank Records and Tax Returns—Request Number Four

With respect to Request Number Four for bank statements, canceled checks and tax returns for various individuals, it appears Bertoli seeks these documents on the

theory that the Government has previously made its documents open for inspection and should continue to do the same. Discovery Affidavit, ¶ 3. Specifically, Bertoli argues when his former counsel made its initial inspection of the three hundred boxes of documents in the Government's storage room, it was agreed that Bertoli would have continued access to these documents as the case proceeds.[85] *Id.*, ¶ 3, Ex. A (letter from Podvey Sachs to Government).

Again, by Bertoli's admission, Bertoli or his then counsel was permitted to inspect the documents on forty-two occasions prior to 9 February 1990. As stated, Bertoli or his then counsel last reviewed the documents and had five boxes of documents copied in June 1991. By providing such access, the Government has done more than is required by the Discovery Order. Nevertheless, the Government has provided no reason as to why Bertoli should not be given continued access to inspect the documents as initially represented to Berto-

order it to be delivered directly to the defendant for his examination and use.
18 U.S.C. § 3500.

**83.** Bertoli urges that the previous ruling that the Defendants were not entitled to particularization of which documents constitute *Brady* material should be re-evaluated in light of his pro se status. Defendants' Reply Brief at 18. Bertoli, however, cites no authority which entitles a pro se defendant to greater discovery under *Brady.* Accordingly, Bertoli's request is denied.

Bertoli also argues that the discovery of *Brady* material may not be delayed because under *United States v. Crozzoli,* 698 F.Supp. 430, 437 (E.D.N.Y.1988), it should be disclosed upon the request of the defendant. Defendants' Reply Brief at 19–20. Bertoli's argument is curious because the Government has maintained throughout this action that it has complied with its obligations under *Brady. Eisenberg,* 773 F.Supp. at 685 n. 15 (citing Government's Opposition Brief to First Set of Pretrial Motions at 57–58). Moreover, the Government continues to represent that should it come into possession or discover that it has in its possession exculpatory evidence that it will provide Bertoli with such evidence. Opposition Brief at 89, 92.

**84.** With respect to Jencks material, Bertoli argues disclosure should be required earlier than the day before the witness's testimony at trial. Defendants' Reply Brief at 20. Specifically, Bertoli argues the practice of requiring disclosure the day before the testimony is offered is "enor-

mously unfair ... where, as here, the issues are deemed complex, the witnesses are numerous, and th+e [sic] defendants ... are *pro se.*" *Id.* In making this assertion, Bertoli relies on a Sixth Circuit decision in *United States v. Minsky,* 963 F.2d 870 (6th Cir.1992).

In *Minsky,* the defendant appealed his conviction, in part, on the ground that the trial court denied defendant's request for FBI reports under Jencks. After an *in camera* review of the reports, the trial court denied the defendant's request because the defendant had been adequately apprised of the conversations recorded in the FBI reports. 963 F.2d at 873. On appeal, the Sixth Circuit stated the defendant's Jencks Act claim was close, but it alone would not constitute a basis for reversal. 963 F.2d at 875. It explained where Jencks material, such as FBI reports are not in dispute, it has been the practice of courts to require disclosure well in advance of trial. 963 F.2d at 874–875.

*Minsky* is not controlling law in this circuit. Bertoli's request for advance discovery of Jencks material is denied.

**85.** Bertoli states the understanding between his counsel and the Government was as follows:

... we will still have access to the documents as the case proceeds during which [period] we can make further selections of documents for copying if needed. We have relied upon and will continue to rely upon that understanding in making our initial selection for copying. Discovery Affidavit, Ex. A.

li's former counsel. Bertoli is given leave to inspect the documents and mark such documents for independent copying. To the extent Bertoli requests the Government to locate and copy the bank records and tax returns, Request Number Four is denied. As stated in the Discovery Order, the Government has no obligation to provide documents it intends to introduce as exhibits at trial until thirty days prior to trial. Discovery Order, ¶ 4.

3. Letter of Intent, Citywide Securities Check and Due Diligence Files—Request Numbers Five through Seven

Request Number Five seeks an order requiring the Government to produce a copy of a letter of intent between Solar Age and Citywide Securities to underwrite the sale of Solar Age common stock. Discovery Notice of Motion, ¶ 5. Request Number Six seeks a copy of a check issued to Citywide Securities on behalf of Solar Age pursuant to the letter of intent. *Id.*, ¶ 5. Request Number Seven requests copies of due diligence files of Citywide Securities or Wood Gundy involving Solar Age, Nature's Bounty and Astrosystems. *Id.*, ¶ 7.

The Government states it "does not have a 'check issued to Citywide ... on behalf of Solar Age....' " Opposition Brief at 92 n. 46. The Government states assuming it possesses the letter of intent or a check relating to the Solar Age issuance of common stock, Bertoli has already had an opportunity to copy such documents. *Id.* With respect to Request Number Seven, the Government states it "does not believe it has any Wood Gundy or Citywide due diligence files on Solar Age, Nature's Bounty and Astrosystems." *Id.* It states even if it possessed such files, they have previously been made available to Bertoli. *Id.*

Request Numbers Five, Six and Seven are denied for the same reasons applied to Request Number Three. As discussed, however, the Government has shown no basis why Bertoli should not be given leave to access the three hundred boxes of documents in the Government's possession. Ac-

cordingly, such leave is granted and Bertoli can mark documents for independent copying. The Government is not, however, required to locate and photocopy the documents requested.

C. *Giglio Material—Request Numbers Eleven through Fourteen*

■ Request Number Eleven seeks a list of witnesses the Government heard before the grand jury, but does not intend to call as trial witnesses, who have contradicted the statements of Eisenberg, Paul Eisenberg, Michael Eisenberg, Robert Cooper and Herbert Cannon. Discovery Notice of Motion, ¶ 11. Bertoli also seeks in Request Number Twelve any deals made by the Government in exchange for a witness's testimony, in Request Number Thirteen he seeks any statements impeaching the credibility of a Government witness and in Request Number Fourteen he seeks all offers of immunity to Government witnesses. *Id.*, ¶¶ 12–14. Requests Eleven through Fourteen all seek material which would be used to impeach the Government's witnesses. These requests, therefore, are classified as requests for *Giglio* material. Bertoli made a similar motion in *Eisenberg.* 773 F.Supp. at 684–85.

In *Eisenberg,* Bertoli's request for *Giglio* material was denied. It stated, "the Third Circuit held a defendant's due process right to a fair trial is satisfied when information relating to the credibility of Government witnesses is disclosed the day the witnesses are scheduled to testify." *Eisenberg,* 773 F.Supp. at 684 (citing *United States v. Higgs,* 713 F.2d 39, 44 (3d Cir.1983), *cert. denied sub nom. Kemp v. United States,* 464 U.S. 1048, 104 S.Ct. 725, 79 L.Ed.2d 185 (1984)). "[T]he purpose of requiring disclosure of impeachment information is not to assist the defense in a general pretrial investigation, but only to give the defense an opportunity to effectively cross-examine the Government's witnesses at trial." *Eisenberg,* 773 F.Supp. at 685 (citing *Higgs,* 713 F.2d at 44–45).

*Eisenberg* recognized the Government's intent to disclose *Giglio* material the day before the witness testifies. 773 F.Supp.

at 685. It further stated early production of *Giglio* material is unwarranted because Bertoli did not present any compelling justification for sweeping discovery in this action. *Id.* at 683, 685.

Bertoli now seeks early disclosure of *Giglio* material on the ground that he is pro se. Defendants' Reply Brief at 18. Bertoli, however, has provided no case law which suggests that the disclosure requirements of *Giglio* are different when a defendant has knowingly and voluntarily waived his right to counsel. Indeed, when Bertoli waived his right to counsel he was repeatedly warned of the fact that this matter presented complicated issues for trial and would be held to the same standards that would be applied were he represented by counsel. *See* 3 September 1991 Tr. at 30, 38–39. Bertoli will not now be allowed to use his voluntary decision to proceed pro se as a means to allow him to otherwise impermissible pretrial discovery. Accordingly, Request Numbers Eleven through Fourteen to the extent they are based on Bertoli's status as a pro se defendant are denied.

Bertoli also argues Request Numbers Eleven through Fourteen should be granted because *Brady* requires the disclosure of "material impeachment evidence." Defendants' Reply Brief at 19 (citing *United States v. Kiszewski*, 877 F.2d 210, 216 (2d Cir.1989); *Perkins v. Le Fevre*, 691 F.2d 616, 619 (2d Cir.1982); *United States v. Kalevas*, 622 F.Supp. 1523, 1531 (S.D.N.Y. 1985)). The requirements of *Giglio* and *Brady* are fully set forth in *Eisenberg*.

773 F.Supp. at 684–85. The Government is fully aware of its obligations under *Brady*. The Government has represented that if "it determines that any 'witnesses ... heard before the Grand Jury' possess exculpatory information within the meaning of *Brady*, it will provide Bertoli with the names of those witnesses." Opposition Brief at 89. The Government's representation is accepted and relied on; Request Numbers Eleven through Fourteen are denied.[86]

## VIII. Motion to Reconsider First Pretrial Motions in Light of Second Superseding Indictment

The Defendants have filed the Notice of Motion that was previously filed for the First Set of Pretrial Motions. At oral argument, Bertoli explained the purpose of this motion as follows:

> That's merely requesting the Court, because I consider the [S]econd [S]uperseding [I]ndictment a totally new indictment, that the Court consider all of those motions as if they were filed and the decisions, of course, ... of the Court would be standing. I don't want to waive, for example, any rights that would have been covered by those motions.

19 June 1992 Oral Arg. Tr. at 34.

The First Set of Pretrial Motions has been considered in light of the Second Superseding Indictment and the decision in *Eisenberg* remains extant.

### Conclusion

For the reasons set forth above, the Misconduct Motion is denied; the Pre–Indict-

---

**86.** Although not specifically requested in the Discovery Notice of Motion, Bertoli has also raised the issue of the Government's compliance with a demand for an inventory list of the three hundred boxes of documents in the Government's possession. Bertoli states that his former counsel requested an inventory of the three hundred boxes of documents in late 1989. Defendants' Reply Brief at 18; Defendants' Reply Exhibits, Ex. 11 (Affidavit of Franklin M. Sachs), ¶ 3; *see also* 19 June 1992 Oral Arg.Tr. at 6. Bertoli states that the Government has refused to provide the inventory. At oral argument, the Government stated no demand for an inventory had been made. It stated Bertoli's former counsel merely asked the Government whether an inventory existed and that it stated none existed. 19 June 1992 Oral Arg.Tr. at 9.

The Government correctly points out that Bertoli has not previously requested an inventory of the documents. *See* Defendants' Reply Exhibits, Ex. 11, ¶ 3 ("I specifically asked [the Government] whether the Government had an inventory of the contents of the more than 300 boxes of documents which we began reviewing at that time.... [The Government] told me that [it] did not have such an inventory."). To the extent Bertoli now demands an inventory of the documents, his request is without merit. Former counsel to Bertoli inventoried every box when they conducted an initial review of the documents. *Id.*, Ex. 11, ¶ 3 ("[W]e have been inventorying every box so we will know what items are contained in the discovery being offered.").

ment Delay Motion is denied; the Statute of Limitations Motion is denied; the Securities Fraud Motion is denied; the Obstruction of Justice Motion is denied. The Motion to Compel Discovery is denied; however, Bertoli is given leave to inspect the documents in the possession of the Government. The Cayman Islands Motion is also denied; however, Bertoli is given leave to cross-examine witnesses with respect to the Second Superseding Indictment and to re-cross individuals not previously recrossed and Cannistraro is given leave to cross-examine individuals deposed in the Cayman Islands. The Motion re First Pretrial Motions is denied.

## APPENDIX
### United States v. BERTOLI, CANNISTRARO
List of Pleadings and Related Documents [1]

Documents | No. of Pages [2]

1. **Bertoli's Motion to Recuse Judge Lechner** .................................... 1
 –Filed 2 Nov. 1989
 –Submitted by Sachs for Bertoli
 –Pursuant to 28 USC 455
 Documents in Support of Motion
 A. Sachs Affidavit, dated 2 Nov. 1989 ..................................... 2
 B. Moving Brief ........................................................ 12
 –submitted 2 Nov. 1989
 –by Sachs for Bertoli
 Exhibits
 1. Bertoli's letter to court, dated 2 Nov. 1987 .......................... 3
 2. Bertoli's letter to Justice Marshall, dated 3 Nov. 1987 ............... 3
 3. N.Y. Times article ................................................ 1
 C. Letter Brief, dated 3 Nov. 1989 in further support ...................... 3
 –submitted by Tolomeo for Bertoli
 Exhibit
 Transcript of Proceedings, U.S. v. Cannistraro, Crim. No. 87–193, dated 2 Nov. 1987 ............................................. 51
 D. Amended Brief in Support of Motion to Recuse ........................ 12
 –dated 6 Nov. 1989
 –submitted by Podvey Sachs
 Exhibits:
 1. Bertoli's letter to court dated 2 Nov. 1987 .......................... 3
 2. Bertoli's letter to Justice Marshall dated 3 Nov. 1987 ............... 3
 3. N.Y. Times article ............................................... 1
 E. Letter from Podvey Sachs, dated 6 Nov. 1989, clarifying 3 Nov. 1989 Letter Brief ........................................................ 2
 Documents in Opposition to Motion
 A. Memorandum of Law in Opposition, dated 17 Nov. 1989 ................. 32
 –submitted by Rosenfield
 –on the Memorandum: Fietkiewicz and Warren
 Exhibits:
 1. Tape Cassette
 2. Cahill Affidavit in Support of Motion to Intervene and to Stay Civil Discovery (w/other docs.) ......................................... 22
 3. Correspondence between Bertoli and Government from Jan. 1976–April 1977 ...................................................... 8
 4. Letter, dated 1977, from Bertoli to U.S. Atty. Gen. requesting indictment of District Judges Lacey and Stern ..................... 1

1. The documents listed in this appendix exclude the appeals to the Great Britain courts to block the Treaty Request.

2. The number of pages for all opinions and orders is of typewritten pages, not published pages.

Documents No. of Pages

 5. Documents re: disqualification of Judge Ralph Tracy..................5

 6. Transcript of Proceedings, U.S. v. Cannistraro, Crim. No. 87–193,
dated 21 Sept. 1987........................................9

 7. Verified Complaint, filed 2 Feb. 1976—Bertoli v. Goldstein, Civil
Action No. 76–207 ........................................8

 8. Verified Complaint—Bertoli v. Foreman of Grand Jury & attached
documents, Civ. No. 76–286 ...............................38

 8a. Bertoli's letter requesting leave to dismiss, dated 12 Aug. 1977.......1

 9. Bertoli's list of witnesses, dated 1 Oct. 1987 ........................7

 10. Subpoena to Bertoli, dated 1 Oct. 1987 ...........................2

 11. Notice of Motion to quash subpoena w/documents, dated 10 Nov.
1987 ..................................................18

 12. Supplemental Memo in support of motion to quash subpoena, dated
13 Nov. 1987 ............................................3

 13. Transcript of Proceeding, U.S. v. Cannistraro, Crim. No. 87–193,
dated 24 Sept. 1987......................................167

 14. Government's Sentencing Memo for U.S. v. Cannistraro, Crim. No.
87–193, dated 23 Oct. 1987 ...............................29

 15. Sentencing Memo submitted by Cannistraro re: U.S. v. Cannistraro,
Crim. No. 87–193, dated 28 Oct. 1987......................106

 16. Transcript of Proceeding, U.S. v. Cannistraro, dated 24 July 1990...150

**Minutes of Proceedings of 29 Jan. 1990**
–Hearing on Defendants' motion for recusal; decision reserved.
–Speedy Trial Order to be filed.
–Appearances: Fietkiewicz, Warren and Rosenfield
 (Government) ·
 Sachs and Tolomeo (Bertoli)
 Pollack and Codey (Cannistraro)
 Sterheim and Fallick (Eisenberg)

**ORDER, filed 6 Feb. 1990**
Continuance granted (excluded time between filing of Bertoli's recusal motion
and the date of both recusal motions pursuant to Speedy Trial Act) .........1

**OPINION, filed 22 March 1990**
Bertoli's motion for recusal denied .......................................77

**ORDER, filed 30 March 1990**
Bertoli's motion for recusal denied........................................1

2. **Government's Motion to Grant Leave to take foreign depositions and for
issuance for request for foreign judicial assistance (Cayman) and to have
a Special Master over proceedings appointed** ...........................4
–Filed 6 Nov. 1989
–Submitted by Rosenfield
–Pursuant to F.R.Crim.P. 15 & 28, 28 USC § 1781, 18 USC § 507
Documents in Support of Motion
A. Government Moving Brief ............................................9
 –Filed 6 Nov. 1989
 –Submitted by Rosenfield
B. Affidavit of Cahill, dated 19 Oct. 1989 ...............................54
 Exhibits
 1. Copy of Superseding Indictment, dated 29 Sept. 1989...............79
 2. Copies of stock certificates for Astrosystems .....................14
 3. Copies of stock certificates for Astrosystems .....................13
 4. Stock purchase receipt for Richardson Greenshields to Euro Bank,
dated 15 July 1983 ....................................1
 5. Statements of Richardson Greenshields to Euro Bank, dated 31 July
1983 ..................................................4
 6. Check of Euro Bank to Richardson Greenshields ...................1
 7. Money transfer from Butterfield Bank to Chase Manhattan Bank,
dated 11 Jan. 1983.................................1

**96**

Documents No. of Pages

8. Account credit from Chase Manhattan to Butterfield Bank & Monarch, dated 11 Jan. 1983 .......................................... 1
9. Financial records, dated 1982–1983 ..................................... 1
10. Check, dated 18 June 1983, from Monarch to Euro Bank ............. 1
11. (a) Statement of Butterfield Bank's account from Irving Trust, dated 31 Jan. 1983 ...................................................... 1
 (b) Check from Monarch to Euro Bank, dated 18 Jan. 1983 .......... 2
12. Records of phone calls of Liquidated Control for Oct. 1982–1983 and of Monarch for Dec. 1982 ........................................ 2
13. Wire transfer from Butterfield Bank to Irving Trust, dated 15 Dec. 1982 ............................................................. 1
14. Wire transfer from Butterfield Bank to Monarch, dated 15 Dec. 1982 ..... 1
15. Balance sheet of Euro Bank for 1982 ................................ 1
16. Wire transfer from Butterfield Bank to Irving Trust, dated 16 Dec. 1982 ............................................................. 1
17. Wire transfer from Euro Bank to Monarch, dated 21 Dec. 1982 ..... 1
18. Check from Monarch to Monarch, dated 14 March 1983 ............. 1
19. Check from Monarch to Venture Partners, dated 17 March 1983 ..... 1
20. Check from Monarch to Irving Trust, dated 14 March 1983 ......... 1
21. Check receipts from Euro Bank to Irving Trust, dated 14 May 1983 ..... 1
22. Balance sheets from March 1983 ..................................... 1
23. Balance sheets from March–April 1983 ............................... 2
24. Sell orders for Toxic Waste from various parties, dated 10 March 1983 ............................................................... 7
25. (a) Deposit from Butterfield into Irving Trust, dated 5 April 1983 ..... 2
 (b) Check from Monarch to Butterfield, dated 5 April 1983 .......... 1
26. Deposit & Check from Monarch to Euro Bank, dated 22 April 1983 ..... 2
27. Record of deposit from Monarch to Euro Bank, dated 9 May 1983 ..... 2
28. Check from Monarch to Euro Bank w/record of Euro Bank's account activity, dated 9 June 1983 ................................. 3
29. Check & record of deposit from Monarch to Irving Trust on behalf of Euro Bank, dated 5 April 1983 ................................. 2
30. Record of deposit from Monarch to Irving Trust on behalf of Euro Bank, dated 5 April 1983 ......................................... 2
31. Check & record from Monarch to Irving Trust for Butterfield, dated 21 April 1983 ................................................. 2
32. Euro Bank request to Irving Trust re: transfer to Butterfield's account, dated 19 April 1983 ......................................... 1
33. Euro Bank's account record of Richardson Greenshields, dated 30 June 1983 ............................................................ 7
34. Check from Richardson Greenshields to Euro Bank, dated 30 July 1983 ................................................................. 1
35. Check from Broadcast Capital Corp. .................................. 1
36. Check & record of deposit from Monarch to Euro Bank, dated 22 June 1983 ............................................................ 2
37. Check & record of deposit from Monarch to Euro Bank, dated 5 July 1983 ................................................................. 2
38. Check from Monarch to Venture Partners, dated 9 Sept. 1983 ........ 1
39. Check from Monarch to Roger Rowland, dated 30 June 1983 ......... 1
40. Two checks and deposit records from Monarch to Roger Rowland, dated 3 & 10 Oct. 1983 ............................................. 3
41. Request for wire transfer from Euro Bank to City Wide Securities from Irving Trust, dated 3 June 1983 ............................... 1
42. Check to City Wide Securities from Irving Trust, dated 2 June 1983 ..... 1
43. Check & deposit record from Hanover Square Securities Group to Grocco Ltd., dated 4 Aug. 1983 ................................... 2
44. Check to Grocco from Hanover Square Securities Group, dated 25 Oct. 1983 .............................................................. 2

| Documents | No. of Pages |
|---|---|

45. Checks from Euro Bank to various parties, dated Oct. 1983–Feb. 1984 ......................................................27
46. Check from Richardson Greenshields to Euro Bank, dated 1983 .......2
47. Solar Age stock sale from Aug. & Sept. 1985 ........................1
48. Check from Euro Bank to Frank Crisona, dated 19 April 1984........1
49. Check from Euro Bank to Govt. Liaison Ass. Inc., dated 19 April 1984 ...............................................................1
50. Authorization under confidentiality relationship preservation law (Cayman), dated 9 Jan. 1987 .....................................2
51. Ltr. from Euro Bank to Police Commissioner of Grand Cayman requesting assistance concerning defendants, dated 20 Jan. 1987.....1
52. Ltr. from Butterfield to Cayman Police Commissioner concerning request, dated 29 Jan. 1987 .................................1
53. Ltr. from Bruce Campbell & Co. (Attorney) to Richardson Greenshields stating clients will not disclose information without court order, dated 17 Feb. 1987 ......................................1
54. (a) Telephone records for Titan Enterprises, in Cayman Islands for Dec. 1986–Feb. 1987 ............................................1
 (b) Telephone Records for Monarch funding for Jan.–Feb. 1987 .......1
 (c) Telephone Records for High Tech for Jan.–Feb. 1987.............1

C. Proposed Order granting the motion ...................................8
D. Affidavit of Chattman, dated 17 Nov. 1989 ...........................3

Documents in Opposition to Motion

A. Bertoli's Opposition Brief ..........................................31
 –Filed 17 Nov. 1989
 –Submitted by Sachs
 –Chattman & Tolomeo on the Brief
 –Exhibits
 1. Chattman Aff., dated 11 Nov. 1989 ...............................2
 2. Objection to specific requests for production of documents and depositions—F.R.Crim.P. 15 ......................................18

B. Sachs Aff., filed 12 Jan. 1990 ......................................9
 –Exhibits
 1. Writ of summons for interlocutory injunction w/supporting documents, dated 11 Dec. 1989 .....................................8
 2. Ex parte summons for interlocutory injunction (Cayman), dated 11 Dec. 1989 .......................................................2
 3. Sachs Aff., dated 14 Dec. 1989 ..................................3
 4. Sachs Aff., dated 14 Dec. 1989 ..................................4
 5. Ex parte summons for interlocutory injunction (Cayman) w/supporting documents, dated 11 Dec. 1989 ...........................8
 6. Order enjoining defendants from making application to Grand Court of Cayman, dated 4 Jan. 1990 ...................................2
 7. Aff. of Alasdain McDonald w/supporting documents, dated 5 Jan. 1990 ............................................................18

C. Supplemental Sachs Affidavit, dated 12 Jan. 1990
 Exhibits
 1. Bertoli Motion for Recusal w/amended brief attached, dated 2 Nov. 1989 ..........................................................19
 2. Letter Brief in support of motion w/supporting documentation, dated 3 Nov. 1989 ...............................................55
 3. Government Opposition Brief to Bertoli's motion for recusal w/supporting documents ..............................................479
 4. Reply Brief supporting Bertoli's Motion for Recusal, dated 22 Nov. 1989 ..........................................................15
 5. Letter from Sachs to court concerning Government's submission of exhibit no's. 7–16, dated 4 Dec. 1989 ...............................4
 6. Bertoli's Notice of Motion for Discovery, dated 6 Dec. 1989 .........4

| Documents | No. of Pages |
|---|---|

7. (a) Letter from Chattman to Warren concerning discovery issues, dated 13 Dec. 1989 ...........................................2

 (b) Letter from Chattman to Warren concerning discovery, dated 14 Dec. 1989 .......................................................2

 (c) Letter from Sachs to court concerning Government exhibit no's. 7–16, dated 15 Dec. 1989 ........................................1

 (d) Transcript of Proceedings, 1987 Cannistraro Indictment, dated 24 July 1989 .......................................................150

**Minutes of Proceedings of 23 April 1990**
–Hrg. on government's motion for order granting leave to take foreign depositions & for the issuance of request for foreign judicial assistance
–Appearances: Rosenfield (Government)
 Fallick, Sternheim (Eisenberg)
 Pollack, Kurzweil (Cannistraro)
 Sachs (Bertoli)
**ORDER, filed 24 April 1990**
Government's motion for leave to take foreign depositions & for the issuance of request for foreign judicial assistance granted ..........................3

3. **Cannistraro's Notice of Motion for Recusal of Judge** .......................1
–Filed 4 Dec. 1989
–Pro se submission
Documents in Support of Motion
A. Moving Brief, dated 24 Nov. 1989 .......................................13
B. Letter from Cannistraro in further support, dated 1 Dec. 1989 ............2
C. Reply Brief, dated 14 Dec. 1989 and submitted pro se ...................17
Documents in Opposition to Motion
A. Opposition Brief, dated 5 Dec. 1989 and submitted by Rosenfield........29
**Minutes of Proceedings of 29 Jan. 1990**
–Hearing on Defendants' motion for recusal; decision reserved.
–Speedy Trial Order to be filed.
–Appearances: Fietkiewicz, Warren and Rosenfield
 (Government)
 Sachs and Tolomeo (Bertoli)
 Pollack and Codey (Cannistraro)
 Sterheim and Fallick (Eisenberg)
**OPINION, filed 22 March 1990**
See supra Bertoli's Motion for Recusal
**ORDER, filed 30 March 1990**
Cannistraro's motion for recusal denied......................................1

4. **Bertoli's Notice of Motion for Order Compelling Discovery** .................4
–Filed 14 Dec. 1989
–Submitted by Sachs on behalf of Bertoli
Documents in Support of Motion
A. Affidavit of Sachs, dated 14 Dec. 1989
 Exhibits
 1. Letter to Government re discovery, dated 6 Nov. 1989 ...............1
 2. Letter to Government re discovery, dated 13 Dec. 1989...............2
**Minutes of Proceedings of 20 Dec. 1991**
Conference Call on Record re Motion for Discovery on recusal motion
**OPINION AND ORDER, filed 11 Jan. 1990**
Motion for order compelling discovery denied .................................7

5. **Bertoli's Notice of Motion on Short Motion for an Order Striking the Government's Submission on the Motion for Recusal and Reassignment of Motion to Another Judge** ...........................................3
–Filed 17 Jan. 1990
–Submitted by Sachs for Bertoli

Documents No. of Pages
 Documents in Support of Motion
 A. Sachs Aff., dated 12 Jan. 1990 ........................................ 9
 –Exhibits
 1. Notice of motion w/amended brief in support of recusal motion,
 dated 6 Nov. 1989 ........................................... 12
 2. Correspondence from Podvey Sachs to court supporting Bertoli's
 motion for recusal, dated 3–6 Nov. 1989 ..................... 4
 3. Government Opposition Brief to Bertoli's Recusal Motion, dated 17
 Nov. 1989 .................................................. 32
 4. Reply brief in support of recusal motion, dated 22 Nov. 1989 ....... 15
 5. Ltr. from Sachs to court re government ex. no's. 7–16, dated 4 Dec.
 1989 ....................................................... 4
 6. Government's notice of motion for discovery, dated 6 Dec. 1989 ..... 4
 7. (1) Ltr. from Chattman to Warren, dated 13 Dec. 1989 .............. 2
 (2) Ltr. from Sachs to court, dated 15 Dec. 1989 .................. 1
 (3) Ltr. from Chattman to Warren, dated 14 Dec. 1989 .............. 2
 Documents in Opposition to Motion
 A. Government's Letter–Brief, dated 22 January 1990 ...................... 2
 **Minutes of Proceedings of 29 Jan. 1990**
 –Hrg. on Bertoli's motion to strike Government's submissions on recusal
 motion and for reassignment of motion.
 –Motion denied on record; opinion to be filed.
 –Appearances: Fietkiewicz, Warren and Rosenfield
 (Government)
 Sachs and Tolomeo (Bertoli)
 Pollack and Codey (Cannistraro)
 Sterheim and Fallick (Eisenberg)
 **ORDER, filed 30 March 1990**
 Bertoli's motion striking government's submissions on motion for recusal &
 for reassignment of recusal motion to another judge denied ................. 1
 **OPINION,** see supra Bertoli's Motion for Recusal
6. **Cannistraro's Notice of Motion on short notice for an evidentiary hearing
 for the disqualification of Judge Lechner to decide Cannistraro's recusal
 motion** ................................................................. 2
 –Filed 25 Jan. 1990
 –Submitted by Pollack for Cannistraro
 Documents in Support of Motion
 A. Pollack Aff., dated 25 Jan. 1990 ...................................... 5
 Exhibits
 1. (a) Cannistraro notice of motion for recusal, dated 24 Nov. 1989 ..... 1
 (b) Memo in support of Cannistraro's recusal motion, dated 24 Nov.
 1989 ................................................... 14
 2. Memo supporting Cannistraro's motion for return of bail money
 w/attached letters, dated 1 Dec. 1989 ...................... 12
 3. Memo opposing Cannistraro's motion for recusal, dated 5 Dec. 1989 .... 29
 4. Reply brief supporting Cannistraro's motion for recusal, dated 14
 Dec. 1989 ................................................. 18
 5. Cannistraro's notice of motion for discovery, dated 14 Dec. 1989 ..... 6
 6. Letter Opinion & Order denying discovery, dated 11 Jan. 1990 ........ 7
 **Minutes of proceeding of 29 Jan. 1990**
 –Bertoli's motion striking government submission on motion for recusal & for
 reassignment of recusal motion to another judge denied.
 –Cannistraro's motion for an evidentiary hrg. on short notice for the disquali-
 fication of Judge Lechner from deciding recusal motion denied.
 –Appearances: Rosenfield, Warren, Fietkiewicz
 (Government)
 Sachs, Tolomeo (Bertoli)
 Pollack, Codey (Cannistraro)
 Sterheim, Fallick (Eisenberg)

Documents No. of Pages

**ORDER, filed 30 March 1990**
Cannistraro's motion for an evidentiary hrg. & for reassignment of his recusal
motion denied ................................................................1

7. **Bertoli's Notice of Motion for Reconsideration of Recusal motion** ..........1
–Filed 2 April 1990
–Submitted by Sachs for Bertoli
–Pursuant to Local Rule 12(I)
Documents in Support of Motion
A. Sachs Aff., dated 2 April 1990 .........................................9
B. Letter brief, dated 2 April 1990 .......................................5
–Submitted by Sachs
Exhibits
 1. Letter from Bertoli requesting recusal w/o formal motion, dated 10
 Oct. 1989 .........................................................1
 2. Letter from Sachs to Warren seeking discovery w/o formal motion,
 dated 6 Dec. 1989 ................................................1
 3. (1) Ltr. from Sachs to court concerning schedule for hearing Berto-
 li's recusal motion, dated 14 Nov. 1989 ...........................2
 (2) Notice of motion for reconsideration of Bertoli recusal motion,
 dated 2 April 1990 ...............................................1
Documents in Opposition to Motion
A. Letter Brief in Opposition, dated 5 April 1990 ..........................6
–Submitted by Rosenfield
**OPINION, filed 12 April 1990**
Bertoli's Motion for Reconsideration denied ...................................7
8. **Government's ex parte application for order for the IRS to release tax
information** ...............................................................6
–Filed 20 April 1990
–Submitted by Rosenfield
–Pursuant to 26 USC § 6103(i)(1) & 6103(i)(2)
**ORDER, filed 23 April 1990**
Government's ex parte application for order for the IRS to release tax
information granted ..........................................................5
9. **Government's ex parte application for order for the IRS to release tax
information** ...............................................................5
–Filed 20 April 1990
–Submitted by Rosenfield
–Pursuant to 26 USC § 6103(i)(1) & 6103(i)(2)
**ORDER, filed 24 April 1990**
Government's ex parte application for order for the IRS to release tax
information granted ..........................................................5
10. **Government's Notice of motion for continuance pursuant to Speedy Trial
Act** ......................................................................2
–Filed 24 April 1990
–Submitted by Rosenfield
–Pursuant to 18 USC § 3161(h)(9)
Documents in Support of Motion
A. Moving Brief, filed 24 April 1990 ......................................4
–Submitted by Rosenfield
**ORDER, filed 5 June 1990**
Time period excluded from 4 April 1990, the date of the issuance of the Treaty
Request until that date the discovery in the Cayman Islands is concluded
and the evidence sought in the US is obtained, but not to exceed one year.....2
**ORDER, filed 27 June 1990**
Corrected Order for Continuance from 4 April 1990 until the date of the
Treaty Request in the Cayman Islands is concluded, such period not to
exceed one year ..............................................................2
**OPINION, filed 29 June 1990**
Government's request for continuance granted ...............................22

Documents No. of Pages
11. **Bertoli's Petition for a Writ of Mandamus** .............................. 42
 –Filed 27 April 1990
 –Submitted by Sachs for Bertoli
 Documents in Support of Petition
 Exhibits
 A. Opinion, dated 20 March 1990, denying Bertoli's recusal motion .......... 77
 B. Opinion, dated 12 April 1990, denying Bertoli's motion for reconsideration..... 7
 C. Sachs Aff., dated 12 Jan. 1990......................................... 9
 D. Sachs Aff., dated 2 April 1990......................................... 9
 E. Opinion denying Bertoli's discovery motion, dated 11 Jan. 1990............ 7
 **ORDER, filed 18 May 1990**
 Writ of Mandamus denied by Third Circuit ................................. 1
 (denied without necessity of Government submissions)
12. **ORDER, filed 23 May 1990**
 Discovery scheduled ..................................................... 6
13. **ORDER, filed 19 June 1990**
 Eisenberg's bail substituted ............................................. 1
14. **Cannistraro's Notice of Motion for Dismissal of Indictment against Cannistraro on "Double Jeopardy" Grounds** ................................... 2
 –Filed 3 July 1990
 –Submitted by Pollack
 Documents in Support of Motion:
 A. Memorandum of Law in Support, dated 2 July 1990 ..................... 10
 – Submitted by Pollack
 B. Letter–Brief in Reply to Government's Opp., dated 27 July 1990 .......... 6
 Exhibits
 – United States v. Russo, No. 89–1503, slip op. (2d Cir. 28 June 1990)..... 3
 C. Brief in further support, dated 27 July 1990 ........................... 11
 Documents in Opposition to Motion
 A. Government's Memorandum of Law in Opposition........................ 26
 –filed 20 July 1990
 –submitted by Fietkiewicz
 –On the Memorandum: Warren and Rosenfield
 **Minutes of Proceedings 7 August 1990**
 –Hearing on double jeopardy motion; decision reserved.
 –Appearances: Fietkiewicz & Rosenfield (Government)
 Pollack (Cannistraro)
 Tolomeo (Bertoli)
 **OPINION, filed 15 August 1990**
 Cannistraro's motion to dismiss for double jeopardy grounds and motion for
 discovery denied ..................................................... 27
15. **CONSENT ORDER, filed 12 July 1990**
 Bertoli's bail conditions modified to allow vacation ........................ 1
16. **Cannistraro's Notice of Motion to Recuse Court**........................... 1
 –Filed, 24 July 1990
 –Submitted by Pollack on behalf of Cannistraro
 Documents in Support of Motion
 A. Affirmation of Pollack, dated 20 July 1990 ............................. 3
 B. Moving Brief, dated 20 July 1990 ..................................... 11
 Exhibits
 1. Financial Disclosure Report of Judge ............................... 1
 2. Reports from National Quotation Bureau ............................ 2
 C. Letter–Reply Brief, dated 27 July 1990.................................. 4
 D. Letter from Tolomeo joining Bertoli in Motion to Recuse Court, dated 26 July 1990 .................................................... 1
 E. Ltr. from Pollack to court clarifying issue at prior hearing, dated 6 Aug. 1990 ............................................. 2
 Exhibits
 1. Quotations Service for stocks, dated 1 Aug. 1990 ..................... 2
 2. Stock quotations, dated 12 July 1990 ............................... 1

| Documents | No. of Pages |
|---|---|

Documents in Opposition to Motion
A. Government's Letter–Brief in Opposition, dated 25 July 1990 ............... 3
**Minutes of Proceeding of 2 Aug. 1990**
–Cannistraro's motion for recusal, joined by Bertoli, denied. Cannistraro's motion to dismiss on double jeopardy continued to 7 Aug. 1990.
–Appearances: Fietkiewicz, Rosenfield (Government)
 Pollack (Cannistraro)
 Tolomeo (Bertoli)
**OPINION, filed 16 August 1990**
Cannistraro's and Bertoli's motion to recuse court denied ..................... 10
17. **Cannistraro's Notice of Appeal of denial of Recusal Motion and denial of Double Jeopardy Motion**
–Filed 23 Aug. 1990
–Submitted by Pollack ................................................... 2
**JUDGMENT ORDER, dated 9 Nov. 1990**
Double Jeopardy Motion affirmed;
Appeal of order denying recusal motion dismissed .......................... 1
18. **Cannistraro's Notice of Motion for Bill of Particulars and Release of Grand Jury Transcripts**
–Filed 30 July 1990 ..................................................... 20
–Submitted by Pollack
Documents in Opposition
A. Letter–Brief in Opposition, dated 1 August 1990 ......................... 2
**OPINION, filed 14 Aug. 1990**
see supra double jeopardy motion
19. **Bertoli's Notice of Motion on short notice for an order altering conditions of bail** ................................................................ 2
–Filed 26 Sept. 1990
–Submitted by Tolomeo for Bertoli
–Amended 26 Sept. 1990
Documents in Support of Motion
A. Tolomeo Aff., dated 26 Sept. 1990 ...................................... 3
B. Copy of transcript from arraignment on 6 Nov. 1989 .................... 6
C. Letter–Reply of Tolomeo, dated 4 Oct. 1990 ............................ 2
Documents in Opposition to Motion
A. Government letter in opposition, dated 2 Oct. 1990 ..................... 2
 –Submitted by Rosenfield
 Exhibits
 1. Bail order of release, dated 6 Nov. 1989 ........................... 1
 2. Copies of Bertoli's Passport ....................................... 4
 3. Ltr. from Chertoff to Tolomeo, dated 15 Aug. 1990 .................. 1
 4. Ltr. from Tolomeo to Warren in response to accusation of mutilated passport, dated 12 Sept. 1990 ....................................... 1
 5. Ltr. from Tolomeo to Rosenfield re informal request for waiver of travel restrictions, dated 19 Sept. 1990 ............................ 2
 6. Ltr. from Rosenfield to Tolomeo denying request, dated 21 Sept. 1990 ............................................................. 1
B. Tolomeo ltr. in response to Government's denial of Bertoli's request for relaxation of travel restrictions, dated 4 Oct. 1990 ..................... 2
**Minutes of Proceedings of 5 Oct. 1990**
–Bertoli's application to relax travel restrictions on bail denied. Sua sponte motion made to revoke bail. Hrg to revoke bail set for 19 Oct. 1990.
–Appearances: Rosenfield (Government)
 Tolomeo (Bertoli)
**Minutes of Proceedings of 24 Oct. 1990**
–Telephone status conference re: stipulation re travel restrictions.
–Appearances: Fietkiewicz (Government)
 Sachs (Bertoli)

Documents No. of Pages
 **STIPULATION & ORDER, filed 29 Oct. 1990**
 –Re: Bertoli's passport and travel restrictions ............................. 3
 –Signed by Fietkiewicz, Sachs, Bertoli, court
 –w/attached copies of Bertoli's passport .................................. 26
20. **Court's sua sponte motion to revoke Bertoli's bail**
 –raised 5 Oct. 1990
 Documents in Opposition
 A. Brief in Opposition, submitted by Sachs, dated 22 Oct. 1990 ............. 17
 Exhibits
 1.A. Bail order of release, dated 6 Nov. 1989 ........................... 1
 2.B. Copies of Bertoli's Passport........................................ 4
 3.C. Ltr. from Chertoff to Tolomeo, dated 15 Aug. 1990.................. 1
 4.D. Ltr. from Tolomeo to Warren in response to accusation of mutilated
 passport, dated 12 Sept. 1990 ...................................... 1
 5.E. Ltr. from Tolomeo to Rosenfield re informal request for waiver of
 travel restrictions, dated 19 Sept. 1990 ........................... 2
 6.F. Ltr. from Rosenfield to Tolomeo denying request, dated 21 Sept.
 1990 .............................................................. 1
 2. Government's opposition ltr. to motion to modify bail terms, dated 2
 Oct. 1990 ......................................................... 2
 3. Transcript of Proceedings of 5 Oct. 1990 ........................... 5
 4. Ltr. from Sachs to court requesting specific reasons for sua sponte
 motion, dated 12 Oct. 1990 ........................................ 2
 5. Ltr. from court to Sachs responding to request, dated 15 Oct. 1990..... 1
 6. Docket sheets for U.S. v. Bertoli, Crim. No. 77–236.................. 8
 **Minutes of Proceedings of 23 Oct. 1990**
 –Hearing re bail revocation.
 –Hrg. continued to 7 Nov. 1990.
 –Appearances: Warren, Rosenfield (Government)
 Sachs, Chattman (Bertoli)
21. **Government's letter request for changes in scheduling matters.**
 –Dated 22 Oct. 1990
 –Submitted by Rosenfield
 –Letter also advises of Pollack's potential conflict of interest w/Cannistraro..... 7
 Exhibits
 A. Copies of decisions from Cayman Islands court and attached documents.... 82
 (1) Amended Writ of Summons, dated 1 Oct. 1990
 (2) Amended endorsement to Writ of Summons
 (3) Order dated 10 May 1990
 (4) Ex parte summons for interlocutory application
 (5) Notice of Amended Writ of Summons
 (6) Sachs Aff.
 B. (1) Order of Bertoli's release on bail................................... 1
 (2) Copy of Bertoli's passport......................................... 4
 (3) Correspondence re Bertoli's request for waiver of travel restrictions..... 5
 C. Government's ltr. in opposition to motion to modify bail conditions, dated
 2 Oct. 1990 ......................................................... 2
 D. Transcript of Proceedings of 5 Oct. 1990 ................................. 5
 E. Ltr. from Sachs to court re sua sponte motion, dated 12 Oct. 1990 ....... 2
 F. Ltr. from court, dated 15 Oct. 1990, in response to Sachs' letter .......... 1
22. **Pollack's Motion for admission Pro Hac Vice**
 –Filed 13 Nov. 1990 ...................................................... 1
 –Affidavit of Pollack, dated 12 November 1990 ............................. 2
23. **Government's Notice of Motion for order modifying 23 May 1990 Discovery**
 **Order** ................................................................. 2
 –Filed 15 Nov. 1990
 –Submitted by Rosenfield
 Documents in Support of Motion
 see supra Government letter dated 22 Oct 1990 requesting change in schedul-
 ing.

**104**

Documents No. of Pages

Documents in Opposition to Motion
A. Ltr. in opposition, dated 13 Nov. 1990...................................3
 –Submitted by Sachs
 –Exhibits
 1. Aff. of Service, dated 1 Nov. 1990 ................................2
 2. Ltr. from Rosenfield to court proposing schedule, dated 24 April
 1990 ..........................................................3
 3. Discovery order, dated 23 May 1990 .............................6
B. Ltr. in Opposition, dated 21 Nov. 1990 ................................3
 –Submitted by Sachs
 Exhibits
 1. Sachs Certification, dated 21 Nov. 1990 .........................2
 2. Ltr. from Rosenfield to court proposing schedule, dated 6 Nov. 1989.....3
 3. Ltr. from Rosenfield to court proposing schedule, dated 24 April
 1990 ..........................................................3
C. Fallick Certification, dated 30 Nov. 1990 .............................2
**ORDER, filed 3 Dec. 1990**
Government's motion for modification of 23 May 1990 discovery schedule
 temporarily transferred to Debevoise ...................................1
**ORDER, filed 17 Dec. 1990**
Motion transferred back to Judge Lechner..................................1
**Minutes of Proceeding of 7 Jan. 1991**
–Motion schedule set for First Set of Pretrial Motions.
–Appearances: Fietkiewicz, Rosenfield (Government)
 Fallick (Eisenberg)
 Pollack (Cannistraro)
 Tolomeo (Bertoli)
**ORDER, filed 14 Jan. 1991**
23 May 1990 Discovery Order modified ....................................1
**ORDER, filed 21 Feb. 1991**
14 Jan. 1991 Discovery Order modified ...................................2
**ORDER, filed 1 March 1991**
21 Feb. 1991 Discovery Order modified ...................................2
24. **CONSENT ORDER, filed 23 January 1991**
Bertoli's bail conditions altered to permit travel to Tampa, Florida.............1
25. **Eisenberg's Notice of Motion [3] for:**
 **(1) severance from Cannistraro's trial;**
 **(2) transfer of obstruction of justice allegations to the Eastern District of
 New York;**
 **(3) pretrial disclosure of similar act evidence Government intends to intro-
 duce at trial;**
 **(4) permission to join in all applicable motions filed by co-defendants** .....2
 –Filed 12 March 1991
 –Submitted by Fallick
 Documents in Support of Motion
A. Fallick Affidavit, dated 7 Mar. 1991....................................1
B. Brief in Support of Eisenberg's Motions.................................13
26. **Bertoli's Notice of motion for discovery and evidentiary matters ............6**
 –Filed 12 March 1991
 –Submitted by Sachs for Bertoli
 Documents in Support of Motion
A. Brief in Support, dated 12 March 1991 .................................41
 –submitted by Sachs
B. Appendix
 Exhibits
 (1) Superseding Indictment ...........................................78
 (2) Aff. of David O'Connor, dated 11 March 1991 ......................3

**3.** This motion and the next five motions repre-
sent the First Set of Pretrial Motions. The docu-
ments in opposition to these motions, the min-
utes of proceedings, and the opinion and order
are listed after motion number 26, *infra* pp.
106–107.

Documents No. of Pages

(3) Transcript of Proceedings of 8 Feb. 1990 ........................... 1
(4) Ltr. from Tolomeo to Fietkiewicz, dated 21 Feb. 1990 ............... 1
(5) Aff. of Tolomeo, dated 12 March 1991 ............................... 2
(6) Chattman Certification w/exhibits, dated 11 March 1991 ............. 7
(7) Ltr. from Tolomeo to Fietkiewicz, dated 7 June 1990 ................ 3
(8) Ltr. from Tolomeo to Fietkiewicz, dated 21 June 1990 .............. 2
(9) Ltr. from Fietkiewicz to Tolomeo, dated 22 June 1990 .............. 3
(10) Ltr. from Tolomeo to Fietkiewicz, dated 2 July 1990 ............... 2
(11) Ltr. from Fietkiewicz to Tolomeo, dated 7 July 1990 .............. 4
C. Affidavit of O'Connor, dated 11 March 1991 ......................... 3
 Exhibits
 A. Ltr. from Chattman to Rosenfield re discovery of documents &
 tapes, dated 16 May 1990 ...................................... 3
 B. Ltr. from Rosenfield to Chattman in response, dated 22 May 1990 ..... 2
D. Certification of Chattman, dated 11 March 1991 ...................... 2
 Exhibits
 A. Letter to Rosenfield, dated 16 May 1990 ....................... 3
 B. Letter to Chattman from Government, dated 22 May 1990 ........... 2
E. Aff. of Tolomeo, dated 12 March 1991 ............................... 2
F. Supplementary Tolomeo Aff., dated 12 March 1991 .................... 4
 Exhibits
 1. Copy of Subpoena duces tecum, dated 6 Feb. 1989 .............. 3
 2. Search Warrant, dated 6 Feb. 1989 ............................ 2
 3. Bank Subpoena to Bank of NY, dated 19 Jan. 1988 ............. 2
 4. Notice of Subpoena from American Express to Bertoli, dated 11 July
 1988 ......................................................... 1
 5. Declaration of Eric Moss w/documents, dated 5 March 1991 ........ 26
G. Reply Brief in further support, dated 13 May 1991 .................. 58
 --submitted by Tolomeo
 Exhibit
 Wall Street Journal Article, dated 9 April 1991 .............. 1
H. Certification of Tolomeo, dated 12 March 1991 ...................... 2
 Exhibits
 1. Tolomeo Aff. w/exhibits, dated 12 March 1991 ................. 37
 2. Bertoli Aff., dated 12 March 1991 ............................ 2
 3. Title 9 Dept. of Justice Guidelines (Attorney's Manual) ....... 24
 4. Article in Barron's, dated 26 Nov. 1990 ...................... 1
 5. Article in Forbes, dated 1 Oct. 1990 ......................... 4
 6. Transcript of Proceedings (In Re Liquidated Control et al.); Testimo-
 ny of Lawrence Rhode, dated 4 July 1983 ...................... 4
27. **Bertoli's Notice of Motion to dismiss Superseding Indictment Counts One
 through Three** .................................................... 2
 --Filed 12 March 1991
 --Submitted by Sachs for Bertoli
 Documents in Support of Motion
 A. Moving Brief, dated 12 March 1991 ............................. 35
 --submitted by Sachs
 B. Appendix, *see supra* Bertoli's discovery motion
 C. Reply Brief, *see supra* Bertoli's discovery motion
28. **Bertoli's Notice of Motion for a Bill of Particulars** .............. 33
 --Filed 12 March 1991
 --Submitted by Sachs for Bertoli
29. **Bertoli's Notice of Motion to dismiss the indictment for prosecutorial
 misconduct or for Discovery of Grand Jury Materials** .............. 6
 --Filed 12 March 1991
 --Submitted by Sachs for Bertoli

Documents No. of Pages

Documents in Support of Motion

A. Brief in Support, dated 12 March 1991 ................................ 30
 –submitted by Sachs
 –Exhibits
 1. Supplemental Affidavit of Tolomeo, dated 12 March 1991 w/exhibits.... 38
 2. Affidavit of Richard Bertoli, dated 12 March 1991 ................... 2
 3. Department of Justice Guidelines ................................... 24
 4. Barrons article, dated 26 Nov. 1990 ............................... 1
 5. Forbes article, dated 1 Oct. 1990 ................................ 4
 6. Transcript of Proceedings (In Re Liquidated Control et al.) Testimony of Lawrence Rhode, dated 4 July 1983 ......................... 4
B. Appendix to Moving Brief, see supra Bertoli's Discovery Motion
C. Affidavit of Tolomeo, see supra Bertoli's Discovery Motion
D. Affidavit of Bertoli, dated 12 March 1990 ............................ 2
E. Reply Brief to Bertoli's Pretrial Motions, see supra Bertoli's Discovery Motion

Documents in Opposition to Motion

A. See infra pp. 21–22
B. Giordano Aff., dated 31 July 1991 ...................................... 2

30. **Cannistraro's Motion to dismiss indictment, to recuse Judge Lechner from further participation and to permit Cannistraro to adopt motions of co-defendants** ................................................................ 2
–Filed 12 March 1991
–Submitted by Pollack for Cannistraro

Documents in Support of Motion

A. Pollack's Affirmation in support of Cannistraro's pre-trial motion, dated 12 March 1991 ...................................................... 5
 Exhibits
 1. Affidavit of O'Connor, dated 11 March 1991 ...................... 2
 2. Opinion survey of judges, dated 5 Oct. 1990 ...................... 15
B. Moving Brief in Support, dated 12 March 1992 ......................... 16

Documents in Opposition to First Set of Pretrial Motions

A. Brief in Opposition, received 18 April 1991 ........................... 155
B. Exhibits to Brief in Opposition
 1. Rosenfield Aff., dated 15 April 1991 ............................... 3
 2. Transcript of Proceedings US v. Cannistraro, 87–193, dated 1 Feb. 1990 ............................................................. 4
 3. Transcript of Proceedings US v. Cannistraro, dated 24 Sept. 1987..... 5
 4. Ltr. from Office of Professional Responsibility to Cannistraro finding claims against Warren meritless, dated 20 March 1990 ........ 1
 5. Cahill Aff., dated 10 April 1991 ................................... 3
C. Government's Sealed Exhibit ......................................... 38

Minutes of Proceedings of 3 July 1991
–Hrg. on defendants pretrial motions. Decision reserved.
–Appearances: Fietkiewicz (Government)
 Fallick (Eisenberg)
 Pollack (Cannistraro)
 Chattman and Tolomeo (Bertoli)

OPINION & ORDER, filed 26 July 1991
Pretrial motions of Eisenberg, Cannistraro and Bertoli denied, except decision reserved on motion for prosecutorial misconduct based on alleged conflict of interest of S.A.U.S.A. Philip Giordano ................................. 166

ORDER, dated 23 Sept. 1991
Bertoli's motion to dismiss the Superseding Indictment due to prosecutorial misconduct to the extent it is based upon an alleged conflict of interest by Giordano denied .......................................................... 2

31. **Bertoli's Letter Request for Hearing Date**
Documents Submitted Regarding Scheduling of Hearing
A. Ltr. from Sachs to court concerning Bertoli's pretrial motions, dated 20 June 1991................................................................ 1

Documents No. of Pages

B. Ltr. from court to all counsel granting oral argument for 3 July 1991,
 dated 21 June 1991 ...................................................2
C. Ltr. from Sachs to court withdrawing Bertoli's request for oral argu-
 ment, dated 24 June 1991 .............................................2
D. Ltr. from court to all counsel, dated 25 June 1991 ...................1
E. Ltr. from Sachs to court stating he will be absent from July 1991
 hearing, dated 26 June 1991 ..........................................2
F. Ltr. from court to Sachs stating Sachs must come to 3 July 1991 hearing,
 dated 26 June 1991 ...................................................1
**OPINION & ORDER, filed 2 July 1991**
Hearing for First Set of Pretrial Motions scheduled for 3 July 1991; Sachs
 ordered to appear.....................................................9
32. **Government's Notice of Motion for a continuance pursuant to Speedy Trial
 Act** ...............................................................2
 –Filed 17 June 1991
 –Submitted by Rosenfield
 –Pursuant to 18 USC 3161 § (h)(8)(A)
 Documents in Support of Motion
 A. Moving Brief, dated 17 June 1991 ...............................16
 –Submitted by Rosenfield
 –On the Brief: Warren, Fietkiewicz
 Exhibits
 1. Rosenfield Ltr. to court, dated 22 Oct. 1990 ..............7
 2. Cayman Court of App. opinion, dated 24–27 Sept. & 28 Nov. 1990....24
 3. Charles George Quinn Aff. (Cayman)
 4. Certificate of Order of Cayman Court of App., dated 5 Dec. 1990.....3
 5. Judgment of Cayman Court of App., dated 22 April 1991 ............4
 6. Notice from Cayman Mutual Legal Assistance Authority to the
 Central Authority of the U.S. Spring 1991 .......................2
 7. Ltr. from Dept. of Justice to Mutual Legal Assistance Authority,
 dated 9 May 1991 ................................................2
 8. Ltr. from Cayman Chief Justice to Justice Dept., dated 10 May 1991.....2
 9. Memo of Understanding (Signed by Fietkiewicz, Sachs, Fallick,
 Pollack) ........................................................3
 10. Ltr. from Dept. of Justice to Cayman Mutual Legal Assistance,
 dated 17 May 1991 ...............................................3
 11. Ltr. from Cayman Chief Justice to Justice Dept., dated 17 May 1991.....2
 B. Reply Brief, dated 12 July 1991 ................................18
 Exhibits
 1. Ltr. from Sachs to court, dated 26 June 1991 ................2
 2. Notice of motion to stay pending Writ of Mandamus ...........2
 3. Bertoli's petition for writ of mandamus w/supporting documents,
 dated 1 July 1991...............................................34
 4. Government's ltr. brief in opposition to application for writ of
 mandamus, dated 2 July 1991 .....................................5
 5. Proposed consent order for continuance ..........................4
 6. Transcript of proceeding of 3 July 1991 .........................5
 7. Ltr. from Tolomeo to Fietkiewicz, dated 10 July 1991 .............2
 8. Proposed stipulation and order ..................................2
 9. Report of Senate Judiciary Committee on the Speedy Trial Act of
 1974 ............................................................2
 C. Letter brief, dated 26 July 1991, in response to Bertoli's sur-reply brief....11
 –Submitted by Fietkiewicz
 Documents in Opposition to Motion
 A. Brief in opposition, filed 2 July 1990..........................13
 –Submitted by Tolomeo
 B. Letter-brief in response to government's amended motion for a continu-
 ance, dated 19 July 1991 ...........................................4
 –Submitted by Tolomeo

108

Documents No. of Pages
 C. Sachs Aff., dated 28 June 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
 Exhibits
 1. Ltr. from Sachs to court concerning Bertoli's pretrial motions, dated
 20 June 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
 2. Ltr. from court to all counsel granting oral argument for 3 July
 1991, dated 21 June 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
 3. Ltr. from Sachs to court withdrawing Bertoli's request for oral
 argument, dated 24 June 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
 4. Ltr. from court to all counsel, dated 25 June 1991 . . . . . . . . . . . . . . . . . . . 1
 5. Ltr. from Sachs to court stating he will be absent from 3 July 1991
 hearing, dated 26 June 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
 6. Ltr. from court to Sachs stating Sachs must come to 3 July 1991
 hearing, dated 26 June 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
 **ORDER FOR CONTINUANCE, filed 31 July 1991**
 Period from date of order through pretrial conference excluded for purposes
 of Speedy Trial Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
33. **Application for a Writ of Mandamus to Third Circuit** . . . . . . . . . . . . . . . . . . . . 17
 –Filed 1 July 1991
 –Submitted by Meanor for Podvey, Sachs
 **ORDER, filed 24 July 1991**
 –submitted by Fietkiewicz & Meanor to Third Circuit . . . . . . . . . . . . . . . . . . . . . . 1
 –Voluntary dismissal of motion for Writ of Mandamus
34. **Notice of Motion for a stay pending consideration of petition for Writ of**
 **mandamus** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
 –Filed 1 July 91
 –Submitted by Meanor
 Documents in Support of Motion
 A. Letter Brief, dated 1 July 1991, to Judge Garth (Third Circuit) . . . . . . . . . . 4
 –Submitted by Meanor
 B. Tolomeo Aff., dated 1 July 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
 Documents in Opposition to Motion
 A. Letter brief opposing stay, dated 1 July 1991 . . . . . . . . . . . . . . . . . . . . . . . . . 5
 –Submitted by Fietkiewicz
 **ORDER of Third Circuit, dated 2 July 1991**
 Re: Motion to stay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
35. **Bertoli's Notice of motion for Giglio material w/respect to witnesses**
 **scheduled to be deposed under R. 15** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
 –Filed 3 July 1991
 –Submitted by Tolomeo for Bertoli
 Documents in Support of Motion
 A. Brief in support of motion, dated 5 July 1991 . . . . . . . . . . . . . . . . . . . . . . . . . 13
 –Submitted by Tolomeo
 Exhibits
 Sachs letter to Government, dated 13 May 1991 . . . . . . . . . . . . . . . . . . . . . . . . 2
 B. Certification of Tolomeo, filed 9 August 1991 . . . . . . . . . . . . . . . . . . . . . . . . . 2
 C. Reply letter brief in support, dated 9 Aug. 1991 . . . . . . . . . . . . . . . . . . . . . . . 5
 –Submitted by Tolomeo
 Documents in Opposition to Motion
 A. Letter brief in opposition, dated 5 July 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . 6
 –Submitted by Rosenfield
 **OPINION & ORDER, filed 20 Aug. 1991**
 Bertoli's motion for Giglio material denied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
36. **Government's application for ex parte order releasing taxpayer informa-**
 **tion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
 –Filed 9 Aug. 1991
 –Submitted by Rosenfield
 **ORDER, filed 19 Aug. 1991**

Documents No. of Pages

Government's ex parte application pursuant to 26 U.S.C. § 6103(i)(1) & 6103(i)(2) granted .......................................................... 4

37. **Cannistraro's Letter Request for court to pay cost incurred by Pollack pursuant to F.R.Crim.P. 15** ............................................ 1
 –Dated 8 Aug. 1991
 –Submitted by Pollack
 Documents in Opposition to Request
 A. Letter in opposition, dated 14 Aug. 1991 .............................. 3
 –Submitted by Rosenfield
 **Letter from court, dated 19 August 1991**
 Request for payment of costs denied ...................................... 1

38. **Cannistraro's letter request for reconsideration of denial of Rule 15 request for travel expenses** ............................................... 1
 –Dated 22 Aug. 1991
 –Submitted by Pollack
 Documents in Opposition to Request
 Letter from Government, dated 26 Aug. 1991 ............................... 2
 **Letter from court, dated 23 Aug. 1991**
 Request for reconsideration of denial of request for costs denied .............. 1

39. **Bertoli's Notice of motion on short notice to proceed pro se only for depositions in Cayman Islands. In alternative, Tolomeo moves to withdrawal as counsel of record so Bertoli can proceed pro se** ................ 2
 –Filed 28 Aug. 1991
 –Submitted by Tolomeo
 Documents in Support of Motion
 A. Letter brief in support, dated 28 Aug. 1991 ........................... 2
 –Submitted by Tolomeo
 –Exhibits
 1. Letter from Tolomeo to Fietkiewicz, dated 26 Aug. 1991 ............ 1
 2. Letter from Fietkiewicz to court, dated 26 Aug. 1991 ............... 3
 Documents in Opposition to Motion
 A. Letter in opposition, dated 29 Aug. 1991 ............................... 2
 –Submitted by Fietkiewicz
 B. Government's list of inquiries of Bertoli w/summary of charges & of statutory offenses, dated 29 Aug. 1991 ............................... 17
 **Minutes of Proceedings of 3 Sept. 1991**
 –Hearing on Bertoli's motion to proceed pro se.
 –Appearances: Warren, Fietkiewicz and Rosenfield
 (Government)
 Tolomeo (Bertoli)
 **ORDER, filed 4 Sept. 1991**
 Bertoli's motion to go pro se only in Cayman Islands denied, but the alternative motion to represent himself for the duration of the trial granted ........ 3

40. **Bertoli's Letter Notice of Withdrawal of Consent Order, dated 24 April 1990,** re: taking of foreign depositions and obtaining documents pursuant to F.R.Crim.P. 15, dated 23 Oct. 1991 ...................................... 3

41. **Bertoli's Letter Request for leave to file the following motions:**
 A. **Renewal of motion to dismiss indictment because unauthorized personnel appeared before the Grand Jury;**
 B. **Motion to dismiss indictment for pre-indictment delay, under the Speedy Trial Act and 6th Amendment right to speedy trial;**
 C. **Motion to extend travel conditions under existing bail agreement;**
 D. **Motion to strike testimony taken in Cayman Islands;**
 E. **Motion to issue Letter Rogatory for the taking of testimony in the Cayman Islands** ...................................................... 3
 –Dated 18 Oct. 1991
 –Submitted by Bertoli (Pro Se)
 Documents in Support of Request
 A. Bertoli letter reply, dated 31 Oct. 1991 ................................ 5
 –Submitted by Bertoli (Pro Se)

Documents No. of Pages
 B. Letter further requesting leave to file Motions, dated 12 Nov. 1991 . . . . . . . 1
 C. Letter in response to Government's 12 Nov. 1991 Ltr., dated 12 Nov. 1992 . . . . . 2
 Documents in Opposition to Request
 A. Government's opposition to request, dated 25 Oct. 1991 . . . . . . . . . . . . . . . . . . . 2
 –Submitted by Rosenfield
 B. Government's letter-reply in further opposition, dated 12 Nov. 1991 . . . . . . . 5
 –Submitted by Rosenfield
 **Minutes of Proceedings of 15 Nov. 1991**
 –Status conference re Bertoli's request to file motions
 –Leave granted and filing schedule set.
 –Appearances: Warren, Rosenfield and Fietkiewicz
 (Government)
 Pollack (Cannistraro)
 Bertoli and Tolomeo (as stand by counsel)
42. **Government's Supplemental Treaty Request** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
 –Filed 28 Oct. 1991
 –Submitted by Rosenfield
 Documents in Opposition to Request
 A. Letter in opposition, dated 4 Nov. 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
 –Submitted by Bertoli
 Documents in Opposition to Motion
 A. Government letter, dated 12 Nov. 1991, responding to Bertoli's 31 Oct.
 1991 and 4 Nov. 1991 letters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
 –Submitted by Rosenfield
43. **Podvey Sachs' Notice of Motion for reimbursement of fees and costs and to**
 **be relieved as standby counsel in any capacity to defend Bertoli** . . . . . . . . . . 2
 –Filed 8 Nov. 1991
 –Submitted by Tolomeo
 Documents in Support of Motion
 A. Moving Brief, dated 8 Nov. 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
 –Submitted by Tolomeo
 B. Tolomeo Certification, dated 7 Nov. 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
 Exhibits
 1. Transcript of Proceedings, dated 3 Sept. 1991 . . . . . . . . . . . . . . . . . . . . . . 55
 2. Order granting Bertoli pro se status, dated 4 Sept. 1991 . . . . . . . . . . . . . 3
 3. Ltr. from Tolomeo to court concerning proposed pro se order, dated
 3 Sept. 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
 C. Reply letter brief in support, dated 9 Dec. 1991 . . . . . . . . . . . . . . . . . . . . . . . . 23
 –Submitted by Tolomeo
 D. Certification of Tolomeo, dated 9 Dec. 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
 E. Ltr. from Meanor to court, dated 30 Jan. 1992 . . . . . . . . . . . . . . . . . . . . . . . . . 2
 Documents in Opposition to Motion
 A. Letter brief in opposition, dated 22 Nov. 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . 7
 –Submitted by Rosenfield
 **Minutes of Proceedings of 27 Jan. 1992**
 –Oral argument on motion to release Podvey Sachs and to pay fees and costs
 pursuant to R. 15
 –Meanor proposed volunteer standby service of Podvey Sachs as requested by
 court.
 –Appearances: Fietkiewicz, Warren and Rosenfield
 (Government)
 Bertoli, Meanor, Tolomeo (standby counsel)
 Pollack (Cannistraro)
 **OPINION & ORDER, filed 11 Feb. 1992**
 (1) Podvey Sachs' motion to be relieved as standby counsel moot. (2) Coun-
 sel's presence required at all pretrial and trial hearings. (3) If Bertoli
 revokes pro se choice, either Sachs or Chattman will be required to repre-
 sent Bertoli. (4) Podvey Sachs' motion to be reimbursed denied . . . . . . . . . . . . 40

| Documents | No. of Pages |

44. **Bertoli's Notice of Motion for leave to take foreign depositions and for foreign judicial assistance** ............................................... 5
 –Filed 12 Nov. 1991
 –Submitted by Bertoli (Pro Se)
 Documents in Support of Motion
 A. Bertoli Aff. w/supporting documents, dated 12 Nov. 1991 ............... 16
 B. Memo of law in support, dated 12 Nov. 1991 ........................... 7
 –Submitted by Bertoli
 C. Bertoli Aff., dated 12 Nov. 1991 ..................................... 10
 D. Copy of Superseding Indictment ...................................... 79
 E. Reply brief in support, dated 4 Dec. 1991 ............................ 6
 –Submitted by Bertoli
 Documents in Opposition to Motion
 A. Letter brief, dated 2 Dec. 1991 ...................................... 2
 –Submitted by Rosenfield
 B. Letter in response to Bertoli's reply brief, dated 11 Dec. 1991 ........... 2
 –submitted by Rosenfield
 **OPINION & ORDER, filed 19 Dec. 1991**
 Motion for leave to take foreign depositions and for foreign judicial assistance granted ................................................................. 17

45. **Bertoli's Notice of motion for an order to alter bail conditions** ............ 1
 –Filed 22 Nov. 1991
 –Submitted by Bertoli (Pro Se)
 Documents in Support of Motion
 A. Bertoli Aff. & attached copy of arraignment, dated 22 Nov. 1991 ......... 9
 B. Reply brief, dated 5 Dec. 1991 ....................................... 6
 –Submitted by Bertoli
 Documents in Opposition to Motion
 A. Letter brief in opposition, dated 3 Dec. 1991 .......................... 2
 –Submitted by Rosenfield
 **ORDER, filed 17 Dec. 1991**
 Bertoli's motion for alteration of bail conditions granted; Bertoli must notify Pretrial Services of all details of travel ..................................... 2

46. **Bertoli's Notice of Motion for order to enjoin the Supplementary Treaty Request to the Cayman Central Authority** ............................... 1
 –Filed 22 Nov. 1991
 –Submitted by Bertoli (Pro Se)
 Documents in Support of Motion
 A. Bertoli Aff., dated 22 Nov. 1991 ..................................... 3
 Exhibits
 (1) Treaty between U.S. and U.K. concerning the Cayman Islands relating to mutual legal assistance in criminal matters ............ 18
 (2) Supplemental Treaty Request, dated 25 Oct. 1991 ................... 21
 (3) Specific objections to Treaty Request ............................. 3
 B. Brief in support, filed 22 Nov. 1991 .................................. 28
 –Submitted by Bertoli
 C. Reply brief in support with correspondence re: Cayman Islands Depositions, dated 7 Dec. 1991 .......................................... 21
 –Submitted by Bertoli
 D. Notice of objection to both the Supplemental Treaty Request and the request for letters rogatory, dated 5 Dec. 1991 ....................... 2
 –Submitted by Pollack for Cannistraro
 Documents in Opposition to Motion
 Letter brief in opposition, dated 6 Dec. 1991 ............................ 5
 –Submitted by Rosenfield
 **OPINION & ORDER, filed 9 Jan. 1992**
 Bertoli's motion to enjoin the Supplemental Treaty Request denied. ........... 15

| Documents | No. of Pages |
|---|---|

**47. Bertoli's Notice of motion for order to seal the records & testimony received pursuant to Treaty Request until use at trial** ..................... 1
–Filed 2 Dec. 1991
–Submitted by Bertoli
Documents in Support of Motion
A. Bertoli Aff., dated 2 Dec. 1991 ......................................... 4
B. Brief in support, dated 29 Nov. 1991 ................................... 15
 –Submitted by Bertoli
C. Reply brief in support, dated 20 Dec. 1991 ............................. 2
 –Submitted by Bertoli
Documents in Opposition to Motion
A. Brief in opposition, dated 15 Dec. 1991 ................................ 4
 –Submitted by Rosenfield
**OPINION & ORDER, filed 31 Jan. 1992**
Bertoli's motion to seal Cayman Islands records denied ....................... 14

**48. Bertoli's Notice of Motion to dismiss indictment for pre-indictment delay and for selective and vindictive prosecution** ............................. 2
–Filed 6 Dec. 1991
–Submitted by Bertoli (Pro Se)
Documents in Support of Motion
A. Memo of law in support, dated 6 Dec. 1991 ............................ 11
 –Submitted by Bertoli
B. Bertoli Aff., dated 6 Dec. 1991 ........................................ 13
 Exhibits
 1. Ltr. concerning death of Jack Isaacson and Isaacson Affidavit ........ 6
 2. Transcript of SEC proceeding re Liquidated Control Inc., dated 9 Feb. 1984 ........................................................ 182
 3. Jack Isaacson Aff. .................................................. 1
 4. Jack Isaacson Aff. .................................................. 8
C. Reply letter brief in support, dated 3 Jan. 1992 ......................... 15
 –Submitted by Bertoli
Documents in Opposition to Motion
A. Letter brief in opposition, dated 12 Dec. 1991 ........................... 4
 –Submitted by Rosenfield
**ORDER, filed 29 Jan. 1992**
Bertoli's motion for pre-indictment delay denied as moot in respect to the superseding indictment, but leave given to file a motion in relation to Second Superseding Indictment .......................................... 1

**49. Government's Notice of Motion for reconsideration of court's letter-opinion, dated 17 Dec. 1991 granting foreign depositions.** ...................... 2
–Filed 17 Dec. 1991
–Submitted by Rosenfield
Documents in Support of Motion
A. Memo of law in support, filed 27 Dec. 1991 ............................. 9
B. Rosenfield Aff., dated 27 Dec. 1991 .................................... 4
 Exhibit—Euro Bank & Venture Partners Certificates ..................... 1
C. Reply brief in support, dated 16 Jan. 1992 .............................. 2
 –Submitted by Rosenfield
Documents in Opposition to Motion
A. Memo in opposition, dated 7 Jan. 1992 .................................. 10
 –Submitted by Bertoli
B. Bertoli Aff., dated 7 Jan. 1992 ......................................... 14
**OPINION & ORDER, dated 27 Jan. 1992**
Government's motion for reconsideration of the 17 Dec. 1991 letter-opinion and order granting foreign depositions granted ........................... 7
**OPINION & ORDER and AMENDED OPINION & ORDER, dated 27 Jan. 1992**
Bertoli's motion for taking foreign depositions granted; however, depositions shall be presided over by a judge ........................................ 16

Documents No. of Pages

**REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE in Cayman Islands,** signed by Judge Lechner, dated 24 Feb. 1992 ..................... 13

50. **Second Superseding Indictment filed against Bertoli & Cannistraro, 17 Jan. 1992**

 –Ltr. from Rosenfield to delineate changes in the Second Superseding indictment, dated 23 Jan. 1992 .............................................. 6

 **Minutes of Proceeding of 23 Jan. 1992**
 –Eisenberg retracted his not-guilty plea and then entered guilty plea to count 1 of Superseding Indictment. Plea agreement R11 form filed
 –Appearances: Fietkiewicz and Rosenfield (Government)
 Fallick (Eisenberg)

 **Minutes of Proceedings of 27 Jan 1992**
 –Cannistraro pleaded not guilty.
 –Bertoli's application to adjourn for one week to consult w/counsel denied.
 –Bertoli entered not guilty plea.
 –Government's request for bail modification for Bertoli denied.
 –Cannistraro to consider conflict of interest with Pollack and advise court w/in one week if conflict waived.
 –Motions on Second Superseding Indictment to be filed w/in 30 days of receipt of Cayman Islands documents.
 –Bertoli's application for subpoenas granted.
 –Appearances: Warren, Fietkiewicz and Rosenfield
 (Goverment)
 Pollack (Cannistraro)
 Bertoli
 Meanor and Tolomeo (as Bertoli's stand-by counsel)

51. **Government's Application for an ex parte order releasing taxpayer return information** ...................................................... 5
 –Filed 21 Jan. 1992
 –Submitted by Rosenfield
 **ORDER, filed 21 Jan. 1992**
 Ex parte application granted .................................................. 5

52. **Government's Notice of motion to modify Bertoli's bail conditions** .......... 2
 –Filed 29 Jan. 1992
 –Submitted by Rosenfield
 Documents in Support of Motion
 A. Memo of law in support, dated 29 Jan. 1992 ........................... 26
 B. Reply memo in support, dated 20 Feb. 1992 ........................... 17
 C. Letter in support, dated 24 Feb. 1992 .................................. 2
 –Submitted by Warren
 D. Cahill Aff., dated 24 Feb. 1992 .......................................... 11
 Exhibits
 1. Proffer agreement, dated 31 Jan. 1992 ............................... 2
 2. File memo of Bertoli' money transfers, dated 29 Sept. 1988 .......... 1
 3. Fax to Business Services Int'l from Morgan Grenfell, dated 7 Feb. 1990 ................................................................. 2
 4. Fax to Business Services Int'l from Morgan Grenfell, dated 25 April 1990 ................................................................. 2
 5. Copy of check to Morgan Guarantee Trust of NY ................... 1
 6. Copy of check to numbered accounts ............................... 1
 7. Copy of check to numbered accounts ............................... 1
 Documents in Opposition to Motion
 A. Ltr. from Bertoli, dated 10 Feb. 1992 ................................... 5
 B. Supplemental letter brief in opposition, dated 13 March 1992 .............. 3
 –Submitted by Bertoli
 C. Bertoli Aff., dated 13 March 1992 ...................................... 14
 Exhibits
 1. Brochure for Business Services Int'l ................................. 2
 2. Deed of Settlement between Eisenberg and Sydney Coleman, dated 6 March 1985 ....................................................... 17

114

| Documents | No. of Pages |
|---|---|

3. Memo concerning Deed of Settlement between Eisenberg and Sydney Coleman, dated 6 March 1985 ................................. 2

4. Indemnity agreement between Eisenberg and Oshec Ltd. and Paget–Brown, dated 6 June 1984 ....................................... 3

5. Indemnity agreement between Eisenberg & Eastern Funds and Paget–Brown, dated 21 Mar. 1990 ................................. 5

6. Indemnity agreement between Cannistraro, Galteo Ltd, and Paget–Brown, dated 6 June 1984 ....................................... 3

7. Ltr. from Paget–Brown, dated 1 June 1990 w/enclosures ............. 5

8. Exchange between Business Services Int'l concerning a numbered account, dated 8 April 1991 ....................................... 2

9. (1) Ltr. to Morgan Grenfell from Business Services concerning BSI owned funds, dated 6 Feb. 1990 ................................. 2
 (2) Ltr. to Morgan Grenfell from Eastern Funds concerning payment instructions, dated 23 Apr. 1990 ........................... 2

10. Articles about corrupt brokers ...................................... 4

11. Ltr. from Consolidated Bank to SEC re Liquidated Control & Toxic Waste, dated 16 Feb. 1984 ....................................... 1

**Minutes of Proceedings of 25 Feb. 1992**
–Hrg. concerning modification of bail ordered pending further submissions by Bertoli. Trial date set for 11 May 92
–Appearances: Fietkiewicz, Warren and Rosenfield
 (Government)
 Bertoli and Tolomeo (as stand-by counsel)
 Pollack (Cannistraro)

**ORDER, filed 8 April 1992**
Government's motion to modify Bertoli's bail conditions denied ................ 1

53. **Government's application for ex parte order releasing taxpayer information** ................................................................. 5
 – Filed 30 Jan. 1992
 – Submitted by Rosenfield
 **ORDER, dated 30 Jan. 1992**
 Ex parte application granted ................................................. 5

54. **Letter Request by Pollack to court concerning costs in going to Cayman Islands Depositions to be taken by Bertoli**
 – Submitted 13 Feb. 1992 ................................................. 1
 Documents in Opposition to Application
 A. Ltr. from Bertoli, dated 18 Feb. 1992 ................................... 2

55. **Podvey Sachs' Notice of motion for reargument and reconsideration of motion to be relieved as standby counsel** ................................ 1
 – Filed 21 Feb. 1992
 – Submitted by Tolomeo
 Documents in Support of Motion
 A. Certification of Meanor, dated 21 Feb. 1992 ............................ 2
 B. Certification of Tolomeo, dated 21 Feb. 1992 ........................... 2
 Exhibits
 1. Ltr. from Rosenfield delineating changes in Second Superseding Indictment, dated 23 Jan. 1992 ................................... 6
 2. Deletions to Superseding Indictment, dated 29 Sept. 1989 ........... 79
 3. Changes and additions to Second Superseding Indictment, dated 17 Jan. 1992 ....................................................... 97
 **ORDER, filed 23 March 1992**
 Podvey Sachs' Motion for reconsideration of 11 Feb. 1992 letter-opinion and order denied ............................................................ 1

56. **Bertoli's Notice of Motion for production of documents pursuant to Rule 17(c) prior to trial date** ................................................. 1
 – Filed 28 Feb. 1992
 – Submitted by Bertoli

Documents No. of Pages
 Documents in Support of Motion
 A. Bertoli Aff., dated 28 Feb. 1992 ........................................ 2
 Exhibits: correspondence & subpoenas duces tecum ..................... 61
 B. Reply brief in support, dated 30 March 1992 ........................... 8
 – Submitted by Bertoli
 Documents in Opposition to Motion
 A. Ltr. from Fietkiewicz to court in opposition, dated 20 March 1992 ........ 7
 B. Ltr. from Fietkiewicz to court in opposition, dated 1 April 1992 ........... 2
 C. Letter brief in opposition, dated 6 April 1992 ........................... 10
 – Submitted by Rosenfield
 **Minutes of Proceedings of 13 April 1992**
 – Motion for order directing the production of documents prior to trial date to be decided pursuant to R. 78
 **OPINION & ORDER, filed 7 May 1992**
 Bertoli's motion for documents pursuant to Rule 17(c) denied ................. 16

57. **Government's Notice of motion to disqualify Pollack** ....................... 1
 – Filed 13 March 1992
 – Submitted by Rosenfield
 Documents in Support of Motion
 A. Moving Brief, dated 13 March 1992 ..................................... 21
 –Submitted by Rosenfield
 –On the brief—Warren and Fietkiewicz
 Exhibits
 1. Ltr. from Pollack to Fietkiewicz denying conflict of interest, dated 6 March 1992 ......................................................... 3
 2. Cahill Aff. w/attached exhibits, dated 13 March 1992 ............... 7
 3. Cahill Aff. w/attached exhibits, dated 24 Feb. 1992 ................ 22
 4. Indemnity agreement between Cannistraro, Centurion Enterprises and Paget–Brown, dated 21 Feb. 1987 ............................. 5
 5. Ltr. from Warren to Pollack w/enclosures re conflict of interest, dated 16 July 1990 ................................................ 2
 6. Ltr. from Warren to Pollack re conflict, dated 9 Aug. 1990 ......... 1
 7. Ltr from Rosenfield to court advising of conflict, dated 2 Oct. 1990 ..... 7
 8. Ltr. from Pollack to court with attached Pollack Aff., dated 12 Nov. 1990 ............................................................. 5
 B. Ltr. from Fietkiewicz advising of Pollack's conflict of interest, dated 24 Jan. 1992 ............................................................. 2
 C. Ltr. from Warren requesting permission to question Pollack about his conflict of interest, dated 24 Feb. 1992 ................................. 3
 D. Reply memo in support, dated 20 April 1992 ........................... 23
 – Submitted by Rosenfield
 Documents in Opposition to Motion
 A. Memo of law in opposition, dated 2 April 1992 ......................... 34
 – Submitted by Pollack
 **Minutes of Proceedings on 1 May 1992**
 – Government's motion to disqualify Pollack reserved.
 – Cannistraro's application to be returned to federal custody denied.
 –Appearances: Rosenfield and Fietkiewicz (Government)
 Barry and Pollack (Cannistraro)
 Bertoli
 **OPINION & ORDER, filed 12 May 1992**
 Government's motion to disqualify Pollack granted ......................... 39

58. **Podvey Sachs' Notice of appeal from order of 11 Feb. 1992 denying motion to withdraw as Bertoli's standby counsel** ................................. 1
 – Filed 1 April 1992
 – Submitted by Meanor

59. **Bertoli's and Cannistraro's Notice of motion for court to consider motions filed in connection with the Superseding Indictment to be filed in connection with the Second Superseding Indictment** ...................... 3
 – Filed 13 April 1992
 – Submitted by Bertoli and Cannistraro

116

Documents No. of Pages

**60. Bertoli's Notice of motion for discovery under F.R.Crim.P. 16** .............. 4
- Filed 13 March 1992
- Submitted by Bertoli

Documents in Support of Motion

A. Bertoli Aff., dated 13 April 1992 ...................................... 4

Exhibits

1. Ltr. from Chattman to Warren re discovery request, dated 14 Dec. 1989 ......................................................................... 2
2. Chattman Cert. w/enclosures, dated 11 March 1991 ................. 7
3. Ltr. from Tolomeo to Fietkiewicz re scheduling order of 23 May 1990, dated 7 June 1990 ......................................... 2
4. Copy of government's form ltr. to request records, dated 5 March 1990 ......................................................................... 2
5. Ltr. from Rosenfield to Tolomeo re discovery request, dated 29 July 1991 ......................................................................... 2
6. Ltr. from Bertoli to Warren demanding production of documents held by the government, dated 1 Feb. 1992 ....................... 2
7. Ltr. from Fietkiewicz to Bertoli in response to above demand for documents, dated 24 Feb. 1992 ..................................... 3

**61. Bertoli and Cannistraro's Second Set of Pretrial Motions:**
- Filed 13 April 1992
- Submitted by Bertoli and Pollack

A. **Dismiss indictment for prosecutorial misconduct or in alternative, for discovery of grand jury material**

Documents in Support of Motion

1. Brief in support, dated 13 April 1992 ............................... 9
 - Submitted by Bertoli and Pollack
2. Reply Brief in support of all motions ............................... 53
 - Submitted by Bertoli and Cannistraro
3. Reply Exhibits
 a. Transcripts of proceedings, dated 3 July 1991 ................. 2
 b. Testimony of Renschak before SEC, dated 13 July 1983 ........ 4
 c. Confirmations of account transaction .......................... 2
 d. Deposition of Renschak, dated 16 June 1987 ................... 7
 e. Account Information of Isaacson, dated 10 June 1983 .......... 9
 f. Testimony of Scott before SEC, dated 2 Nov. 1983 ............ 10
 g. Newspaper Articles about Lindsley ............................. 8
 h. Discovery Order, dated 13 May 1990 ............................ 6
 i. Newspaper Articles re securities analysts ..................... 6
 j. Affidavit of Bertoli, dated 13 May 1992 ....................... 3
 ja. Bertoli's ltr. to court, dated 6 March 1992 .................. 1
 jb. Government's ltr. to court, dated 13 March 1992 .............. 3
 jc. Bertoli's ltr. to court, dated 24 March 1992 ................. 1
 jd. Ltr. to deputy clerk, dated 9 April 1992 ..................... 1
 je. Ltr. from court, dated 6 April 1992 ........................... 1
 jf. Copy of envelope, postmarked 10 April 1992 ................... 1
 k. Affidavit of Sachs, dated 7 May 1992 .......................... 2
 ka. Ltr. from Sachs to Government, dated 13 Dec. 1989 ............ 2
 l. Transcript of Cayman Islands Depositions proceedings .......... 1
 m. Transcript of Cayman Islands Depositions ...................... 3
 n. Transcript of Cayman Islands Depositions Proceedings .......... 1
 o. Securities Research Reports ................................... 14

B. **Dismiss indictment for pre-indictment delay and for selective and vindictive prosecution**

Documents in Support of Motion

1. Memo of law in support, dated 13 April 1992 ...................... 11
 - Submitted by Bertoli and Pollack
2. Bertoli Aff., dated 13 April 1992 ................................. 15
3. Reply Brief, see supra prosecutorial misconduct motion
4. Reply Exhibits, see supra prosecutorial misconduct motion

Documents No. of Pages
 C. **Preclude Cayman Islands Depositions**
 Documents in Support of Motion
 1. Memo in support, dated 13 April 1992 ............................57
 –Submitted by Bertoli & Pollack
 Exhibit
 Ltr. from Rosenfield to court re changes in Second Superseding
 Indictment, dated 23 Jan. 1992 ...................................6
 2. Reply Brief, see supra prosecutorial misconduct motion
 3. Reply Exhibits, see supra prosecutorial misconduct motion
 D. **Dismiss indictment on grounds that RICO offenses and conspiracy are
 barred by Statute of Limitations**
 Documents in Support of Motion
 1. Brief in support, dated 13 April 1992 ..............................29
 –Submitted by Bertoli & Pollack
 2. Reply Brief, see supra prosecutorial misconduct motion
 3. Reply Exhibits, see supra prosecutorial misconduct motion
 E. **Dismiss Counts One, Two and Seven for failure to state an offense**
 Documents in Support of Motion
 1. Brief in support, dated 13 April 1992 ..............................18
 –Submitted by Bertoli & Pollack
 2. Reply Brief, see supra prosecutorial misconduct motion
 3. Reply Exhibits, see supra prosecutorial misconduct motion
 F. **Dismiss Count Eight**
 Documents in Support of Motion
 1. Brief in support, dated 13 April 1992 ...............................5
 –submitted by Bertoli
 2. Reply Brief, see supra prosecutorial misconduct motion
 3. Reply Exhibits, see supra prosecutorial misconduct motion
 Documents in Opposition to Second Set of Pretrial Motions
 1. Government brief in opposition, filed 4 May 1992 .................132
 2. Unsealed Exhibits
 a. Transcript of Proceedings re Liquidated Controls, dated 9 Feb.
 1984.........................................................1
 b. Transcript of Proceedings re Liquidated Controls, dated 15 Oct.
 1984.........................................................1
 c. U.S.–U.K. Treaty for Mutual Legal Assistance in Cayman,
 dated 3 July 1986.........................................18
 d. Ltr. from CS Gill & Co. to Euro Bank (Grand Cayman) asking
 that the bank not disclose information about Bertoli's ac-
 count, dated 7 Feb. 1986 ...................................2
 e. Ltr. from Pollack to court, dated 8 Aug. 1991 .................1
 f. Ltr. from Rosenfield to court in opposition to Cannistraro's
 request for reimbursement of travel expenses, dated 14 Aug.
 1991.........................................................3
 g. Ltr. from court to Pollack denying reimbursement of travel
 expenses, dated 19 Aug. 1991 ..............................1
 h. Ltr. from Pollack asking for reconsideration of requests for
 travel costs, dated 22 Aug. 1991............................1
 i. Ltr. from court to Pollack denying reconsideration, dated 23
 Aug. 1991 ..................................................1
 j. Ltr. from Rosenfield to court stating Cannistraro has failed to
 establish that he cannot afford attorneys costs, dated 26
 Aug. 1991 ..................................................2
 k. Ltr. from Pollack to Rosenfield, Sachs and Fallick stating that
 Cannistraro cannot pay costs and therefore will not attend
 Cayman proceedings, dated 29 Aug. 1991 ....................1
 l. Ltr. from Fietkiewicz to Pollack saying Cannistraro claim of
 indigency is unsubstantiated, dated 30 Aug. 1991..............1

Documents No. of Pages

 m. Ltr. from Pollack to Warren asking Cannistraro be placed in
 federal custody, dated 24 April 1991 . . . . . . . . . . . . . . . . . . . . . . . . . 2
 n. Government's unsealed aff. in opposition to Cannistraro's Cay-
 man Island motion, dated 4 May 1992 . . . . . . . . . . . . . . . . . . . . . . 3
 o. Ltr. from Pollack to Rosenfield stating that Cannistraro should
 be allowed to stay in federal prison, dated 5 June 1991 . . . . . . . 2
 p. Ltr. from Pollack to court requesting that Cannistraro be
 allowed to waive appearance for hearing on 3 July 1991,
 dated 26 June 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
 3. Government's Sealed Exhibit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Minutes of Proceedings of 19 June 1992**
–Hearing on Second Set of Pretrial Motions; decision reserved.
–Appearances: Fietkiewicz and Rosenfield (Government)
 Bertoli
 Cannistraro

**OPINION & ORDER, filed 22 July 1992** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166
–Bertoli's and Cannistraro's second set of pretrial motions denied.
–Bertoli and Cannistraro granted leave to attend second round of Cayman
 Islands Depositions for cross and recross.
–Bertoli given leave to access the Government's documents.

62. **Cannistraro's letter request for reconsideration of 12 May 1992 Opinion** . . . . . 3
–Dated 27 May 1992
–Submitted by Cannistraro
**ORDER, filed 3 June 1992**
Cannistraro's request for reconsideration denied . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

63. **Cannistraro's Memorandum of Law in support of Motion to Preclude
 Multiple Punishments**
–Formal Motion not filed
–Brief received in chambers 8 June 1992
–Submitted by Cannistraro
Documents in Support of Multiple Punishments Motion
A. Memorandum of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
 Exhibits
 1. Deposition transcripts, Evidentiary Hearing, 24 Sept. 1987 . . . . . . . . . . . 20
 2. Cannistraro Pre–Sentencing Report, dated 10 Feb. 1988 . . . . . . . . . . . . . 41
 3. Transcript of Proceedings, U.S. v. Cannistraro, Crim.Action No. 87–
 193, dated 23 April 1990 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
 4. (a) Ltr. from Warren to Federal Correction Institutions, dated 27
 April 1990 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
 (b) Ltr. from U.S. Parole Commission to Warren re Cannistraro,
 dated 3 May 1990 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Documents in Opposition to Multiple Punishments Motion
Government's letter brief in opposition, dated 11 June 1992 . . . . . . . . . . . . . . . . . 3
–Submitted by Fietkiewicz

64. **Cannistraro's Letter Request for trial date pursuant to Speedy Trial Act or
 for severance**
–Filed June 22, 1992
–Submitted by Cannistraro
Documents in Support of Request
A. Letter from Cannistraro, dated 22 June 1992 . . . . . . . . . . . . . . . . . . . . . . . . . 3
B. Letter from Cannistraro to court, dated 30 June 1992 . . . . . . . . . . . . . . . . . . . 2
Documents in Opposition to Request
A. Government's letter-brief in opposition, dated 25 June 1992 . . . . . . . . . . . . . . 10
B. Government's supplemental letter in opposition, dated 30 June 1992 . . . . . . . 4
 –Submitted by Fietkiewicz
C. Letter from Fietkiewicz to court re Cayman Islands videotapes, dated 7
 July 1992 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
 Exhibits
 1. Ltr. from Fietkiewicz to court re Cayman Islands evidence, dated 5
 Feb. 1992 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

| Documents | No. of Pages |
|---|---|

2. Ltr. from Fietkiewicz to Pollack re Sydney Coleman's testimony, dated 7 Feb. 1992 ........................................... 1

3. Ltr. from Warren to Pollack re Supplemental Treaty Request, dated 20 Feb. 1992 ....................................... 1

4. List of Transcripts that Pollack has received, dated 24 Feb. 1992 ..... 1

5. Ltr. from Docuplex to Warren re copying procedures for the Supplemental Treaty Request documents, dated 25 Feb. 1992 ............. 1

6. Ltr. from Pollack to Reprotech re reproduction of documents, dated 28 Feb. 1992 ........................................ 1

7. Ltr. from Fietkiewicz to Bertoli, Pollack and Tolomeo re reproduction of Cayman Island records, dated 2 March 1992 ................ 2

8. Ltr. from Fietkiewicz to Bertoli and Pollack re copying the videotapes, dated 3 March 1992 ........................................ 1

9. List of videotapes that Bertoli has received, dated 4 March 1992 ..... 1

10. Reprotech ltr. re copies of Cayman Island's evidence ................. 1

11. Receipt from messenger service that delivered reproductions of Cayman Island transcripts, dated March 1992 ..................... 1

12. Ltr. from Fietkiewicz to court, dated 13 March 1992, responding to Bertoli's ltr., dated 6 March 1992 ................................ 3

13. Ltr. from Rosenfield to Bertoli and Pollack re immigration records, dated 23 March 1992 ........................................ 1

**ORDER, filed 8 July 1992**
Cannistraro's letter request for trial date denied;
Cannistraro's request for severance denied; Government ordered to make arrangements for Cannistraro to watch videotapes of Cayman Islands Depositions ................................................................. 2
**ORDER, filed 10 July 1992**
Order, dated 8 July 1992 modified re: viewing videotapes in Federal Building ..... 3
Documents in Response to Order, dated 10 July 1992
1. Cannistraro's letter to court, dated 16 July 1992 ..................... 2
2. Government's letter to court, dated 21 July 1992 ..................... 2

CONCLUSION TO APPENDIX:

A. MOTIONS
1. Government submitted 7
2. Bertoli submitted 22
3. Cannistraro submitted 10

B. LETTER REQUESTS
1. Government submitted 2
2. Bertoli submitted 3
3. Cannistraro submitted 4

C. APPLICATIONS
1. Government submitted 5
2. Bertoli submitted 0
3. Cannistraro submitted 0

D. TOTAL PAGES OF SUBMISSIONS:

| | Motions or Appeals w/Supporting Briefs or Affidavits, etc. | Exhibits |
|---|---|---|
| 1. Government | 806 | 1209 |
| 2. Bertoli | 1080 | 2115 |
| 3. Cannistraro * | 201 | 202 |

E. ORDERS AND OPINIONS FILED: **
1. Total number to date: 59
2. Total pages to date: 783·

---

\* This does not include pages of submissions on which Cannistraro joined in Bertoli's submissions.

\*\* This includes Third Circuit Orders and responses to letter requests.

## TRANSCRIPTS OF DEPOSITIONS AND PROCEEDINGS IN CAYMAN ISLANDS

Document . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Pages
Proceedings of 4 Sept 91 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
Deposition of Nicholas J. Dugan 4 Sep 91 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
Deposition of Sheree Ebanks 4 Sep 91 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
Deposition of M.F.B. Gillooly 4 Sep 91 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
Proceedings of 5 Sep 91 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
Deposition of M.F.B. Gillooly (Volume II) 5 Sep 91 . . . . . . . . . . . . . . . . . . . . . . . . . . 50
Deposition of David Meyeroff 5 Sep 91 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
Deposition of Cecil Chan-a-sue 5 Sep 91 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
Deposition of Timothy Bechard 5 Sep 91 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
Proceedings of 6 Sept 91 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Continued deposition of David Meyeroff 6 Sep 91 . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
Deposition of Delano Solomon 6 Sep 91 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
Deposition of Brian Lundie 6 Sep 91 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Videotaped deposition of Rodney Bend 6 Sep 91 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
Proceedings of 10 Sept 91 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Continued videotaped deposition of Rodney Bend 6 Sep 91 . . . . . . . . . . . . . . . . . . . . 81
Proceedings of 11 Sept 91 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
Deposition of Rodney Bend 11 Sep 91 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138
Deposition of Susan Rivers 11 Sep 91 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Proceedings of 12 Sept 91 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
Deposition of Rodney Coleman 12 Sep 91 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191
Proceedings of 13 Sept 91 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Continued videotaped deposition of Sydney Coleman 13 Sep 91 . . . . . . . . . . . . . . . . 111
Continued videotaped deposition of Rodney Bend 13 Sep 91 . . . . . . . . . . . . . . . . . . 56
Proceedings of 17 Sept 91 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

